**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq. (KR 4963)
John K. Sherwood, Esq. (JS 2453)
Scott Cargill, Esq. (SC 4827)
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Remedial (Cyprus) Public Company Ltd., | Case No. 10-10782 (REG) |
| Debtor. | |

### AFFIDAVIT PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF THE DEBTOR'S PETITION AND FIRST DAY MOTIONS

Stuart Bannerman, pursuant to 28 U.S.C. §1746, declares as follows:

1.       I am the Chief Financial Officer of Remedial (Cyprus) Public Company Ltd., a company incorporated under the laws of Cyprus and the above-captioned debtor and debtor in possession ("Remedial" or the "Debtor").   In this capacity, I have detailed knowledge of the business and financial affairs of the Debtor.  On February 17, 2010, the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").   The Debtor is operating its businesses and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     This Affidavit is being submitted pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") and in support of the relief requested in the First Day Motions (defined below).  Except as otherwise indicated herein, all facts set forth in this Affidavit are based upon my personal knowledge of the Debtor's operations and finances and information gathered from a review of relevant documents, or provided to me by other members of the Debtor's management or professionals.  I am authorized to submit this Affidavit on behalf of the Debtor.  If called upon to testify, I could testify competently to the facts set forth herein.

3.     Part I of this Affidavit sets forth the background information required by Local Rule 1007-2(a) regarding the nature of the Debtor's businesses and a concise statement of the circumstances leading to the commencement of the chapter 11 case.  Several exhibits are attached to this Affidavit, which provide additional information required under Local Rule 1007-2(a).

4.     Part II of this Affidavit describes the "first day" motions (each such motion, a "First Day Motion" and, collectively, the "First Day Motions")[1] through which the Debtor seeks certain forms of relief necessary for a smooth transition to chapter 11.  I have reviewed the relief sought in each First Day Motion and believe the relief requested therein is necessary to enable the Debtor to continue to operate in chapter 11 and to permit the Debtor to successfully reorganize and maintain the value of its business.  Accordingly, I believe the relief sought in the First Day Motions is in the best interests of creditors, the Debtor, and its bankruptcy estate.

---

[1]     Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the corresponding First Day Motion.

## PART I:

## NATURE OF THE DEBTOR'S BUSINESS AND CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

**A.** ***Nature Of Debtor's Business Operations***

5.       Remedial is an early stage company that is in the process of constructing its first two Elevating Support Vessels (the "ESVs") - state of the art, stable offshore work platforms specifically designed to support remedial oil and gas activities, including well intervention and work-overs.  The Debtor's ESVs will be employed to facilitate mature field rejuvenation and increase or maintain production in the later stages of oil and gas wells.

6.       Beneficial heavy well intervention work and remedial services often are not performed in offshore fields due to cost, logistical challenges and/or weight and service limitations of currently available vessels. Remedial's ESVs are designed to fulfill these unmet demands for offshore well intervention and work-over support.

7.       Remedial has entered into two shipyard contracts for the construction of two ESVs, the Guardian and the Solution, with Yantai Raffles and Cosco Shipyard, respectively. Delivery from the shipyards (both located in China) is expected during the 2010 calendar year. However, the Debtor has been plagued by a severe liquidity crisis, due to a lack of significant incoming cash flow, construction cost overruns and substantial delays as to the original vessel delivery dates.

*Jurisdiction and Venue*

8.       Upon information and belief, the Debtor is eligible to be a debtor under Bankruptcy Code § 109 because the Debtor has property located in the United States and because the Debtor has a place of business in the United States.  The Debtor's U.S.-based assets are predominantly located in New York, New York and in Houston, Texas.  The Debtor owns significant pieces of equipment located in Houston that will be used in connection with the operations of the ESVs.  Principal among these assets are two "work-over" rigs (as discussed below), which are specifically built for the ESVs and have a cost value of over $20 million.  In

addition, spare parts owned by the Debtor of significant value, to be used in connection with the ESVs' operations, including four engines, a warehouse full of electronic switchgear, and "rack and chord" equipment (used as part of the jacking component on the ESVs) are also located in Houston. New York is the venue for another of the Debtor's principal assets: the stock certificates of its non-debtor operating subsidiary Remedial Offshore Limited, which is discussed in further detail below. The stock certificates of this entity are held in New York City at the offices of Lowenstein Sandler PC, the Debtor's proposed counsel, on behalf of the Debtor.

9. Equally important, the Southern District of New York serves as the principal place of the Debtor's business in the United States. As described herein, the Debtor has been intently focused on solving its liquidity crisis and implementing a balance sheet restructuring. These restructuring efforts have been and are being conducted by the Debtor's board of directors. Two of the three members of the board are based in New York City (the third residing outside the U.S). The principal business decisions by the Debtor's board, as well as their interaction with the key creditors in this case, the Bondholders (defined below), have taken place in New York City. Moreover, the U.S. legal advisors to the Debtor, the legal advisors to the Bondholders (Bingham McCutchen LLP), and the financial advisors to the Bondholders (AMA Capital Partners, LLC) are located in New York City. Accordingly, this district is the 'nerve center' for the key business decisions and for negotiations concerning the Debtor's restructuring efforts. Moreover, to the extent other participants in this process who reside outside the United States wish to participate in these proceedings (many of whom are located in Europe); this venue provides the most convenient forum in the United States.

*Well Intervention In The Oil And Gas Industry*

10. Well intervention, or 'well work', is any operation carried out on an oil or gas well that alters the state of the well or manages the production of the well. A 'work-over' takes place when changing reservoir conditions or the deteriorating condition of the well necessitates

repair, maintenance or completion of the well. Both well intervention and work-overs are used to maintain production or extend the production life of the well.

11.     There are various pieces of equipment used to perform well intervention and work-overs on offshore oil and gas wells. These include platform rig operations, jack-up drill rigs, and floating barge operations. While each of them can sufficiently handle certain tasks, each method has certain limitations and drawbacks in areas such as cost, logistics, size and service limitations.

*The ESVs*

12.     The ESV is meant to conduct all of the functions of the aforementioned equipment while eliminating many of their drawbacks. The ESV is a revolutionary piece of equipment as there is nothing similar currently on the market or being employed.

13.     The size of each vessel allows customers to increase operating efficiency by working from a stable platform (with reduced sensitivity to weather conditions) and benefit from higher utilization (24-hour operations, concurrent operations on multiple wells), resulting in lower per-well cost of intervention.

14.     The ESV functions both like a typical jack-up rig and like an ocean-going vessel insomuch as it jacks itself up and stands, self-supported, on the ocean floor, yet it also is self-propelled and dynamically positioned, so it can move from point-to-point within an offshore field without requiring tug boats, anchor handlers and comparable support vessels. In addition, because the ESVs are purpose-built to support well intervention and remedial work, each is equipped with high-capacity cranes and offers ample usable (undedicated) deck space and high deck-load capacity.

15.     The ESV design is based on the skeleton structure of an industry standard "300 class" jack-up drilling rig, meaning a rig that can stand and work in 325-foot (100 meter) nominal water depths. More than 30,000 oil and gas wells have been drilled worldwide by "300 class" rigs, so the ESVs will be capable of supporting services throughout this universe of

existing wells and facilities. As underlying commodity prices have risen over the past few years, oil and gas operators have shown increasing interest in pursuing well intervention and work-overs to enhance hydrocarbon production from mature wells and fields.

*Shipyard Contract With Yantai Raffle for the ESV Guardian*

16.     In November 2006, Remedial entered into its first shipyard contract for the construction of an ESV with Yantai Raffles. The basic price was $81,357,720, to be paid in nine installments. The yard's liability is limited to 10% of the contract price. Ownership of the ESV passes progressively to Remedial during construction in accordance with the payment schedule, but the yard has the risk of loss or damage to the rig until the ESV's delivery date. Liquidated damages for late delivery are limited to 3% of contract value.

17.     The forecast delivery date for the ESV Guardian is June 2010.  Originally, the delivery period was to be eighteen months.

18.     As part of the Restructuring Proposal (defined below), Remedial sought to enter into an agreement to defer part of the final installment under the contract of $7,000,000.  In response, Yantai Raffles proposed that a party associated with Yantai Raffles would lend an amount equivalent to the final installment of $7,000,000 for 12 months at an interest rate of 10%, secured on a *pari passu* basis with the Bondholders (defined below).  This proposal has not been agreed to by all parties.

*Shipyard Contract With Cosco Shipyard for the ESV Solution*

19.     In February 2007, Remedial entered into its second shipyard contract for the construction of a second ESV with Cosco Shipyard. The basic price was $84,000,000, to be paid in five installments.  Ownership of the ESV unit passes progressively to Remedial during construction. Liquidated damages for late delivery are limited to 4%.

20.     The forecast delivery date for the ESV Solution is March 2010, eighteen months after the original expected delivery date.

21.     On August 16, 2009, Remedial entered into an amendment to the construction contract with Cosco to allow for part of the final installment under the contract of $7,000,000 to be paid 12 months after delivery of the vessel pursuant to a note secured by the vessel bearing an interest rate of 3 %. The amendment also allows for the vessel to be stored at the shipyard for 90 days following delivery free of charge.

22.     Remedial entered into an agreement with Cosco on February 11, 2010, as part of the Restructuring Proposal (as defined below) pursuant to which, *inter alia*, Cosco agreed to receive a $7,000,000 promissory note from Remedial in partial discharge of the final payment due under its construction contract, with the remaining amount of the final payment being due in cash.   Cosco also agreed that, following a default, the promissory note and the construction contract could be assigned to a third party who had adequate financing available to satisfy any further payments due under the promissory note and/or the construction contract.

23.     On February 11, 2010, the Debtor entered into a further amendment to the construction contract with Cosco pursuant to which it was agreed that, in conjunction with the penultimate payment to Cosco, the Debtor would provide Cosco with first-ranking security over the ESV (Solution), in a form acceptable to Cosco, for the final deferred $7,000,000 installment. Cosco is to use this security to obtain a Sinoinsure insurance policy.

*Owner Furnished Equipment For Third Vessel*

24.     Initially, Remedial planned on procuring long-lead materials and equipment for a potential third vessel. The key commitments involved leg material, thrusters, cranes and engines, which have been delivered. As a result of the liquidity crises facing the company, Remedial is in the process of marketing and selling certain pieces of this owner-furnished equipment ("OFE") and intends to use the proceeds to help finance its operations.   Certain of the OFE for the third vessel, in particular the four engines, rack and chord material which secure the $3 million released to date from the NTM Account (as defined below) and which is located in Houston, Texas.

*Employment Of The ESV Units*

25.     During 2008, the Debtor's subsidiary, Remedial Offshore Limited, was awarded a 2-year contract with Chevron Offshore (Thailand) Limited ("Chevron"), to provide one of its ESVs for operations in the Gulf of Thailand. During the first quarter of 2009, an amendment was signed which gave Chevron the right to designate the contract commencement date by providing Remedial with 90 days' advance written notice. If Chevron does not designate the commencement date on or before March 1, 2010, the contract will automatically terminate without penalty.  To this date, Chevron has not designated the contract commencement date and because the vessels will not be delivered until after the expiration date, it is doubtful that Chevron will exercise its rights under the agreement

26.     Remedial has subsidiaries in Mexico and Malaysia that are attempting to procure contracts from their respective national gas companies and continues to market its ESVs to major oil and gas operators with a view to securing long-term charter contracts.  A subsidiary of Remedial has an opportunity to submit a tender for the employment of one of the units on a three year contract.

**B.     Pre-Petition Indebtedness And Capital Structure**

*Bond Loan*

27.     On or about March 28, 2007, the Debtor issued a five-year $210 million Norwegian law bond at a 360-day interest rate equivalent to 3-month USD LIBOR plus 5.25% (the "Bond Loan").  The Bond Loan is secured by a floating charge granted by Remedial to the Loan Trustee (as defined below) in respect of its rights, titles and interests in and to certain the Construction Contracts (as defined in the Prepetition Loan Agreement).

28.     The Bond Loan was also previously secured for the benefit of the bondholders (the "Bondholders") over an escrow account into which the proceeds of the Bond Loan were deposited (the "Escrow Account").

29.     Remedial defaulted under the terms of the Bond Loan in or about September 2009 when it failed to make an interest payment of $3.1 million.  Remedial was, as a consequence of that default, unable to access the approximately $56.5 million in the Escrow Account (although a meeting of the Bondholders did resolve to permit drawdowns by Remedial in an aggregate amount of $3 million, as outlined in Paragraph 31 below).

30.     As part of the discussions which led to the Restructuring Proposal (defined below), the balance of the proceeds of the Bonds were moved from the Escrow Account to an account (the "NTM Account") held in the name of Norsk Tillitsmann ASA (the "Loan Trustee") upon the instruction of Remedial.

31.     In December of 2009, during the restructuring discussions, the Bondholders authorized the Loan Trustee to advance $3 million from the NTM Account.  The release of these funds was secured by additional collateral provided by Remedial and Remedial Offshore Limited over certain OFE, engines, and rack and chord material.  The full $3 million has since been released from the NTM Account leaving a balance of approximately $53.5 million.

32.     On February 16, 2010, the Loan Trustee issued a notice of acceleration and demand to Remedial in respect of the amounts due under the Bond Loan Agreement as a result of the continuing default.

*Unsecured Creditors*

33.     As of the Petition Date, the Debtor had approximately $11 million in outstanding unsecured obligations to various creditors.  A list of the Debtor's largest unsecured creditors is included in this Affidavit as **Exhibit A**.

34.     The two largest unsecured creditors, not including any potential deficiency claim by the Bondholders, are Swedbank AB ("Swedbank") and SEB Enskilda ("SEB").  The claim by Swedbank is approximately $7.2 million as a result of the termination of three interest rate swap confirmations following a missed payment, which was due on September 28, 2009.  The claim from SEB is approximately $2.6 million under an engagement letter, pursuant to which SEB was

engaged by Remedial to provide financial advice on a restructuring of Remedial's capital structure and is contingent upon a successful restructuring of, or rights issue by, the Debtor, which has not occurred.

*Corporate Structure*

35.    The Debtor is the parent company, directly or indirectly, of various non-debtor entities. A corporate structure diagram is attached as **Exhibit B**.

36.    The Debtor is not only the parent entity of the corporate group, but is also the holder of the ESV construction contracts, the purchase orders for certain OFE, and assets consisting of, among other things, the two work-over rigs, four engines, a warehouse full of electronic switchgear, and spare parts, all located in Houston.

37.    Non-debtor Remedial Offshore Limited is responsible for the commercial activities of the group. Remedial Offshore Limited submits tenders and commercial proposals to clients for the employment of the vessels either in its own name or through its operating subsidiaries. It provides expatriate offshore crews to the vessels, sets operating policies and practices and establishes the quality, health, safety and environmental policies of the group. Remedial Offshore Limited granted security over certain OFE located in Houston, Texas for the $3 million of funds drawn down from the NTM Account since December 2009. Remedial Thailand, a branch of Remedial Offshore was established in the hopes of procuring work from Chevron. It is anticipated that this branch will be closed in the near future.

38.    Non-debtor Remedial Offshore LLC (USA) provides engineering and procurement support to the group and will set the maintenance policies for the vessels and equipment and provide maintenance support.

39.    Non-debtor Remedial Offshore de Mexico SA de CV (Mexico) is an operating entity established to submit commercial proposals and operate vessels in the Gulf of Mexico offshore from Mexico.

40.     Non-debtor Remedial Offshore M Sdn. Bhn (Malaysia) is owned by Remedial Offshore Limited.   The company is an operating entity established to submit commercial proposals and operate vessels offshore from Malaysia.

*Equity Structure*

41.     The Debtor has one class of stock, which is registered with the Norwegian Central Securities Depository (VPS) under the securities identification code (ISIN) CY 0100130919. The Registrar of the Company is DnB NOR Bank ASA, Registrars Department.  The Debtor's current authorized share capital is $150,000, consisting of 60,000,000 shares, each with a par value of $0.0025.  As of September 30, 2009, there were 29,440,924 shares issued and fully paid.  The Debtor's shares are listed on the Oslo Axess stock exchange, but are currently suspended from trading as a result of recent events.

**C.     *Events Leading To The Debtor's Chapter 11 Filing***

42.     Remedial is suffering from a severe liquidity crisis after defaulting under the terms of the Bond Loan.  Since that default, the Bondholders have agreed to make $3 million available from the NTM Account, which has been exhausted.  The Bondholders are unwilling to continue to make funds available to Remedial outside of an organized court process, but are prepared to make the a loan available (the "DIP Loan") as part of the chapter 11 process. Without sufficient cash on hand, the completion of construction of the ESVs is at substantial risk.   While the Debtor's projections after the Bond Loan provided ample liquidity for the construction of the vessels, several causes led to the current liquidity crisis.

43.     The construction of the ESV vessels has been plagued by cost overruns and unexpected delays.  The total cost for the ESV Solution was originally projected at $136.1 million, but the most recent forecast predicts the final price to be $160.9 million.  The total cost for constructing the ESV Guardian was originally projected at $132.5 million but the most recent forecast estimates the final price to be $157.3 million.

44.     Moreover, Remedial expected both ships to be delivered within 18 months of the start of construction on each vessel. Construction on the ESV Solution commenced in February 2007 and it is not expected to be delivered until March 2010, over three years after start of construction. Construction of the ESV Guardian commenced in November 2006 and it is not expected to be delivered until June 2010, three and a half years after the start of construction.

45.     Another cause of the liquidity crunch facing Remedial is that it has marginal incoming revenue. Currently, there is only one option (Chevron) to use the ESV but it is unlikely to be exercised prior to the expiration of the option period. Due to the uncertainty with respect to delivery of the vessels, no other firm contractual arrangements for the use of the ESVs have been made to date.

46.     The only other revenue stream is from the sale of various OFE which was originally purchased in the hopes of constructing a third ESV. For instance, Remedial recently sold a blowout preventer piece for $850,000, with $150,000 in payment up front and the remaining payments due in early March, 2010. However, this revenue is not nearly enough to remedy the Debtor's liquidity crisis.

*Restructuring Proposal With Bondholders*

47.     Recognizing the liquidity issues, Remedial summoned its Bondholders to confer on the best possible means to restructure Remedial's balance sheet. The Bondholders initially requested that the Debtor's shareholders contribute funds to the Debtor, however, the shareholders revealed that they were unwilling to provide any additional funds.

48.     Recently, an extraordinary general meeting of the Debtor's shareholders and a meeting of the Bondholders approved a proposal (the "Restructuring Proposal") which sought to convert all of the indebtedness under the Bond Loan, except for $56.5 million (being the amount equivalent to the approximately $53.5 million currently held in the NTM Account and the $3 million that has been advanced from the account to Remedial since December 2009), to new shares representing 95% of the company. Current shareholders would have retained their shares

resulting in a pro rata allocation of 5% of the enlarged share capital. The $53.5 million held by the Loan Trustee would have been made available as a residual loan for Remedial to use for agreed shipyard payments to procure delivery of the ESV vessels (provided that a payment of $7 million to each shipyard would be deferred for twelve months) and general corporate purposes. The Restructuring Proposal allowed for an additional debt facility of $20 million to be secured against the ESV vessels ranking on an equal basis to the remaining loan from the Bondholders.

49.    A condition precedent to the approval of the Restructuring Proposal by the Bondholders was that Swedbank and SEB, the two unsecured non-critical creditors holding alleged claims worth approximately $10 million (Remedial disputes SEB's claim), would agree to accept $1.5 million to settle their claims in full (up to $1.25 million to Swedbank and up to $0.25 million to SEB). The Restructuring Proposal was not economically viable if Remedial was unable to reach a compromise of the claims by Swedbank and SEB, and further, the Bondholders would not agree to payments of this magnitude being made in full to unsecured creditors who were not critical to the delivery of the ESVs under a Restructuring Proposal which involved the equitization of their secured bond loan. The proposed settlement amounts were based upon an estimate of the costs to be saved by avoiding filing this chapter 11 case, and a liquidation analysis which was undertaken that indicated the proposed settlement amounts were likely in excess of the amounts such creditors would receive under a liquidation (on a liquidation SEB would not receive anything). Swedbank and SEB did not agree to the proposed terms to settle their claims and Remedial was left with no option but to file this chapter 11 case.

50.    Through this bankruptcy proceeding, the Debtor intends to market its assets for sale to the highest and best bidder in an abbreviated but open process. The Bondholders are prepared to fund such a bankruptcy proceeding through the provision of a DIP Loan. While the Bondholders have to date agreed to advance $3 million to the Debtor from the NTM Account to support the Debtor's efforts to find a solution for its financial difficulties, the Bondholders are not prepared to make further funding available to the Debtor outside of such an organized court process.

51. Accordingly, I believe that commencement of this chapter 11 case is necessary and in the best interests of creditors. The Debtor filed its Chapter 11 petition to stabilize its day-to-day operations, avail itself of the protective provisions of the Bankruptcy Code, and preserve and protect the value of its assets for the benefit of its creditors. The Debtor believes that, under the protection of the Bankruptcy Code, it will be able to maximize the value of its assets for the benefit of all creditors and propose and implement a plan of reorganization.

**D.    *Other Information Required Pursuant To Local Rule 1007-2***

52. Pursuant to Local Bankruptcy Rule 1007-2(a)(3), an *ad hoc* committee of the Bondholders was formed when Remedial first breached the terms of the Bond Loan. On behalf of the Bondholders, the Loan Trustee engaged a financial advisor, AMA Capital Partners LLC, and a legal adviser, Bingham McCutchen, LLP, to perform due diligence and give advice with respect to the Bondholders' position and the Restructuring Proposal. The ad hoc committee of Bondholders comprises approximately 76% of the outstanding bonds.

53. Pursuant to Local Bankruptcy Rule 1007-2(a)(4), attached hereto as **Exhibit A** is a consolidated list of the names, addresses and, where available, telephone numbers, of the creditors of the Debtor holding the 20 largest unsecured claims, excluding insiders.

54. Pursuant to Local Bankruptcy Rule 1007-2(a)(5), attached hereto as **Exhibit C** is a list of the names, addresses, amount of claim and brief description and estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed, of the holders of the five largest secured claims.

55. Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the Debtor's consolidated assets are $157,011,763, and the Debtor's consolidated liabilities are $237,304,364. The Debtor's main assets are the two ESVs, located in China. The Debtor also owns equipment across the world including thrusters in Finland, a large crane in Malaysia, and two work-over rigs, GE engines, and rack and chord material in Houston, Texas.

56.     Pursuant to Local Bankruptcy Rule 1007-2(a)(7), Remedial has one class of shares registered with the Norwegian Central Securities Depository (VPS) under the securities identification code (ISIN) CY 0100130919. The Registrar of the Debtor is DnB NOR Bank ASA, Registrars Department. The Company's current authorized share capital is $150,000, consisting of 60,000,000 shares, each with a par value of $0.0025. As of September 30, 2009, there were 29,440,924 shares issued and fully paid. Svein Eggen, one of the Debtor's directors, owns 250,800 shares and Stuart Bannerman, the Chief Financial Officer, owns 71,500.

57.     Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the Bondholders are in possession of approximately $53.5 million that the Debtor no longer has access to as a result of the default under the Loan Agreement with the Bondholders. The Bondholders are represented by the Loan Trustee, AMA Capital Partners LLC as financial advisor, and Bingham McCutchen, LLP as legal advisors.

58.     Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the Debtor does not lease or own any real property.

59.     Pursuant to Rule 1007-2(a)(10), the Debtor's substantial assets are located in the New York, New York; Houston, Texas and China. The Debtor's books and records are located in the Bahamas; and Texas. The Debtor holds the following assets outside the territorial limits of the United States.

- ESV 1, the Guardian, is located in Yantai, China.
- ESV 2, the Solution, is located in Qidong, China.
- Thrusters are located at Steerprop in Finland.
- Large Crane is located at Favco in Malaysia.

60.     Pursuant to Rule 1007-2(a)(11), the Debtor is not a party to any pending litigation.

61.     Pursuant to Rule 1007-2(a)(12), the Debtor's existing senior management team is comprised of Stuart Bannerman, Michael D. Brown, Dennis Corley and Gerald Raabe.

62.     Mr. Bannerman joined Remedial in April 2007 as Chief Financial Officer.  Mr. Bannerman has over 20 years of experience in the oil and gas industry, including CFO responsibilities with various oil and gas contracting entities.  He has had extensive experience with the financial and commercial management of vessel operations, fabrication yards and personnel operations.  Most recently he was CFO of Technip USA Inc, an entity with annual revenues in excess of $1 billion.

63.     Mr. Brown has been Vice President of Construction of Remedial since it was established in September 2006. Mr. Brown has more than 40 years of experience in the oil and gas business. He has engaged in detailed engineering, design and rig construction on a global basis. His many installed components are still utilized and working throughout the global drilling rig fleet.

64.     Mr. Corley is Vice President of Operations.  He has over thirty years' experience in work-over, snubbing, coiled tubing and well control services, including onshore and offshore well recovery and work-over operations. His experience with high-pressure wells includes controlled exploratory and production wells in Bolivia, Colombia, Venezuela, Kuwait, Algeria, Mexico, Australia, Libya, Turkmenistan, Argentina, Gabon, Cameroon, and Egypt. Prior to joining Remedial, he was senior well control specialist for Cudd Pressure Control.

65.     Mr. Raabe is Vice President of Quality, Health, Safety and Environment.  Mr. Raabe has thirty years of oil and gas engineering and operations experience with Gulf Oil and Chevron in various production, purchasing, logistics and drilling-related capacities. He has vast international experience (both in-country and rotational assignments) in the Far East, Middle East and West Africa. With a background in onsite well control supervision, he oversaw Chevron's accredited IADC Well Control School, developed multi-million dollar contracts and drilled fresh water wells for several townships in Nigeria.

66.     Remedial is currently without a Chief Operating Officer and a Chief Executive Officer.  Effective February 1, 2010, the interim Chief Operating Officer, Svein Eggen, resigned.

67.     The Board of Directors is comprised of Eugene Davis (Chairman of the Board), Svein Eggen, and Bradley Eric Scher.

68.     Mr. Davis, 54, is the Chairman and Chief Executive Officer of PIRINATE Consulting Group, LLC, a privately-held consulting firm specializing in turn-around management, merger and acquisition consulting, hostile and friendly takeovers, proxy contests and strategic planning advisory services for domestic and international public and private business entities. Since forming PIRINATE in 1997, he has advised, managed, sold, liquidated and/or acted as a Chief Executive Officer, Chief Restructuring Officer, Director, Committee Chairman and/or Chairman of the Board of a number of businesses, including companies operating in the telecommunications, automotive, manufacturing, high-technology, medical technologies, metals, energy, financial services, consumer products and services, import-export, mining and transportation and logistics sectors. Prior to forming PIRINATE, Mr. Davis served as President, Vice-Chairman and Director of Emerson Radio Corp, and CEO and Vice-Chairman of Sport Supply Group, Inc. He began his career as an attorney and international negotiator with Exxon Corp. and Standard Oil Company (Indiana) and as a partner in two Texas-based law firms where he specialized in corporate/ securities law, international transactions and restructuring advisory. Mr. Davis holds a BA from Columbia College, a Masters of International Affairs (MIA) in International Law and Organization from the School of International Affairs of Columbia University and a JD from the Columbia University School of Law.  Mr. Davis performs his duties as a director of the Debtor mostly in New York City.

69.     Mr. Eggen has in-depth experience in the global oil & gas service industry through more than 30 years in the business. He was President & CEO of Technip Offshore Inc. until 2005. He has held leading positions with Aker-related companies, including President & CEO of Aker Maritime ASA and President & CEO of Aker Maritime Inc. in Houston. He serves as a Director of Cidra Corporation Inc., Global Tender Barges ASA, Securo AS and Midt-Norsk Betong AS. He is a Norwegian citizen who resides in London.

70.     Mr. Scher is currently the Managing Member of Ocean Ridge Capital Advisors, LLC ("Ocean Ridge"), a privately held consulting firm formed in 2002 to provide financial and operating consultative services to institutional investors, boards of directors of public and private companies and to managements of public and private companies.  Mr. Scher has been a member of the boards of directors of both private and public companies, including Atari, Inc., The Antioch Company, CCLM Holdings, Geo Specialty Chemicals, FLAG Telecom, Impact Services, Sun Cruz Casinos, Refco, Inc., Telespectrum Worldwide, Advanced Glassfiber Yarn, Norwood Promotional Products, Winthrop Realty Trust and O-Cedar Brands.  Prior to the formation of Ocean Ridge, Mr. Scher was a Managing Director for PPM America, Inc., managing in excess of $1 billion of investments for a special situations fund.  Previously he was a Director with TIAA-CREF in the special loans unit of the investing arm of this insurance and pension company.  Prior to TIAA-CREF, Mr. Scher was an Investment Manager in the Private Placements division of The Travelers and was a middle market lending officer with Chemical Bank.  Mr. Scher is a graduate of Yeshiva University, where he earned his bachelor's degree in economics and finance.  Mr. Scher is also a graduate of Fordham University's Graduate School of Business where he earned his MBA.  Mr. Scher resides in New Rochelle, New York.  Mr. Scher performs his duties as a director of the Debtor mostly in New York City.

71.     Pursuant to Rule 1007-2(b)(1), the estimated gross amount of payroll obligations to employees of the Debtor (exclusive of officers, directors and stockholders) for the thirty-day period following the commencement of the Debtor's chapter 11 case is $0.00.  The Debtor does not have any employees as only the non-debtor subsidiaries hire employees.  These non-debtor subsidiaries engage payroll companies to pay their employees.  The Debtor transfers funds to the accounts of the non-debtor subsidiaries, which then make payments to the appropriate payroll company.

72.     Pursuant to Rule 1007(b)(2), the estimated proposed gross amounts to be paid to the Debtor's officers, stockholders, directors and financial or business consultants for services for the thirty-day period following the commencement of the Debtor's chapter 11 case is

$49,250.  This aggregate total is comprised of $28,000 to be paid to Officers, $6,250 to be paid to directors, and approximately $15,000 for reimbursement of travel expenses for officers and directors.

73.     Pursuant to Rule 1007-2(b)(3), attached hereto as **Exhibit D** is the Debtor's projected 12-week cash flow.

## PART II:

## FACTS IN SUPPORT OF FIRST DAY MOTIONS

74.     Concurrently with the filing of the chapter 11 petition, the Debtor filed the First Day Motions.  The Debtor requests that each of the First Day Motions described below be granted, as each constitutes a critical element in achieving a successful transition to Chapter 11.

75.     The following paragraphs summarize only the most salient provisions of the First Day Motions.  The Debtor respectfully refers the Court to the respective First Day Motions for more detailed descriptions.

A.      ***Debtor's Motion For An Order (1) Authorizing The Debtor To (A) Continue and Maintain its Cash Management System, (B) Continue And Maintain its Existing Bank Accounts And (C) Use Existing Business Forms; (2) Granting Interim Waiver of Section 345 Investment Guidelines; and (3) Granting Related Relief ("<u>Cash Management Motion</u>").***

76.     The Office of the United States Trustee has established certain operating guidelines for debtors in possession.  These guidelines typically require chapter 11 debtors to, among other things, (a) close all existing bank accounts, (b) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes, (c) maintain a separate debtor in possession account for cash collateral, and (d) obtain checks for all debtor in possession accounts which bear the designation "debtor in possession," the bankruptcy case number, and the type of account.  These requirements are generally designed to provide a clear line of demarcation between pre-petition and post-petition transactions and operations and

to prevent the inadvertent post-petition payment of pre-petition claims through the payment of checks drawn prior to the filing of a petition.

77. Prior to the commencement of this chapter 11 case, as part of its ordinary business practices, the Debtor maintained three bank accounts, a cash management system, business forms and checks, and engaged in customary investment practices that are consistent with those followed by similar business enterprises.

78. As more fully set forth in the Cash Management Motion, to avoid disruption to the ordinary and usual cash management and day-to-day operations of the Debtor, and to ensure an orderly transition into chapter 11, the Debtor requests an order authorizing the Debtor to continue to use its existing bank accounts, cash management system, checks, and business forms and to keep its customary investment practices.

79. Part of the Debtor's usual cash management involves transferring funds from its accounts to the accounts of non-debtor subsidiaries, so that these subsidiaries can pay their obligations in the ordinary course of business. The Debtor requests that this practice continue just like the other ordinary cash management practices that the Debtor has been using prepetition, including the Debtor's practice of maintaining records of all fund transfers to its subsidiaries.

80. The Debtor also requests that the banks at which the Debtor maintains its existing accounts be entitled to receive payment of both pre-petition and post-petition service and other fees, costs, charges, and expenses to which such banks may be entitled under the terms of, and in accordance with, its contractual arrangement with the Debtor.

81. The Debtor submits that continuation of its existing bank accounts and cash management system and the use of its ordinary checks and business forms are essential to a smooth and orderly transition into chapter 11 and to a successful resolution of this chapter 11 case.

**B.**     ***Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e),***

*364(c), 364(d)(1), and 364(e); and (B) Utilize Cash Collateral of Prepetition Secured Parties; (ii) Granting Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (IV) Granting Related Relief ("DIP Motion")*

82.     The Debtor's secured bondholders, represented by a bond trustee ("DIP Trustee"), have agreed to provide a $5 million term loan as post-petition secured financing to the Debtor.  By the DIP Motion, the Debtor requests, among other things, authority to (i) obtain this post-petition secured financing from the DIP Trustee in accordance with the DIP Financing Documents; (ii) grant the DIP Trustee first priority liens and security interests in the Postpetition Collateral; (iii) accord the Postpetition Obligations "super-priority" administrative claim, subject only to the Carve-Out; (iv) provide adequate protection to the prepetition bond trustee in the form of junior replacement liens; and (v) modify the automatic stay in certain respects in connection with the DIP Facility.

83.     Upon the entry of an interim order approving the DIP Motion, the Debtor will be permitted to borrow up to an aggregate of $2 million.  Upon entry of a final order approving the DIP Motion, the Debtor will be permitted to draw up to a maximum aggregate principal amount of $5 million as a term loan (including any amounts drawn down under the interim order), in intervals subject to the completion of certain milestones in the Debtor's chapter 11 case.

84.     The DIP Facility will accrue interest on a daily basis at a rate equal to 12.0% per annum.

85.     Due to the liquidity crisis it is facing, the Debtor needs the DIP Facility to finance administrative expenses and other general corporate purposes in accordance with the Budget.  The DIP Trustee has specifically permitted the Debtor to transfer the proceeds of the DIP Facility to any non-debtor subsidiary to pay obligations incurred in the ordinary course as provided for in the Budget or as consented to by the DIP Trustee.

86.     Subject to the Carve-Out, the Postpetition Obligations will have "super-priority" administrative expense status and will be secured by substantially all the post-petition

assets of the Debtor, including avoidance actions under Chapter 5 of the Bankruptcy Code.

87.     Because the Debtor's existing cash on hand is not sufficient to fund its on-going working capital requirements, the Debtor believes that approval of the DIP Facility is critical if it is to continue to operate its business and continue and complete the construction of the ESVs in the ordinary course. The Debtor further believes that obtaining a firm commitment for post-petition financing will not only enhance the Debtor's liquidity and enable it to meet its day-to-day working capital requirements, but will also provide vendors, consultants, contractors and suppliers with confidence that the Debtor has sufficient resources available to continue construction of the ESVs. If the Debtor's creditors, vendors, consultants, contractors and suppliers perceive a risk to the Debtor's ability to honor its post-petition obligations, the Debtor's business will deteriorate drastically and construction would cease -- which would materially impair the Debtor's ability to execute its restructuring plan and provide a recovery to its creditors.

88.     The Debtor has determined in the exercise of its sound business judgment that the DIP Facility is the Debtor's best option under the circumstances and provides the most favorable terms to the Debtor's estate. Specifically, the DIP Facility will provide the Debtor with the liquidity necessary for it to continue its operations throughout this chapter 11 case, for the benefit of its estate.

89.     It is the Debtor's view that it would have been virtually impossible for the Debtor to obtain post-petition financing on an unsecured basis, pursuant to section 364(a) or (b) of the Bankruptcy Code, under the circumstances. Further, even if the Debtor had unencumbered property adequate to attract sufficient unsecured credit, the Debtor does not believe, given the magnitude of its secured obligations, the incomplete stage of construction, and the attendant risks and unknowns with the prototype ESVs, that such unsecured credit, even if granted administrative priority, would have been on more favorable terms than those offered by the Lender.

90.     Additionally, the feedback received was that the Bondholders would not

be willing to subordinate their Prepetition Loan, eliminating the Debtor's ability to obtain secured financing without granting superpriority or administrative expense treatment.

91. Finally, the terms of the DIP Facility, which the Debtor believes are fair and reasonable, were negotiated in good faith and at arm's length, with all parties represented by experienced counsel.

[Signature page to follow.]

<u>**CONCLUSION**</u>

92.     The Debtor respectfully requests that all of the First Day Motions be granted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief.


Dated:  February 18, 2010

                                        /s/ Stuart Bannerman_____
                                        Stuart Bannerman
                                        Chief Financial Officer
                                        **Remedial (Cyprus) Public Company Ltd.**

# Exhibit A
## TOP TWENTY CREDITORS

| Creditor Name | Amount of Claim |
|---|---|
| Swedbank AB<br>105 34 Stockholm<br>Sweden | $7,162,265.02 |
| SEB Enskilda<br>PO Box 1363<br>Vika, NO-0113 Oslo<br>47 21 00 85 41 | $2,600,000.00 |
| Siemens Energy, Inc. Oil & Gas<br>15990 N. Barkers Landing, Suit<br>Suite 100<br>Houston, TX 77079<br>281-668-3277 | $653,667.00 |
| Favelle Favco Crames (M) Snd.<br>26360 FM 106<br>Harlingen, TX 78550<br>956-428-7488 | $356,251.65 |
| Bingham McCutchen (London) LLP<br>41 Lothbury<br>London EC2R7HF<br>England<br>020-7661-5310 | $200,765.33 |
| Le Tourneau Technologies<br>6500 Brittmore Road<br>Houston, TX 77041<br>832-782-6500 | $76,739.25 |
| PricewaterhouseCoopers, Ltd.<br>City House<br>6 Karaiskakis Street CY<br>Limassol 3032, Cyprus<br>+357-25555000 | $41,614.82 |
| Dixie Pipe Sales, Inc.<br>2407 Brollier Street<br>Houston, TX 77054<br>713-736-2021 | $2,255.35 |
| Higgins Supply Inc.<br>1769 Upland<br>PO Box 19449<br>Houston, TX 77224-9449<br>713-932-9700 | $946.00 |
| Matherne Instrumentation<br>128 Capital Blvd.<br>Houma, LA 70360<br>985-876-9808 | $281.77 |
| Ameren Sales International<br>4311 FM 2351, Suite A<br>Friendswood, TX 77546<br>281-922-2612 | $22.48 |
| Kjetil Berg<br>DnB Bank ASA<br>Verdipapiservice<br>Stranden 21, 0021<br>Oslo, Norway<br>011 47 22 48 12 17 | Unknown |

# Exhibit B



# Exhibit C
# 5 largest secured creditors

| Creditor Name | Amount of Claim |
|---|---|
| Norsk Tillitsmann ASA, as trustee for the holders of FRN Remedial Cyprus PCL Secured Callable Bond Issue 2007/2012 (ISIN#: NO 001 0360340) | $210 million face amount |

# Exhibit D
## 13 week cash flow

**Remedial (Cyprus) Consolidated**
**Cashflow Forecast 2010**
**13 Week Cash Budget**
**15-Feb-10**

| | 1 | | | | | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fri | Mon | Tue | Wed | Thur | Fri | | | | | | | | | |
| **Week Commencing** | 12-Feb | 15-Feb | 16-Feb | 17-Feb | 18-Feb | 19-Feb | 21-Feb | 28-Feb | 7-Mar | 14-Mar | 21-Mar | 28-Mar | 4-Apr | 11-Apr | 18-Apr |
| **Revenue from Operations** | | | | | | | | | | | | | | | |
| OFE Sales - Favco/BOP | | | 0.15 | | | | | | 0.70 | | | 1.40 | | | |
| **Total Revenue from Operations** | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.70 | 0.00 | 0.00 | 1.40 | 0.00 | 0.00 | 0.00 |
| **Cost of Operations** | | | | | | | | | | | | | | | |
| Personnel Costs (payroll, med ins) - Con Supervision | (0.01) | | | | | (0.00) | (0.25) | (0.00) | (0.00) | (0.02) | (0.24) | (0.02) | (0.00) | (0.02) | (0.24) |
| Personnel Costs - Kreal | | | | | | | | (0.09) | | | (0.09) | | | | |
| Personnel Costs (payroll, med ins) - Engineering | (0.07) | | | | | | (0.07) | | (0.01) | (0.07) | | (0.07) | (0.01) | (0.07) | |
| Travel, PPE, Training | | | (0.00) | | (0.02) | | (0.06) | | (0.01) | (0.01) | (0.01) | (0.15) | (0.01) | (0.01) | (0.01) |
| Equipment Maintenance, Fuel, Lubes | | | | | | | | | | | | | | | |
| IT, Communications | | | | | | (0.02) | | | | | | (0.04) | | | |
| Catering on Unit (Sodexo) | | | | | | | | | | (0.05) | | (0.05) | | | |
| OFE Sales Commissions | | | (0.01) | | | | | | (0.04) | | | (0.07) | | | |
| **Total Cost of Operations** | (0.09) | 0.00 | (0.01) | 0.00 | (0.02) | (0.02) | (0.47) | (0.08) | (0.06) | (0.10) | (0.34) | (0.48) | (0.03) | (0.10) | (0.25) |
| **Cashflow from Operations** | (0.09) | 0.00 | 0.14 | 0.00 | (0.02) | (0.02) | (0.47) | (0.08) | 0.64 | (0.10) | (0.34) | 0.92 | (0.03) | (0.10) | (0.25) |
| **G&A Costs** | | | | | | | | | | | | | | | |
| IT, Commuications | (0.00) | | | | | (0.01) | (0.01) | (0.03) | (0.02) | (0.02) | (0.02) | (0.03) | (0.02) | (0.02) | (0.02) |
| Property - rent, utilities, property expense, insurance | | | (0.00) | (0.02) | | (0.01) | | (0.07) | | | | (0.07) | | | |
| Personnel Costs (payroll, med ins) inc Directors Fees | (0.05) | | | | | | (0.08) | | | (0.05) | (0.01) | (0.07) | (0.03) | (0.05) | (0.01) |
| Professional Fees - Advisors & Legal | (0.01) | | | (0.04) | (0.00) | | | (0.14) | | | (0.13) | | | | (0.13) |
| Travel | | | | | | (0.01) | | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) |
| **Total G&A Costs** | (0.06) | 0.00 | (0.00) | (0.06) | (0.02) | (0.02) | (0.10) | (0.25) | (0.03) | (0.08) | (0.17) | (0.18) | (0.05) | (0.08) | (0.17) |
| **Cashflow after Ops & G&A** | (0.15) | 0.00 | 0.14 | (0.06) | (0.05) | (0.04) | (0.57) | (0.34) | 0.61 | (0.19) | (0.50) | 0.74 | (0.08) | (0.19) | (0.41) |
| Cumulative Cash Flows | (1.87) | (1.87) | (1.73) | (1.79) | (1.84) | (1.88) | (2.45) | (2.79) | (2.18) | (2.36) | (0.67) | (2.13) | (2.21) | (2.39) | (2.80) |
| Accounts Payable to be cleared Cyprus | | | | | | | | | | | | (0.36) | | | |
| Accounts Payable to be cleared LLC | | | | | | (0.01) | | | | | | | | | |
| Accounts Payable to be cleared Bahamas | | | | | | | | | | | | | | | |
| Accounts Payable to be cleared - Thrusters | | | | | | | | | | | | | | | |
| Third Party Capex ESV 194 Yantai - OFE | | | | | | | | | | | (0.01) | | | | (0.13) |
| Third Party Capex ESV 194 Yantai - RIG | | | | | | | | | | | (0.05) | | | | (0.08) |
| Third Party Capex ESV 194 Yantai - Transport allowance | | | | | | | | | | | (0.04) | | | | (0.05) |
| Third Party Capex ESV 112 COSCO - OFE | | | | | (0.08) | | (0.17) | (0.04) | | | (0.78) | | | | (0.37) |
| Third Party Capex ESV 112 COSCO - RIG | | | | | | | | | | | (0.24) | | | | (0.10) |
| Third Party Capex ESV 112 COSCO - Transport & Contingency | | | | | | | | | | | (0.01) | | | | (0.01) |
| **COSCO Delivery Payment** | | | | | | | | | | | | | | | |
| Third Party Capex ESV 3 | | | | | | | | | | | (0.05) | | | | |
| Post Delivery Unit Consumables & Services | | | | | | | | | | | | (0.05) | | | |
| G&A Contingency / Buffer | | | | | | | | | | | | | | | |
| Capex Spares & Misc | | | | | | | | | (0.02) | | | (0.02) | | | |
| Unit Insurance | | | | | | | (0.05) | | | | (0.07) | | | | |
| Move Solutions to Yantai ? | | | | | | | | | | | | | | | |
| **Cashflow after investment** | (0.15) | 0.00 | 0.14 | (0.06) | (0.13) | (0.10) | (0.74) | (0.40) | 0.61 | (0.19) | (1.74) | 0.31 | (0.08) | (0.19) | (1.15) |
| Liquidation Fees | | | | | | | | | | (0.25) | (0.25) | | (0.25) | (0.25) | (0.25) |
| **Advisor Success Fees** | | | | | | | | | | | | | | | |
| **Total Finance & Tax** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (0.25) | (0.25) | 0.00 | (0.25) | (0.25) | (0.25) |
| **Cashflow for the period** | (0.15) | 0.00 | 0.14 | (0.06) | (0.13) | (0.10) | (0.74) | (0.40) | 0.61 | (0.44) | (1.99) | 0.31 | (0.33) | (0.44) | (1.40) |
| Cash balance brought forward | 0.35 | 0.20 | 0.20 | 0.34 | 0.28 | 0.15 | 0.05 | 0.81 | 0.41 | 1.02 | 0.58 | 0.60 | 0.91 | 0.58 | 0.14 |
| Draw from escrow | | | | | | | 1.50 | | | | 2.00 | | | | 1.50 |
| **Cash balance carried forward** | 0.20 | 0.20 | 0.34 | 0.28 | 0.15 | 0.05 | 0.81 | 0.41 | 1.02 | 0.58 | 0.60 | 0.91 | 0.58 | 0.14 | 0.25 |

**Remedial (Cyprus) Consolidated**
**Cashflow Forecast 2010**
**13 Week Cash Budget**
**15-Feb-10**

| | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 21-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Commencing** | 25-Apr | 2-May | 9-May | 16-May | 23-May | 30-May | 6-Jun | 13-Jun | 20-Jun | 27-Jun | 4-Jul | |
| **Revenue from Operations** | | | | | | | | | | | | |
| OFE Sales - Favco/BOP | | | | | | | | | | | | |
| **Total Revenue from Operations** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2.25 |
| **Cost of Operations** | | | | | | | | | | | | |
| Personnel Costs (payroll, med ins) - Con Supervision | (0.02) | (0.00) | (0.02) | (0.00) | (0.25) | (0.00) | (0.02) | (0.00) | (0.25) | (0.00) | (0.02) | (1.42) |
| Personnel Costs - Kreal | (0.09) | | | | (0.08) | | | | (0.08) | | | (0.43) |
| Personnel Costs (payroll, med ins) - Engineering | (0.07) | (0.01) | (0.07) | | (0.07) | (0.01) | (0.07) | | (0.07) | (0.01) | (0.07) | (0.87) |
| Travel, PPE, Training | (0.08) | (0.01) | (0.01) | (0.01) | (0.08) | (0.01) | (0.01) | (0.01) | (0.08) | (0.01) | (0.01) | (0.56) |
| Equipment Maintenance, Fuel, Lubes | (0.12) | | | | (0.16) | | | | (0.26) | | | (0.68) |
| IT, Communications | (0.03) | | | | (0.03) | | | | (0.03) | | | (0.18) |
| Catering on Unit (Sodexo) | (0.05) | | | | (0.05) | | | | (0.05) | | | (0.25) |
| OFE Sales Commissions | | | | | | | | | | | | (0.11) |
| **Total Cost of Operations** | (0.46) | (0.03) | (0.10) | (0.01) | (0.73) | (0.03) | (0.10) | (0.01) | (0.83) | (0.03) | (0.10) | (4.50) |
| **Cashflow from Operations** | (0.46) | (0.03) | (0.10) | (0.01) | (0.73) | (0.03) | (0.10) | (0.01) | (0.83) | (0.03) | (0.10) | (2.25) |
| **G&A Costs** | | | | | | | | | | | | |
| IT, Commuications | (0.03) | (0.02) | (0.02) | (0.02) | | (0.03) | (0.02) | (0.02) | (0.02) | | | (0.33) |
| Property - rent, utilities, property expense, insurance | (0.07) | | | | | (0.07) | | | | | (0.07) | (0.37) |
| Personnel Costs (payroll, med ins) inc Directors Fees | (0.07) | | (0.05) | (0.01) | (0.07) | | | | (0.05) | (0.01) | (0.07) | (0.03) | (0.72) |
| Professional Fees - Advisors & Legal | | | | | (0.11) | | | | | | | (0.55) |
| Travel | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.01) | (0.26) |
| **Total G&A Costs** | (0.18) | (0.03) | (0.08) | (0.04) | (0.20) | (0.11) | (0.03) | (0.08) | (0.04) | (0.15) | (0.04) | (2.23) |
| **Cashflow after Ops & G&A** | (0.64) | (0.05) | (0.19) | (0.05) | (0.92) | (0.13) | (0.13) | (0.09) | (0.87) | (0.18) | (0.14) | (4.48) |
| **Cumulative Cash Flows** | (3.44) | (3.49) | (3.68) | (3.73) | (4.66) | (4.79) | (4.92) | (5.02) | (5.89) | (6.06) | (6.21) | |
| Accounts Payable to be cleared Cyprus | | | | | | | | | | | | (0.36) |
| Accounts Payable to be cleared LLC | | | | | | | | | | | | (0.01) |
| Accounts Payable to be cleared Bahamas | | | | | | | | | | | | 0.00 |
| Accounts Payable to be cleared - Thrusters | | | | | (2.01) | | | | | | | (2.01) |
| Third Party Capex ESV 194 Yantai - OFE | | | | | (0.22) | | | | | | | (0.46) |
| Third Party Capex ESV 194 Yantai - RIG | | | | | (0.04) | | | | (1.16) | | | (1.33) |
| Third Party Capex ESV 194 Yantai - Transport allowance | | | | | (0.05) | | | | (0.10) | | | (0.24) |
| Third Party Capex ESV 112 COSCO - OFE | | | | (0.50) | (0.73) | | | | | | | (2.67) |
| Third Party Capex ESV 112 COSCO - RIG | | | | (0.50) | | | | | | | | (0.84) |
| Third Party Capex ESV 112 COSCO - Transport & Contingency | | | | | (1.00) | | | | | | | (1.01) |
| **COSCO Delivery Payment** | | | | | | | | | | | | 0.00 |
| Third Party Capex ESV 3 | | | | | | | | | | | | (0.05) |
| Post Delivery Unit Consumables & Services | (0.07) | | | | (0.07) | | | | (0.12) | | | (0.31) |
| G&A Contingency / Buffer | | | | | | | | | | | | 0.00 |
| Capex Spares & Misc | | | | | | | | | | | | (0.04) |
| Unit Insurance | (0.07) | | | | (0.07) | | | | (0.07) | | | (0.33) |
| Move Solutions to Yantai ? | | | | | (1.00) | | | | | | | (1.00) |
| **Cashflow after investment** | (0.78) | (0.05) | (0.19) | (1.05) | (6.12) | (0.13) | (0.13) | (0.09) | (2.41) | (0.18) | (0.14) | (15.13) |
| Liquidation Fees | | | | | | | | | | | | (1.25) |
| **Advisor Success Fees** | | | | | | | | | | | | 0 |
| **Total Finance & Tax** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (1.25) |
| **Cashflow for the period** | (0.78) | (0.05) | (0.19) | (1.05) | (6.12) | (0.13) | (0.13) | (0.09) | (2.41) | (0.18) | (0.14) | (16.38) |
| Cash balance brought forward | 0.25 | (0.53) | (0.59) | (0.77) | (1.82) | (7.94) | (8.07) | (8.21) | (8.30) | (10.71) | (10.89) | 0.35 |
| **Draw from escrow** | | | | | | | | | | | | 5.00 |
| **Cash balance carried forward** | (0.53) | (0.59) | (0.77) | (1.82) | (7.94) | (8.07) | (8.21) | (8.30) | (10.71) | (10.89) | (11.03) | (11.03) |