**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq. (KR 4963)
John K. Sherwood, Esq. (JS 2453)
Scott Cargill, Esq. (SC 4827)
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Remedial (Cyprus) Public Company Ltd., | Case No. 10-10782 (REG) |
| Debtor. | |

**MOTION FOR AN ORDER (A) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, GRANT SECURITY INTERESTS AND LIENS AND ACCORD PRIORITY STATUS PURSUANT TO 11 U.S.C. §§ 361, 364(c) AND 364(d); (B) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2)(B); (C) GRANTING ADEQUATE PROTECTION; (D) GIVING NOTICE OF FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b)(2) AND (c)(2); AND (E) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(d)**

The above captioned debtor and debtor in possession (the "<u>Debtor</u>" or the "<u>Borrower</u>"), by and through its undersigned proposed counsel, hereby submits this motion (the "<u>Motion</u>") for an order (a) authorizing the Debtor to obtain postpetition financing, grant security interests and liens and accord priority status pursuant to 11 U.S.C. §§ 361, 364(c) and 364(d); (b) authorizing the use of cash collateral pursuant to 11 U.S.C. § 363(c)(2)(b); (c) granting adequate

protection; (d) giving notice of the final hearing pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2); and (e) modifying the automatic stay pursuant to 11 U.S.C. § 362(d).  In support of this Motion, the Debtor respectfully represents as follows:

## **RELIEF REQUESTED**

1.      By this Motion, and as more specifically set forth in, and subject in all respects to, the Interim Order and DIP Documents (both defined below), the Debtor requests, among other things, authority to:

(i)     obtain secured, superpriority postpetition financing (the "<u>DIP Facility</u>") pursuant to the terms and conditions of that certain Debtor in Possession Credit Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "<u>DIP Agreement</u>") by and among the Borrower, Norsk Tillitsmann ASA, as Loan Trustee (in such capacity, the "<u>DIP Loan Trustee</u>") on behalf of the Prepetition Noteholders (the "<u>DIP Lenders</u>"), substantially in the form of Exhibit A attached hereto;

(ii)    execute and deliver the DIP Agreement and other related loan documents (collectively with all documents comprising the DIP Facility, the "<u>DIP Documents</u>") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)   grant to the DIP Loan Trustee and the DIP Lenders allowed superpriority administrative expense claims in the Case and any Successor Case for the DIP Facility and all obligations owing thereunder and under the DIP Documents (collectively, and including all "Obligations" as described in the DIP Agreement, the "<u>DIP Obligations</u>"), subject to the priorities set forth in paragraph 8 of the Interim Order;

(iv)    grant to the DIP Loan Trustee, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "<u>Cash Collateral</u>"), which liens will be subject to the priorities set forth in paragraph 7 of the Interim Order;

(v)     pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents as they become due, including, without limitation the fees and disbursements of each DIP Loan Trustee's attorneys, advisers, accountants, and other consultants, all to the extent provided by and in accordance with the terms of the respective DIP Documents;

(vi)    provide adequate protection to the Prepetition Note Trustee and Prepetition Noteholders for any diminution in value of their respective interests in the Prepetition Note Collateral (as defined herein), including the Cash Collateral;

(vii)    vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order; and

(viii)   schedule a final hearing (the "<u>Final Hearing</u>") to consider the relief requested in the DIP Motion and approve the form of notice with respect to the Final Hearing.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this Motion under 28 U.S.C. § 1334, which is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 361, 362, 363, and 364(c) and (d) and Federal Rule of Bankruptcy Procedure 4001.

## BACKGROUND

4.      On February 17, 2010 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

5.      The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No trustee, examiner or committee has been appointed in this chapter 11 case.

7.      A more complete account of information regarding the Debtor's business and the events leading to this chapter 11 filing is set forth in the Affidavit of Stuart Bannerman Pursuant to Local Bankruptcy Rule 1007-2 and In Support of the Debtor's Petition and First Day Motions, filed simultaneously herewith.

## DEBTOR'S OPERATIONS

8.      The Debtor is an early stage company that is in the process of constructing its first two Elevating Support Vessels (the "<u>ESVs</u>") - state of the art, stable offshore work platforms specifically designed to support remedial oil and gas activities, including well intervention and work-overs.  The ESVs are currently under construction at shipyards located in China.  The first

ESV, the Guardian, is being constructed at the shipyard of Yantai Raffles Shipyard Ltd. The forecast delivery date for the vessel is June 2010. The second ESV, the Solution, is being built at the shipyard of Cosco (Nantong) Shipyard Ltd. The forecast delivery date for the vessel is end of March 2010. The Solution is sea-worthy and was set for jack-rig trials, which test the 325-foot legs on the ESV. These tests were postponed, however, due to the substandard seafloor surface near the Cosco shipyard. The Solution is currently undergoing at-sea trials and will conduct the jack-rig trials shortly thereafter on a more stable surface.

9. The construction of both of the ESVs has been plagued by substantial, unanticipated delays and cost overruns.

10. Directly relating to these delays and cost overruns, in September of 2009, the Debtor defaulted under the terms of the Bond Loan (defined below) when it failed to make an interest payment of $3.1 million. The Debtor has, as a consequence, been unable since then to access the approximately $56.5 million of Bond Loan proceeds (subject to drawdowns in an aggregate amount of $3 million, which were approved by a meeting of the Bondholders), which was held in an escrow account established as part of the Bond Loan transaction.

11. As a result, the Debtor is suffering from a severe liquidity crisis. Without sufficient cash on hand, the completion of construction and delivery of the ESVs is at substantial risk. As the ESVs are among the Debtor's principal assets, the completion of, or at least the continuance of, construction is paramount to realizing value for the Debtor's estate.

12. The Debtor needs financing to fund ongoing operations and the costs related to the ESVs so that these assets may realize their full value. Within the next several days, the Debtor anticipates that it will file a Sale Motion (defined below) wherein the Debtor will seek to sell substantially all of its assets, including the ESVs. In order to obtain the maximum value of its assets, as well as provide the best opportunity for a recovery to its creditors, and the highest value to its estate, the Debtor needs to continue construction on the ESVs.

13. The financing will allow for necessary payments to be made by the Debtor to the shipyards and various contractors, consultants, and engineers hired to construct the vessels. The

financing will also provide for the vessels to be commissioned - one of the final steps prior to delivery.

14.     Although the Debtor is the owner of the ESVs and is party to many of the material contracts involving the ESVs, certain services and personnel are provided by two of the Debtor's wholly-owned subsidiaries:   Remedial Offshore Limited, the ESVs' operator and provider of construction supervision and certain personnel at the shipyards and Remedial Offshore, LLC, provider of engineering services and procurement support for the ESVs.   Prior to the Petition Date, the Debtor transferred funds to these subsidiaries to allow them to pay obligations in the ordinary course of business.   The proposed financing anticipates that the Debtor will continue this practice of funding its subsidiaries, provided, however, that such funding will be made pursuant to the terms of the Budget, or as consented to by the DIP Loan Trustee.

15.     The Debtor needs the financing immediately as parties necessary to the construction and completion of the ESVs have already threatened that they will cease working on construction or cease to provide services and/or goods necessary for the construction of the ESVs unless they are paid in the ordinary course.

16.     Additionally, obtaining financing immediately is essential to avoid irreparable harm and to obtain the highest bid through the Sale Motion, and thereby maximize recovery for creditors.   The value of the ESVs is highest if construction of the ESVs is completed uninterrupted and delivered from the shipyards.

17.     Prior to the Petition Date, the Debtor undertook substantial efforts to restructure and secure immediate financing.   The Debtor was unable to secure the needed financing.   The Debtor sought additional capital contributions from its equity holders, however, no agreement could be reached on terms acceptable to the parties.   The Debtor sought additional credit from the Bondholders in the context of an out-of-court restructuring, but was unable to secure agreement from all necessary parties, particularly certain unsecured creditors, to implement a restructuring proposal. Thus, the Bondholders' present willingness to provide financing is limited to financing in the context of a Bankruptcy Court supervised restructuring and sale process.

Moreover, the Bondholders have refused to agree to subordinate their prepetition security interests in the Debtor's assets to the liens of any other party that may be willing to supply secured financing. Accordingly, the Debtor has been unable to obtain credit, encumbered or unencumbered, and the DIP Facility is the Debtor's only opportunity to obtain financing which will allow it to maximize the value of its assets.

**B.      The Debtor's Prepetition Financing.**

18.      Pursuant to that certain FRN Remedial (Cyprus) Public Company Limited Secured Callable Bond Issue 2007/2012 dated as of March 23, 2007 (the "<u>Prepetition Note</u>," and together with all other loan and security documents executed in connection therewith, the "<u>Prepetition Note Documents</u>"), among the Debtor as Borrower and Norsk Tillitsman ASA as trustee (in such capacity, the "<u>Prepetition Note Trustee</u>"), the Debtor incurred indebtedness to certain holders (collectively, the "<u>Prepetition Noteholders</u>") in an initial aggregate principal amount at maturity of $210,000,000 (the "<u>Prepetition Notes</u>," and together with other charges owing in connection with the Indenture, the "<u>Prepetition Note Obligations</u>" or the "<u>Bond Loan</u>").

19.      The Debtor's obligations to the Prepetition Note Trustee are secured by (i) a first priority floating charge granted by the Borrower in respect of its rights, titles and interests in and to the Construction Contracts (as defined in the Prepetition Note Documents); and (ii) a first priority pledge over the escrow account into which the Bond proceeds were originally deposited. The Debtor defaulted under the terms of the Bond Loan in or about September 2009 when it failed to make an interest payment of $3.1 million. The Debtor has, as a consequence, been unable since then to access the approximately $56.5 million in the escrow account (subject to drawdowns in an aggregate amount of $3 million, which were approved by a meeting of the Bondholders). As part of the discussions with which led to a restructuring proposal, the balance of the proceeds of the Bonds were made from the escrow account to an account (the "<u>NTM Account</u>") held in the name of Prepetition Loan Trustee upon the instruction of the Debtor.

20.      In December of 2009, during the restructuring discussions, the Prepetition Noteholders authorized the Prepetition Loan Trustee to advance $3 million from the NTM

Account.  The release of these funds was secured by (i) a first priority security interest granted by the Borrower over certain owner furnished equipment ("OFE") being stored by Advanced Rig Services, LLC at their yard in Houston, Texas; and (ii) a first priority security interest granted by Remedial Offshore Limited over certain OFE being stored by Advanced Rig Services, LLC at their yard in Houston, Texas, (collectively, the "Prepetition Note Collateral") to the Prepetition Note Trustee, for the benefit of the Prepetition Noteholders (the "Prepetition Note Liens").

**C.      The Proposed DIP Facility. [1]**

21.      The Debtor proposes to enter into a post-petition financing arrangement, the DIP Facility, with the DIP Loan Trustee on the terms set forth in the DIP Agreement, substantially in the form attached hereto as Exhibit A, subject to the budget (the "Budget") attached hereto as Exhibit B.  Upon review of the expected administrative expenses, the Debtor believes the Budget will be adequate to pay all administrative expenses payable during the period covered by the Budget.  The DIP Loan Agreement includes the following provisions.

22.      DIP Facility.  Upon entry of a final order approving this Motion, the Debtor will be permitted to draw up to a maximum aggregate principal amount of $5,000,000 as a term loan.  Prior to the entry of such final order, and subject to the entry of an interim order approving this Motion, the Debtor will be permitted to borrow up to an aggregate of $2,000,000.  Upon the entry of a final order, the Debtor will be permitted to incremental extensions of credit upon the satisfaction of certain milestones in accordance with the DIP Documents.

23.      Term.  The obligations under the DIP Facility are due and payable on the period from the Closing Date[2] to the earliest to occur of: (i) 30 days after the Petition Date if a Final Order has not been entered by such date; (ii) the date that is ten months after the Petition Date; (iii) the consummation of a sale or other transaction with respect to all or substantially all of the assets of the Debtor; (iv) the effective date of a plan of reorganization in this case; (v) the

---

[1]      This discussion encompasses only the most salient provisions of the DIP Documents and Interim Order. Parties are commended to examine the foregoing documents, which are annexed hereto, for a complete description of the terms of the DIP Facility.

[2]      Unless otherwise defined herein, capitalized terms will have the meanings ascribed to such terms in the DIP Documents.

Termination Declaration Date (defined below); or (vi) 45 days after the date on which the Debtor has filed a motion pursuant to section 363 of the Bankruptcy Code for entry of an order (in form and substance acceptable to the DIP Loan Trustee) approving bidding procedures related to the sale of all or substantially all of the assets of the Debtor if, by such time, such order has not been entered (the "Termination Date").

24.     Interest.   The DIP Facility will accrue interest on a daily basis at a rate equal to 12.0% per annum, which will be compounded into the principal outstanding amount of the Obligations at the end of each month and will be payable on the earlier to occur of the date on which the Obligations are repaid and the Termination Date.   Upon the Termination Declaration Date, the outstanding principal amount of the Obligations will accrue interest at the rate in effect *plus* 3.0%, and such interest will be payable on demand.

25.     **Extraordinary Provisions**.   Pursuant to that General Order of the Bankruptcy Court for the Southern District of New York, signed on September 9, 2002, titled "Guidelines for Financing Requests" (the "Standing Order"), a list of the Extraordinary Provisions, as defined therein, is attached hereto as Exhibit C.

26.     Use of Proceeds.   The proceeds of the DIP Facility will be used, in each case in a manner consistent with the terms and conditions of the DIP Documents and in accordance with and to the extent set forth in the Budget, solely for (1) working capital, letters of credit, and other general corporate purposes, (2) permitted payment of costs of administration of the Case (subject to the limitations of the Carve Out (as defined below)), (3) payment of fees and expenses due under the DIP Facility, (4) payment of any authorized Adequate Protection Payments, and (5) payment of such prepetition expenses, in addition to the Prepetition Note Obligations, as consented to by the DIP Loan Trustee, in its sole discretion, and as approved by the Court.   The Debtor is specifically permitted to transfer the proceeds of the DIP Facility to its non-debtor subsidiaries to pay obligations incurred in the ordinary course as provided for in the Budget or as consented to by the DIP Loan Trustee.

27.     DIP Liens.   The DIP Obligations will be secured by a first-priority

perfected security interest pursuant to section 364(c)(2) and (c)(3) and section 364(d) of the Bankruptcy Code (the liens securing the DIP Facility will be senior to the liens securing the Prepetition Note Obligations in all of the following real and personal property, whether now existing or hereafter arising, of the Debtor in any and all presently owned and hereafter acquired personal property, real property and other assets of the Debtor, whether owned or consigned by or to, or leased from or to the Debtor, including, without limitation, the following (the "DIP Collateral") [3]: all (i) Prepetition Note Collateral; (ii) Accounts; (ii) Books; (iii) Chattel Paper; (iv) Deposit Accounts, (v) Equipment and fixtures, (vi) General Intangibles, (vii) Inventory, (viii) Investment Related Property, (ix) Negotiable Collateral, (x) Supporting Obligations, (xi) Commercial Tort Claims, (xii) money, cash and Cash Equivalents, (xiii) proceeds of all leases and leasehold interests, (xiv) owned Real Property, (xv) unencumbered assets, including proceeds of any and all lawsuits or causes of action, (xvi) *upon entry of the Final Order, all bankruptcy avoidance actions or claims arising under section 549 of the Bankruptcy Code and the proceeds thereof*; (xvii) Patent Collateral; (xviii) Trademark Collateral; (xix) Copyright Collateral; and (xx) Proceeds, subject only to the following (the "Permitted Priority Liens"): (i) the Carve-Out (defined below) and (ii) valid, perfected, enforceable and non-avoidable liens as of the Petition Date which were senior in priority to liens securing obligations owing to the Loan Trustee under the Bond Loan Agreement as of the Petition Date.

28. <u>Superpriority Claim; Surcharge</u>. All DIP Obligations will have administrative priority in accordance with, and will constitute an allowed superpriority claim (the "Superpriority Claim") pursuant to § 364 (c)(1) of the Bankruptcy Code, over all other administrative expenses in Debtor's case of the kind specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 or 1114 of the Bankruptcy Code, subject only to the Carve-Out, which Carve-Out will have priority to all other claims under the DIP Facility and all other claims which are *pari passu* in rank with the DIP

---

[3] All defined terms in the description of DIP Collateral will have the meanings ascribed thereto in the DIP Documents.

Facility.

29.     Carve-Out.   The liens and the superpriority claims securing the DIP Facility will be subject to a "Carve-Out", which, for purposes hereof will mean the sum of the following amounts (collectively, the "Carve-Out Amount"): (a) following the occurrence of a Triggering Event, (i) allowed fees, and reimbursement for disbursements of professionals retained by the Debtor and any Statutory Committee (the "Professional Fee Payments") in an aggregate amount for all such Professional Fee Payments incurred upon and after the occurrence of such Triggering Event (as defined below) not to exceed $250,000 (the Carve Out Amount"); (ii) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court; and (iii) fees payable to a chapter 7 trustee in an aggregate amount not to exceed $25,000; and (b) without reducing the Carve Out Amount, all Professional Fee Payments allowed, or subsequently allowed, and payable under sections 328, 330 and 331 of the Bankruptcy Code, to the extent incurred prior to such Triggering Event (the "Pipeline Period").   The Carve Out Amount will be funded with proceeds of the Term Loan (as defined in the DIP Agreement) and segregated in an interest bearing deposit account.

30.     "Triggering Event" means the earlier to occur of (a) the date the DIP Loan Trustee provides notice to the Borrowers, with a copy to Borrower's counsel at the address set forth in the DIP Documents, of an Event of Default for purposes of the Carve Out; or (b) the date upon which the failure of the Borrowers to notify the DIP Loan Trustee of the occurrence of a default or Event of Default constitutes a failure to comply with the requirement to give such a notice under the DIP Documents.   Prior to a Triggering Event, the Debtor will be permitted to pay Allowed Professional Fees that were incurred in accordance with the Budget.   The DIP Loan Trustee and DIP Lenders will not be responsible for the direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Case or any Successor Case.

31.     Repayment; Other Terms.   The DIP Facility will mature on the Termination Date.   Notwithstanding the foregoing, the DIP Obligations will be due and payable

in full, to the extent not previously paid, without offset or counterclaim. The Debtor will repay the DIP Obligations as and when provided, and otherwise in accordance with, the DIP Documents. In no event will the Debtor be authorized to offset or recoup any amounts owed, or alleged to be owed to the DIP Loan Trustee or DIP Lenders, unless and to the extent expressly otherwise agreed to in writing by the DIP Loan Trustee or DIP Lenders.

32. <u>Section 506(c) and 552(b)</u>. Each of the DIP Loan Trustee, DIP Lenders, Prepetition Note Trustee, and the Prepetition Noteholders are entitled to (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code; and (b) upon entry of a Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

33. <u>Adequate Protection of Prepetition Obligations Owing to Prepetition Note Trustee</u>. As adequate protection pursuant to §§ 361, 363 and 364 of the Bankruptcy Code for any diminution in value arising out of the Debtor's use, consumption, sale, collection or other disposition of any of the Prepetition Collateral (including Cash Collateral):

(a) The Prepetition Note Trustee, on behalf of the Prepetition Noteholders, will be granted continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on all of the DIP Collateral as partial adequate protection to the Prepetition Note Trustee to the extent that the Debtor's use, consumption, sale, collection or other disposition of any Prepetition Note Collateral results in any diminution in the value of the Prepetition Note Trustee's security interest in or lien upon such Prepetition Note Collateral as of the Petition Date. Such liens are referred to herein as the "<u>Note Adequate Protection Liens</u>" and will be subordinate in priority only to the Carve Out and DIP Liens. Except as provided herein, the Note Adequate Protection Liens will not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Case or any Successor Case, and will be valid and enforceable against any trustee appointed in the Case or any Successor Case, or upon the dismissal of the Case or Successor Case. *The Note Adequate Protection Liens will not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code.* No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code will be made *pari passu* with or senior to the Note Adequate Protection Liens.

(b) As further adequate protection of the interests of the Prepetition Note Trustee and Prepetition Noteholders in the Prepetition Note Collateral against any diminution in value of such interests in the Prepetition Note Collateral, the Prepetition Note Trustee and Prepetition Noteholders will be granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Case and any Successor Case (the "<u>Note Superpriority Claims</u>"). The Note Superpriority Claim will be junior only to

the Carve Out and DIP Superpriority Claims. Except as set forth herein, the Note Adequate Protection Superpriority Claim will have priority over all administrative expense claims and unsecured claims against the Debtor or the estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code.

(c) Any Cash Collateral that is used by the Debtor and not secured by the Prepetition Note Collateral or the DIP Collateral will constitute a cost and expense of administration in this chapter 11 case and will have a superpriority status pursuant to § 507(b) of the Bankruptcy Code and thus will be paid ahead of all other costs and expenses of administration including, but not limited to, those specified in §§ 503(b) or 507(b) of the Bankruptcy Code, subject, however, to the Carve Out, the unpaid fees of the clerk of the Bankruptcy Court or District Court, as applicable, and of the U. S. Trustee pursuant to 28 U.S.C. §§ 1930(a) and (b).

(d) To enable the Debtor to use and dispose of inventory constituting a part of the Prepetition Note Collateral or the DIP Collateral (the "Prepetition Inventory" and the "Postpetition Inventory," respectively) and in order to preserve and adequately protect the rights and interests of the Prepetition Loan Trustee, on behalf of the Prepetition Noteholders, with respect to Prepetition Obligations based upon the security of Prepetition Inventory, if any inventory used or disposed of is not clearly identifiable as constituting solely Postpetition Inventory and any accounts are not clearly attributable solely to the DIP Collateral, such inventory may be treated by the Prepetition Loan Trustee (and will, therefore, be deemed to be) either Prepetition Inventory or Postpetition Inventory and such accounts may be treated by the Prepetition Loan Trustee as attributable either to Prepetition Inventory or to Postpetition Inventory.

(e) As further adequate protection, the Debtor will be authorized and directed to provide adequate protection to the Prepetition Note Trustee and Note Lenders, in the form of ongoing payment of the Prepetition Note Trustee's and Prepetition Noteholders' reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses (together, the "Note Adequate Protection Payments").

34.     Reimbursement of Expenses.  All reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and other out of pocket expenses of the DIP Loan Trustee in connection with the DIP Facility and the DIP Documents, whether or not the transactions contemplated hereby are consummated, will form a part of the DIP Obligations and will be paid by Debtor (without the necessity of filing any application with or obtaining further order from the Court) in accordance with the terms of the DIP Documents.

35.     Covenants.  In order to induce the DIP Loan Trustee to provide the DIP

Loans, the Debtor has agreed, and the Interim Order provides, that as a condition for the use of Cash Collateral and postpetition financing:

(a) The Debtor will comply with the budget approved as the Budget within 10% individual line item cumulative and rolling variances. The Debtor will update the Budget from time to time (provided that any update will be in form and substance acceptable to the DIP Loan Trustee and DIP Lenders, each in its sole discretion), but in any event not less than every four weeks (with delivery to the DIP Loan Trustee on Tuesday following the fourth week after the Closing Date, and thereafter on each fourth Tuesday thereafter).

(b) Limitations on asset sales, except those in the ordinary course of business, without the DIP Loan Trustee's consent.

(c) The DIP Loan Trustee will be granted replacement first priority security interests in and liens on all of the DIP Collateral as partial adequate protection to the Lender to the extent that the Debtor's use, consumption, sale, collection or other disposition of any Prepetition Collateral results in any diminution in the value of the Lender's security interest in or lien upon such Prepetition Note Collateral as of the Petition Date. Such liens are referred to herein as the "Note Adequate Protection Liens" and will be subordinate in priority only to the DIP Liens.

(d) The Debtor will have filed its schedules and statement of affairs with the Bankruptcy Court no later than within 30 days after commencement of the Chapter 11 Case.

(e) The Debtor will have obtained an order of the Bankruptcy Court setting the last day to file claims in the Chapter 11 Case no later than within 45 days after commencement of the Chapter 11 Case.

(f) To the extent the Debtor obtains an order approving a sale (or sales) of all or substantially all of the assets of the Debtor, such order will be in form and substance acceptable to the DIP Loan Trustee.

(g) No other costs or expenses of administration, other than as provided in the Interim Order or the Final Order, as applicable, which have been or may be incurred in the Case or any Successor Cases at any time, will be charged against the DIP Loan Trustee, the Prepetition Loan Trustee, or the Prepetition Noteholders or any of their respective claims, the DIP Collateral or the Prepetition Note Collateral pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the affected DIP Loan Trustee, the Prepetition Loan Trustee, or the Prepetition Noteholders, and no such consent will be implied from any other action, inaction, or acquiescence by the affected DIP Loan Trustee, the Prepetition Loan Trustee, or the Prepetition Noteholders.

(h) Within three (3) days of the Petition Date (unless extended by the DIP Loan Trustee), the Debtor will file a motion pursuant to section 363 of the Bankruptcy Code to sell all or substantially all of the assets of the Debtor, such sale to occur within fifty-five (55) days of the Petition Date.

(i) The Debtor will schedule a hearing for approval of bidding procedures related to the motion pursuant to section 363 of the Bankruptcy Code to sell all or substantially all of the assets of the Debtor, which bidding procedures will be considered at a hearing to be held not later than ten days of the filing of such motion, which period may be extended with the consent of the DIP Loan Trustee (which consent will not be unreasonably withheld). The bidding procedures order will: (a) expressly recognize the right of the Prepetition Loan Trustee, on behalf of the Prepetition Noteholders, to credit bid pursuant to section 363(k) of the Bankruptcy Code; (b) approve the Prepetition Loan Trustee or its designee as the "stalking horse" bidder; and (c) provide for an expense reimbursement, bidding increments, and other usual and customary stalking-horse protections (provided, however, that no break-up fee will apply).

36. <u>Events of Default</u>. The occurrence of any of the following will constitute an event of default under the DIP Documents and Interim Order ("<u>Event of Default</u>"):

Failure to pay interest, principal, or fees when due (with a three (3) business day grace period for interest and fees); failure to comply with any term of the DIP Documents, the Interim Order or the Final Order; any post-petition judgment in excess of an amount of $50,000 or which would operate to divest the Debtor of any material assets or contracts; the Debtor being enjoined from conducting any material portion of its business; disruption of material business operations of the Debtor; material damage to or loss of material assets or contracts; conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; the dismissal of the Chapter 11 Case, any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing; the appointment in the Chapter 11 Case of a chapter 11 trustee or an examiner with expanded powers; the grant of any superpriority administrative expense claim or any lien (other than in favor of the holders of the Prepetition Note Obligations as set forth herein) which is *pari passu* with or senior to those of the DIP Loan Trustee; any payment of prepetition debt (provided that the Interim Order and all orders relating to cash management will be acceptable to the DIP Loan Trustee in its sole discretion) other than payments as may be acceptable to the DIP Loan Trustee and approved by the Bankruptcy Court; the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of the Debtor of a value in excess of an amount of $50,000; an order terminating exclusivity having been entered (or requested, unless actively contested by the Debtor) or failure of the Debtor to obtain, within thirty (30) days following the Petition Date (or such other date as may be agreed to by DIP Loan Trustee and fixed by the Bankruptcy Court), the Final Order with respect to those matters covered by the Interim Order and permitting extensions of credit under the DIP Facility not to exceed $5 million in principal amount and otherwise in form and substance reasonably satisfactory to the DIP Loan Trustee; any reversal, revocation or modification without the consent of the DIP Loan Trustee of such order or any other order of the Bankruptcy Court with respect to the Chapter 11

Case and materially and adversely affecting the DIP Facility; Any certification, representation or warranty previously, presently or hereafter made in writing by or on behalf of Debtor in connection with any DIP Loan Document will prove to have been false or incorrect in any material respect on the date on or as of which made.

37. <u>Remedies</u>. Upon and following the Termination Date and/or an Event of Default, the DIP Loan Trustee will have the following remedies under the DIP Documents and Interim Order:

Immediately upon the occurrence and during the continuation of an Event of Default: the Lender may declare (1) all Obligations under the DIP Documents to be immediately due and payable, (2) the termination, reduction or restriction of any further commitment to extend credit to the Debtor to the extent any such commitment remains, (3) the termination of the DIP Facility and any other DIP Documents as to any future liability or obligation of the Lender, but without affecting any of the Liens or the Obligations under the DIP Facility or the DIP Documents and/or (iv) a termination, reduction or restriction on the ability of the Debtor to use Cash Collateral, except as provided in paragraph 11 of the DIP Order (the "<u>Termination Declaration</u>"). The Termination Declaration will be given by electronic mail to counsel to the Debtor, counsel to the Prepetition Note Trustee, counsel to any Statutory Committee, and the U.S. Trustee (the earliest date any such Termination Declaration is made will be referred to herein as the "<u>Termination Declaration Date</u>"). *The DIP Obligations will be due and payable, without notice or demand, and the use of Cash Collateral will automatically cease on the Termination Declaration Date, except as provided in paragraph 11 of the DIP Order.*

In addition to remedies described above and other customary remedies, any automatic stay otherwise applicable to the DIP Loan Trustee or the DIP Lenders is modified so that five (5) days after the Termination Declaration Date (the "<u>Remedies Notice Period</u>"), the DIP Loan Trustee and the DIP Lenders will be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Documents and the  Interim Order and will be permitted to satisfy the DIP Obligations and DIP Superpriority Claims, subject to the Carve Out, and the Prepetition Note Trustee and Prepetition Noteholders will be entitled to exercise their rights and remedies to satisfy the Prepetition Note Obligations, Note Superpriority Claims, and Note Adequate Protection Payments, subject to the Carve Out.  During the Remedies Notice Period, the Debtor will be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.  Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, the automatic stay will automatically be terminated at the end of the Remedies Notice Period without further notice or order, and the Debtor will no longer have the right to use or seek to use Cash Collateral, and the DIP Loan Trustee, DIP Lenders, Prepetition Note Trustee, and

Prepetition Noteholders will be permitted to exercise all remedies set forth herein, in the DIP Agreement, the DIP Documents, or Prepetition Note Documents, as applicable, and as otherwise available at law against the DIP Collateral and/or Prepetition Note Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to the DIP Loan Trustee and DIP Lenders with respect thereto pursuant to the DIP Agreement, DIP Documents, or the Interim Order.

38.    <u>Modification of Automatic Stay</u>.  The automatic stay provisions of Section 362 of the Bankruptcy Code are to be modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to: (a) permit the Debtor to grant the DIP Liens, Note Adequate Protection Liens, DIP Superpriority Claims, and Note Adequate Protection Superpriority Claim; (b) permit the Debtor to perform such acts as the DIP Loan Trustee, DIP Lenders, Prepetition Note Trustee or Prepetition Noteholders each may request in its sole discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtor to incur all liabilities and obligations to the DIP Loan Trustee, DIP Lenders, Prepetition Note Trustee and Prepetition Noteholders under the DIP Documents, the DIP Facility and the Interim Order; and (d) authorize the Debtor to pay, and the DIP Loan Trustee, DIP Lenders, Note Trustee and Prepetition Noteholders to retain and apply, payments made in accordance with the terms of the Interim Order.

39.    <u>Challenges to Prepetition Lender's Liens and Claims</u>.

(a)    The Debtor (for itself and the estate) and the Prepetition Note Trustee, for itself and the Prepetition Noteholders, have acknowledged and agreed that (a) as of the Petition Date, the Prepetition Note Liens on the Prepetition Note Collateral were valid, binding, enforceable, non-avoidable and properly perfected; (b) as of the Petition Date, the Prepetition Note Liens were senior in priority over any and all other liens on the Prepetition Note Collateral, subject only to certain Permitted Priority Liens; (c) the Prepetition Note Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Note Liens or Prepetition Note Obligations exist, and no portion of the Prepetition Note Liens or Prepetition Note Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to

the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtor and its estate have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the Prepetition Loan Trustee or the Prepetition Noteholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to their loans to the Debtor; and (f) any payments made on account of the Prepetition Note Obligations to or for the benefit of the Prepetition Loan Trustee or the Prepetition Noteholders prior to the Petition Date were on account of amounts in respect of which the Prepetition Loan Trustee and the Prepetition Noteholders were oversecured, were payments out of the Prepetition Note Collateral, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

(b)      Except as set forth in subparagraph (c) below, the Debtor, on behalf of itself and its estate, successors and assigns: (i) releases and discharges the Prepetition Loan Trustee and any of its affiliates, agents, attorneys, officers, directors and employees, from any and all claims and causes of action arising out of, based upon or related to the Prepetition Note Documents and all other instruments and documents executed or delivered in connection therewith; (ii) waives any and all claims, defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and avoidability (under §§ 510, 544, 545, 547, 548, 549, 550, 552 and 553 of the Bankruptcy Code or otherwise) of the Prepetition Note Obligations or the security interests and/or liens granted to secure the Prepetition Note Obligations; and (iii) agrees, without further Court order, to the allowance of the Prepetition Loan Trustee's claims as fully secured claims in an amount no less than the Prepetition Note Obligations pursuant to §§ 502 and 506 of the Bankruptcy Code.  The release, discharge, waivers and agreements set forth in this subparagraph will be deemed effective upon the date the Interim Order is entered, subject only to the Creditors' Committee's, and any party in interest's right to object on the terms and conditions set forth in subparagraph (c) below.

(c)     The provisions of subparagraph (b) above will be without prejudice to the right of the Creditors' Committee or, if no Creditors' Committee is formed, any party in interest to seek to disallow the Prepetition Loan Trustee's claims, avoid any liens, security or collateral interest in the Debtor's assets previously pledged in favor of the Prepetition Loan Trustee or to seek disgorgement of all or any part of any payment made by the Debtor to the Prepetition Loan Trustee.  *The Creditor's Committee, or a party in interest, must commence, as appropriate, a contested matter or adversary proceeding raising such claim, objection or challenge, including, without limitation, any claim or cause of action against any Prepetition Note Trustee or Noteholder (each, a "Challenge") within thirty (30) calendar days following the date of entry of a Final Order, and if no Final Order is entered, within thirty (30) calendar days following the date of entry of this Interim Order (together, the "Challenge Period").*  The applicable Challenge Period may

only be extended with the written consent of the applicable Prepetition Note Trustee, or Noteholder. In the event that no objection or complaint is filed during the Challenge Period: (a) the waiver and release granted in subparagraph (b) above will become final and binding on all parties (including the Creditors' Committee, any creditor, or any subsequently appointed trustee); (b) the Prepetition Note Obligations and the Prepetition Loan Trustee's liens in the Prepetition Note Collateral will be conclusive and binding upon all parties in interest in this case and in any superseding chapter 7 case, including any subsequently appointed trustee, as a legal, valid, binding, enforceable and fully secured claim that is not subject to offset, counterclaim, equitable subordination or other defense or claim; (c) the Prepetition Note Obligations will be deemed to be allowed in full as a fully secured claim within the meaning of Section 506 of the Bankruptcy Code; and (d) any payment of the Prepetition Note Obligations will not be subject to disgorgement. To the extent such objection or complaint is filed, the Prepetition Loan Trustee will be entitled to include such costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in defending the objection or the complaint as part of the Prepetition Note Obligations.

## BASIS FOR THE RELIEF REQUESTED

40.     The Debtor submits that approval of the DIP Facility is amply supported

by the applicable provisions of the Bankruptcy Code. Section 364(c) and (d) of the Bankruptcy

Code provide, in relevant part, as follows:

> (c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
>> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>> (3)     secured by a junior lien on property of the estate that is subject to a lien.
>
> (d)     (1)     The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if
>
>> (A)     the trustee is unable to obtain such credit otherwise; and
>> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. §§ 364(c), (d).

41.     Because the Debtor's existing cash on hand is not sufficient to fund its on-

going working capital requirements, the Debtor believes that approval of the DIP Facility is critical if it is to continue to operate its business and continue and complete the construction of the ESVs in the ordinary course. The Debtor further believes that obtaining a firm commitment for post-petition financing will not only enhance the Debtor's liquidity and enable it to meet its day-to-day working capital requirements, but will also provide vendors, consultants, contractors and suppliers with confidence that the Debtor has sufficient resources available to continue construction of the ESVs. If the Debtor's creditors, vendors, consultants, contractors and suppliers perceive a risk to the Debtor's ability to honor its post-petition obligations, the Debtor's business will deteriorate drastically and construction would cease -- which would materially impair the Debtor's ability to preserve the value of the estate's assets.

42. While the Debtor sought other sources of capital prior to the Petition Date, it has determined in the exercise of its sound business judgment that the DIP Facility is the Debtor's best option under the circumstances and provides the most favorable terms to the Debtor's estate. Specifically, the DIP Facility will provide the Debtor with the liquidity necessary for it to continue its operations throughout this chapter 11 case, for the benefit of its estate.

43. It is the Debtor's view that it would have been virtually impossible for the Debtor to obtain post-petition financing on an unsecured basis, pursuant to section 364(a) or (b) of the Bankruptcy Code, under the circumstances. Further, even if the Debtor had unencumbered property adequate to attract sufficient unsecured credit, the Debtor does not believe, given the magnitude of its secured obligations, the incomplete stage of construction, and the attendant risks and unknowns with the prototype ESVs, that such unsecured credit, even if granted administrative priority, would have been on more favorable terms than those offered by the Lender.

44. Additionally, feedback was received from the Prepetition Noteholders that they would not be willing to subordinate the Prepetition Note Liens, eliminating the Debtor's ability to obtain secured financing from other sources without granting superpriority or

administrative expense treatment

45. Finally, the terms of the DIP Facility, which the Debtor believes are fair and reasonable, were negotiated in good faith and at arm's length, with all parties represented by experienced counsel. Before finally agreeing on the terms of the DIP Facility, the Debtor and the DIP Loan Trustee engaged in vigorous negotiations regarding the monetary and non-monetary terms and conditions of the DIP Facility. Accordingly, the Debtor's submit that the DIP Loan Trustee should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the Interim Order are later modified, vacated, stayed or terminated by subsequent order of this or any other court, the DIP Loan Trustee will be fully protected with respect to any amounts previously advanced.

46. In sum, the Debtor, with the assistance of its legal advisors, has concluded in the sound exercise of its business judgment that the DIP Facility is the best financing alternative available to it. The financing contemplated hereunder, which will allow for the continued construction of the ESVs, is clearly for the benefit of the estate and the creditors and for preserving and enhancing the Debtor's value as a going concern. Accordingly, the Debtor respectfully requests that this Court grant the relief requested herein.

## NEED FOR IMMEDIATE RELIEF

47. Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), a minimum of fifteen (15) days' notice is required before a final hearing on this Motion may commence. However, such Rule provides that the Court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit or authorize the use of cash collateral, as the case may be, only to the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(b)(2) and (c)(2). It is essential to the continued operation of the Debtor's business that it be authorized by this Court to obtain interim financing on the terms set forth in the Interim Order pending the final hearing on the Motion. Unless this Motion is approved on an interim basis, the Debtor and its wholly-owned non-debtor subsidiaries

will have difficulty paying the shipyards, suppliers and contractors, which would have a devastating effect on the Debtor's operations and the value of the ESVs. Thus, funds are urgently needed to meet all of the Debtor's working capital and other liquidity needs. In the absence of immediate relief, the Debtor's attempts to preserve its assets will be immediately and irreparably jeopardized. Accordingly, the Debtor respectfully requests that, pending a final hearing on the Motion, the terms and provisions of the DIP Facility be implemented and approved on an emergency interim basis, on the terms and subject to the conditions set forth in the DIP Documents and the Interim Order, or on any other terms that the Court may deem appropriate (the "Interim Order").

48. The Debtor also requests that the Court schedule a final hearing on the Motion with objections to the Final Order being due in writing on or before the date that is at least three (3) business days prior to such final hearing.

## NOTICE

49. No trustee, examiner or, creditors' committee has been appointed in this Chapter 11 case. Notice of this Application has been given to (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney for the District of New York; (iv) the Internal Revenue Service; (v) the Debtor's consolidated twenty (20) largest unsecured creditors; (vi) Norsk Tillitsmann ASA, trustee for the Debtor's Prepetition Noteholders; and (vii) the Debtor's Financial Institutions.[4] The Debtor respectfully submits that such notice is sufficient, and request that this Court find that no further notice of the relief requested herein is required.

## NO PRIOR REQUEST

50. No previous motion for the relief sought herein has been made to this or to any other court.

---

[4] A list of the Debtor's financial institutions is attached as Exhibit A to the Debtor's Cash Management Motion filed simultaneously herewith.

## WAIVER OF BRIEF

51.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtor respectfully requests that the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Rules be deemed satisfied.

## CONCLUSION

The Debtor respectfully requests that the Court enter an Order, substantially in the form annexed hereto as Exhibit D, granting the relief requested herein and for such other and further relief as this Court may deem just and proper.

Dated:  February 18, 2010

**LOWENSTEIN SANDLER PC**

/s/ *Scott Cargill*
Kenneth A. Rosen, Esq. (KR 4963)
John K. Sherwood, Esq. (JS 2453)
Scott Cargill, Esq. (SC 4827)
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

*Proposed Counsel to the Debtor and
Debtor in Possession*