# EXHIBIT  A

## SENIOR SECURED SUPER-PRIORITY
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT


dated as of February [19], 2010


Remedial (Cyprus) Public Company Limited
Gr. Xenopoulou 17
P.C. 3106 Limassol
Cyprus
Attention: Stuart Bannerman, CFO

   Re:  <u>Debtor-in-Possession Facility</u>

Ladies and Gentlemen:

   Norsk Tillitsmann ASA, as Loan Trustee on behalf of the bondholders (the "<u>Bondholders</u>") in the FRN Remedial (Cyprus) Public Company Limited Secured Callable Bond Issue 2007/2012 with ISIN No. 001 036034.0 (the "<u>Lender</u>"), hereby agrees to make a certain multiple advance term loan (the "<u>Term Loan</u>") to Remedial (Cyprus) Public Company Limited, a public company organized under the laws of Cyprus, as debtor and debtor-in-possession (the "<u>Borrower</u>") in accordance with the terms of this agreement, including without limitation, those certain terms and conditions set forth herein and contained in that certain Term Sheet attached hereto as <u>Exhibit A</u> (the "<u>Term Sheet</u>"). This agreement, together with the Term Sheet are referred to as the "<u>Agreement</u>" and collectively set forth the terms and conditions of the Term Loan facility (the "<u>Facility</u>") to be provided to the Borrower. Unless otherwise defined herein, capitalized terms used herein shall have the same meanings as specified therefor in the Term Sheet.

   By signing where indicated below, the Borrower agrees, for good and adequate consideration, the receipt and sufficiency of which is hereby acknowledged, to the terms and conditions set forth herein:

   1.  <u>OBLIGATIONS</u>. The obligations of the Borrower set forth in this Agreement and in any and all other documents executed in connection herewith (collectively, the "<u>Loan Documents</u>"), shall be collectively referred to as the "<u>Obligations</u>", unless otherwise indicated. The Obligations shall include, without limitation, all obligations of the Borrower to make payments of principal, interest, fees and costs hereunder.

   2.  <u>LOAN AMOUNT</u>. The outstanding principal amount of all advances under the Term Loan shall not exceed $5,000,000.00, subject to the conditions and limitations set forth in the Term Sheet. All amounts borrowed hereunder shall bear interest as set forth in the Term Sheet.

   3.  <u>PROMISE TO PAY</u>. The Borrower shall, and hereby promises to, pay to the order of the Lender, unconditionally and without setoff, reduction counterclaim or withholding, all outstanding principal and accrued interest, and all fees, costs and expenses of the Lender on the Termination Date, or earlier if otherwise required by this Agreement. The Lender's records shall be prima facie evidence of the amounts outstanding under the Facility.

4.	APPLICATION OF PREPAYMENTS.  Any payments received prior to payment in full of the Obligations shall be applied first to any fees, expenses or charges incurred by the Lender hereunder, and thereafter to accrued and unpaid interest as of the time of such payment, and thereafter to outstanding principal hereunder or under the respective Prepetition Secured Obligations (as set forth in the Final Order) in the sole discretion of the Lender.

5.	REPRESENTATIONS AND WARRANTIES.  The Borrower represents and warrants that:

(a)	Existence.  The Borrower (a) is duly organized and validly existing under the laws of the jurisdiction of its organization and (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its Obligations hereunder and under the Loan Documents to which it is a party.

(b)	DIP Collateral.  The Borrower owns the DIP Collateral, free of all liens, except for those disclosed to the Lender in writing on or before the Closing Date.  Subject to approval by the Bankruptcy Court, the Borrower has the power and authority to grant to the Lender a lien in the DIP Collateral as security for the Obligations.

(c)	No Conflicts.  The execution, delivery and performance by the Borrower of its Obligations hereunder and under each other Loan Document to which the Borrower is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not: (a) contravene the terms of the Borrower's constitutive documents; (b) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (i) any contractual obligation to which the Borrower is a party or affecting the Borrower or the properties of the Borrower or any of its subsidiaries or (ii) any order, injunction, writ or decree of any governmental authority or any arbitral award to which the Borrower or its property is subject; or (c) violate any law.

(d)	Consents.  Except for the entry of the Final Order, and except as expressly contemplated hereunder or in any other Loan Documents, no consent, approval, authorization or order of, and no notice to or filing with, any governmental authority or third party is required in connection with the execution, delivery or performance by the Borrower of any Loan Document or to consummate any transactions contemplated hereby or thereby.

(e)	Enforceability.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by the Borrower.  This Agreement constitutes, and each other Loan Document when so delivered will constitute and shall remain, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms.

(f)	Material Adverse Change.  Except for the filing of the Chapter 11 Case, no event that has had or could reasonably be expected to have a Material Adverse Change has occurred and is continuing.  The Borrower is not aware of any event likely to occur that is reasonably expected to result in a Material Adverse Change.

(g)	Actions Before Governmental Authorities.  Except for the Chapter 11 Case, there are no actions, suits or proceedings at law or in equity or by or before any governmental authority now pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower or its property.

A/73287456.4

(h)     Laws.  The Borrower is not in violation of any law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any governmental authority, where such violation or default could reasonably be expected to result in a Material Adverse Change.  The Borrower is not in default in any manner under any provision of any agreement or instrument evidencing indebtedness, or any other material agreement to which it is a party or by which it is bound where such default could reasonably be expected to result in a Material Adverse Change.

(i)     Information Correct and Current.  No information, report, request for advance, Budget, financial statement, exhibit or schedule furnished, by or on behalf of the Borrower to the Lender in connection with any Loan Document or included therein or delivered pursuant thereto contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading at the time such statement was made or deemed made.

(j)     Tax Matters.  The Borrower (a) has filed all tax returns that it is required to file, (b) has duly paid or fully reserved for all taxes or installments thereof (including any interest or penalties) as and when due, which have or may become due pursuant to such returns, and (c) has paid or fully reserved for any tax assessment received by the Borrower for the three (3) years preceding the Closing Date, if any (including any taxes being contested in good faith and by appropriate proceedings).

6.     AFFIRMATIVE COVENANTS.  In addition to those certain covenants and requirements set forth in the Term Sheet, the Borrower agrees as follows:

(a)     Legal Existence and Good Standing.  The Borrower shall preserve and maintain its legal existence in the jurisdiction of its formation.

(b)     Compliance with Applicable Laws.  The Borrower shall comply with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, paying before the same become delinquent all taxes, assessments and governmental charges imposed upon it, except where any such noncompliance could not reasonably be expected to have a Material Adverse Change.

(c)     Continuation of Business.  The Borrower shall: do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence and its material rights; continue to conduct its business substantially as now conducted or as otherwise permitted hereunder; at all times maintain, preserve and protect all of its assets and properties used or useful in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices.

(d)     Payment of Taxes, Charges and Fees.  The Borrower shall pay when due all taxes, fees and other charges of any nature whatsoever (together with any related interest or penalties) now or hereafter imposed or assessed against the Borrower or upon the Borrower's ownership, possession, use, operation or disposition thereof or upon the Borrower's rents, receipts or earnings arising therefrom. Notwithstanding the foregoing, the Borrower may contest, in good faith and by appropriate proceedings, taxes for which the Borrower maintains adequate reserves therefore in accordance with generally accepted accounting principles.

(e)     Insurance.  At no cost to Lender, the Borrower shall provide and maintain with financially sound and reputable insurance companies not affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by persons engaged in the same or similar business, of such types and in such amounts as are customarily carried

-3-

under similar circumstances by such other persons. Such insurance policy shall name the Lender as an additional insured, loss payee or mortgagee, as the case may be.

(f)     Environmental Matters. The Borrower shall: (a) conduct its operations and keep and maintain its property in compliance with all environmental laws and environmental permits other than noncompliance that could not reasonably be expected to have a Material Adverse Change; (b) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the DIP Collateral or to otherwise comply with environmental laws and environmental permits pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any hazardous material on, at, in, under, above, to, from or about any of its property in all material respects; (c) notify Lender promptly after the Borrower becomes aware of any violation of environmental laws or environmental permits or any release on, at, in, under, above, to, from or about any real estate; and (d) promptly forward to Lender a copy of any order, notice, request for information or any communication or report received by the Borrower in connection with any such violation or release or any other matter relating to any environmental laws or environmental permits.

(g)     Further Assurances. The Borrower agrees that it shall, at the Borrower's expense and upon the reasonable request of Lender, duly execute and deliver to Lender such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purposes of this Agreement and each Loan Document.

(h)     Rights of Access. The Borrower shall grant access to the DIP Collateral and cooperate with any advisers of Lender, including without limitation financial advisers, auditors, appraisers, consultants, and any other such adviser or agent of Lender as Lender may request in it sole discretion, and the Borrower agrees to pay all reasonable costs and expenses of such parties upon request by Lender.

7.     NEGATIVE COVENANTS. In addition to those certain covenants and requirements set forth in the Term Sheet, the Borrower agrees as follows:

(a)     Mergers, Subsidiaries. The Borrower shall not directly or indirectly, by operation of law or otherwise, (a) form or acquire any subsidiary, or (b) merge with, consolidate with, acquire all or substantially all of the assets or stock of, or otherwise combine with or acquire, any person.

(b)     Investments; Loans and Advances, Etc. The Borrower shall not make or permit to exist any investment in, or make, accrue or permit to exist loans or advances of money to, any person, through the direct or indirect lending of money, holding of securities or otherwise. The Borrower shall not make any distribution or dividends on account of or in respect of its equity securities.

(c)     Indebtedness. The Borrower shall not create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness, other than the Obligations, the Prepetition Secured Obligations and all other Indebtedness arising prior to the Petition Date, or prepay any Indebtedness or take any actions which impose on the Borrower an obligation to prepay any Indebtedness. "Indebtedness" means indebtedness of any kind, including (a) all indebtedness for borrowed money or the deferred purchase price of property or services, including reimbursement and other obligations with respect to surety bonds and letters of credit, (b) all obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations, and (d) any contingent obligations.

(d)     Liens. The Borrower shall at all times keep the DIP Collateral and all other property and assets used in the Borrower's business or in which the Borrower now or hereafter holds any interest free and clear from any legal process or liens whatsoever (except for Permitted Priority Liens and all other

liens that are valid, perfected, enforceable and non-avoidable with respect to the DIP Collateral in existence prior to the Petition Date), and shall give Lender prompt written notice of any legal process affecting the DIP Collateral or any liens thereon. The Borrower shall protect and defend its title to its assets from and against all persons claiming any interest adverse to the Borrower, and the Borrower shall at all times keep its property and assets free and clear from any legal process or liens whatsoever (except for Permitted Priority Liens, liens securing obligations owing to the Loan Trustee under the Prepetition Loan Agreement, adequate protection liens, and all other non-avoidable liens with respect to the DIP Collateral in existence prior to the Petition Date), and shall give Lender prompt written notice of any legal process affecting the Borrower's assets. The Borrower shall not enter into or permit to exist any arrangement or agreement (excluding this Agreement and the other Loan Documents) which directly or indirectly prohibits the Borrower from creating, assuming or incurring any lien upon its properties, revenues or assets whether now owned or hereafter acquired; in each case other than (i) restrictions on specific assets which assets are the subject of purchase money security interests to the extent included as a Permitted Priority Lien, and (ii) customary anti-assignment provisions contained in leases and licensing agreements entered into by the Borrower in the ordinary course of business.

(e)     <u>Sales, Transfers, Etc.</u>  Without the prior written consent of Lender, the Borrower shall not voluntarily or involuntarily transfer, sell, lease, license, lend or in any other manner convey any equitable, beneficial or legal interest in any portion of their material assets, except by sales of all or substantially all of the assets of the Borrower as contemplated by the Term Sheet.

(f)     <u>Transactions with Affiliates</u>.  Except as specifically contemplated in the Budget, the Borrower shall not enter into or be a party to any transaction with any affiliate except in the ordinary course of and pursuant to the reasonable requirements of the Borrower's business and as may be necessary to consummate the sale of all or substantially all of the assets of the Borrower as contemplated by the Term Sheet, and upon fair and reasonable terms that are no less favorable to the Borrower than would be obtained in a comparable arm's length transaction with a person not an affiliate of the Borrower.

(g)     <u>Disbursements</u>.  The Borrower shall not make any payment or disbursement to any person other than in the amounts and at the times, if any, set forth in the Budget.

(h)     <u>Capital Structure and Business</u>.  The Borrower shall not amend its constitutive documents in a manner that would adversely affect Lender or the Borrower's duty or ability to repay the Obligations. The Borrower shall not engage in any business other than the businesses currently engaged in by it.

(i)     <u>Change of Corporate Name, State of Incorporation or Location</u>.  The Borrower shall not (a) change its name as it appears in official filings in the jurisdiction of its incorporation, (b) change its chief executive office, principal place of business, corporate offices or warehouses or locations at which DIP Collateral is held or stored, or the location of its records concerning the DIP Collateral, (c) change the type of entity that it is, (d) change its organization identification number, if any, issued by its jurisdiction of incorporation, or (e) change its jurisdiction of incorporation or incorporate in any additional jurisdictions, in each case without at least thirty (30) days prior written notice to Lender and after Lender's written acknowledgment that any reasonable action requested by Lender in connection therewith, including to continue the perfection of any liens in favor of Lender, in any DIP Collateral, has been completed or taken.

(j)     <u>Repayment of Indebtedness</u>.  Except pursuant to a confirmed reorganization plan or the Budget, and except as specifically permitted hereunder, the Borrower shall not, without the express prior written consent of Lender or pursuant to an order of the Bankruptcy Court after notice and hearing, make any payment or transfer with respect to any lien or Indebtedness incurred or arising prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Code.

8.    FINANCIAL INFORMATION.  In addition to the financial information described in the Term Sheet that is required to be delivered to the Lender, for so long as any obligations under the Facility are outstanding under this Agreement and to enable the Lender to carry out an ongoing financial review of the Borrower, the Borrower shall furnish the Lender with any financial or other information about the Borrower as the Lender may reasonably request.  In addition, at any reasonable time and from time to time, the Borrower shall permit the Lender or any of its agents or representatives to examine and make copies and abstracts from the records and books of account of, and visit the properties of, the Borrower and to discuss the affairs, finances and accounts of the Borrower with any of the Borrower's officers, directors and independent accountants (to the extent permitted by applicable law).

9.    INDEMNIFICATION.  The Borrower agrees to indemnify and hold the Lender and its shareholders, directors, agents, officers, subsidiaries, beneficiaries and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party by reason of or resulting from the Facility, this Agreement, the other Loan Documents, the transactions contemplated hereby or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such indemnified persons is a party thereto, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party as finally determined by a final non-appealable order of a court of competent jurisdiction.  The indemnity includes indemnification for the Lender exercising discretionary rights granted under the Facility.  In all such litigation, or the preparation therefor, the Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Borrower agrees to pay promptly the reasonable fees and expenses of such counsel.  The provisions of this section shall survive payment or satisfaction of payment of amounts owing under or with respect to the Loan Documents.

10.    EXPENSES.  The Borrower shall be liable for all reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and other out of pocket expenses of the Lender in connection with the Facility and the Loan Documents (collectively, the "DIP Expenses").  The DIP Expenses shall be treated as Obligations hereunder in all respects.  The provisions of this section shall survive payment or satisfaction of payment of amounts owing under or with respect to the Loan Documents.

11.    CONSENTS, AMENDMENTS, WAIVERS, ETC. Except as otherwise expressly provided in this Agreement, any consent or approval required or permitted by this Agreement to be given by the Lender may be given, and any term of this Agreement or the Loan Documents may be amended, and the performance or observance by the Borrower of any of the terms of this Agreement or the Loan Documents may be waived (either generally or in a particular instance and either retroactively or prospectively) with, but only with, the written consent of the Borrower and the Lender.

12.    ASSIGNMENT.  The Lender may, with the consent of the Borrower, which consent will not be unreasonably withheld or delayed, make an assignment of any portion of its share of the Facility.  The Borrower shall have no right to assign all or any portion of its rights and/or obligations hereunder without the prior written consent of the Lender.

13.    NOTICES, ETC. Except as otherwise expressly provided herein or in the other Loan Documents, all notices and other communications made or required to be given pursuant to this Agreement or the other Loan Documents to any party hereto shall be in writing and shall be delivered by hand, sent by overnight courier, or sent by fax and confirmed by delivery via courier at the address set forth for such party on the signature pages hereto or at such other address for notice as such party shall have last furnished in writing to the person giving the notice.  Any such notice shall be deemed to have been duly given or made and to have become effective upon receipt thereof.

14. <u>MISCELLANEOUS</u>.

(a)     This Agreement is for the Borrower's information only and is not to be shown to, or relied upon by, third parties (except for the professional advisors of the Borrower and except as otherwise required by applicable law or in connection with any litigation or the Borrower's chapter 11 case).  This Agreement (taken as a whole, together with all exhibits and schedules hereto) constitutes the entire understanding between the Borrower and the Lender on this subject and supersedes all prior discussions, agreements, correspondence and communications with respect to the matters referred to herein.

(b)     **THIS AGREEMENT AND THE LOAN DOCUMENTS SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  EACH PARTY HERETO AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE BORROWER AND THE LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.**

(c)     **EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THEREUNDER OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF THE LENDER RELATING TO THE ADMINISTRATION OF THE EXTENSIONS OF CREDIT OR ENFORCEMENT OF THE LOAN DOCUMENTS AND AGREES THAT IT WILL NOT SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED**.  Except as prohibited by law, the Borrower hereby waives any right it may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.  The Borrower (a) certifies that no representative, agent or attorney of the Lender has represented, expressly or otherwise, that the Lender would not, in the event of litigation, seek to enforce the foregoing waivers and (b) acknowledges that the Lender has been induced to enter into the Loan Documents by, among other things, the waivers and certifications contained herein.

(d)     **The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the Act.**

(e)     This Agreement may be executed in several counterparts, each of which shall  be an original, and all of which shall constitute one agreement.  Delivery of an executed signature page of this Agreement by facsimile or electronic (PDF) transmission shall be effective as delivery of a manually executed counterpart hereof.  The provisions of this Agreement are severable and if any one provision

hereof shall be held invalid or unenforceable in whole or in part in any jurisdiction, such invalidity or unenforceability shall affect only such provision in such jurisdiction.

*[Remainder of this page intentionally left blank.]*

Please acknowledge your understanding of the above by signing and returning the enclosed copy of this letter.

Sincerely,

NORSK TILLITSMAN ASA, as trustee on behalf of the Bondholders, as lender

By: _____
    Name:
    Title:

Address:

Postboks 1470
Vika 0116 OSLO
Norway
Tel:
Fax: 47.22.87.94.10
Email:
Attention: [_____]

A/73287456.4

Accepted and agreed to as of
the date first set forth above:

REMEDIAL (CYPRUS) PUBLIC COMPANY
LIMITED, as the Borrower


By: _____
     Name:
     Title:

Address:

Gr. Xenopoulou 17
P.C. 3106 Limassol
Cyprus
Tel:
Fax: 242-356-9432
Email:
Attention: Stuart Bannerman, CFO

## Exhibit A

[Term Sheet]

**Remedial (Cyprus) Public Company Limited**

**$5,000,000**

**Multiple-Draw Debtor-in-Possession Term Loan Facility**

**<u>Term Sheet</u>**
**(Dated as of February 17, 2010)**

*The following Term Sheet (this "<u>Term Sheet</u>") provides the terms of a proposed multi-draw debtor in possession term loan facility with the Borrower identified below, who will become a debtor in possession under chapter 11 of the United States Bankruptcy Code.*

| | |
|---|---|
| **Borrower/Debtor:** | Remedial (Cyprus) Public Company Limited, a private company formed under the laws of Cyprus (the "<u>Borrower</u>" or "<u>Debtor</u>"), including (if and when applicable) as a debtor in possession under chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") in a case (the "<u>Chapter 11 Case</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"). |
| **Lender:** | Norsk Tillitsmann ASA as Loan Trustee on behalf of the bondholders in the FRN Remedial (Cyprus) Public Company Limited Secured Callable Bond Issue 2007/2012 with ISIN No. 001 036034.0 (the "<u>Lender</u>"). |
| **Facility:** | A multiple-draw debtor-in-possession term loan facility, made available to the Borrower in a maximum aggregate principal amount of up to $5,000,000 (the "<u>Facility</u>"). |
| | Obligations owed by, and outstanding from, the Borrower under the Facility, and under any documents relating or entered into ancillary or pursuant thereto (collectively, the "<u>DIP Loan Documents</u>") to which it is a party, shall become due and payable on the Termination Date (as defined below) (collectively, the "<u>Obligations</u>"). |
| | Prior to the entry by the Bankruptcy Court of an order finally and unconditionally approving the Facility on terms and conditions acceptable to the Borrower and the Lender (the "<u>Final Order</u>"), the maximum aggregate principal amount of the Facility which shall be available to the Borrower shall be limited to $1,500,000 (the "<u>Initial Availability</u>"). The balance of the Facility shall be available to the Borrower following entry by the Bankruptcy Court of a Final Order, subject to satisfaction of certain milestones set forth below. |
| **Use of Proceeds:** | To finance expenses of administration and other general corporate purposes in accordance with the Budget (as defined below). |
| **Closing Date:** | The closing of the Facility shall be no later than the third business day following the entry of an interim order by the Bankruptcy Court approving the Facility (the "<u>Interim Order</u>"). |
| **Term:** | The period from the Closing Date to the earliest to occur of: (i) 30 days after the Petition Date (as defined below) if a Final Order has not been entered by such date; (ii) the date that is ten (10) months after the Petition Date; (iii) the consummation of a sale or other transaction with |

respect to all or substantially all of the assets of the Borrower; (iv) the effective date of a plan of reorganization in respect of the Borrower in the Chapter 11 Case; (v) the Termination Declaration Date (as defined below); (vi) forty-five 45 days after the date on which the Borrower has filed a motion pursuant to section 363 of the Bankruptcy Code (the "363 Motion") for entry of an order (in form and substance acceptable to the Lender) approving bidding procedures related to the sale of all or substantially all of the assets of the Borrower (a "Sale") if, by such time, such order has not been entered (the "Termination Date"); or (vii) if the Debtor takes any of the following actions without written consent of the DIP Lender (a) extension of the deadlines set forth in the 363 Motion; (b) adjournment or cancellation of the Auction and/or Sale Hearing; and (c) modification of the Bidding Procedures or withdrawal of the 363 Motion.

**Priority:**        Pursuant to section 364(c)(1) of the Bankruptcy Code, all amounts owing by the Borrower under the Facility in respect thereof at all times will constitute allowed super-priority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carve-Out (as defined below), which Carve-Out shall have priority to all other claims under the Facility and all other claims which are *pari passu* in rank with the Facility.

**Security:**        Subject to the Carve-Out, all obligations of the Debtor under or in respect of the borrowings under the Facility shall be entitled to: (a) super priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code, and (b) will be secured by a first-priority perfected security interest pursuant to section 364(c)(2) and (c)(3) and section 364(d) of the Bankruptcy Code (the liens securing the Facility shall be senior to the liens securing the Prepetition Secured Obligations (as defined below)) in all of the following real and personal property, whether now existing or hereafter arising, of the Debtor (the "DIP Collateral"): all of the assets (tangible, intangible, real, personal or mixed) of the Debtor, whether now owned or hereafter acquired, including, without limitation, all accounts, documents, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, commercial tort claims, cash, cash equivalents, securities accounts, deposit accounts, real estate, leasehold interests, contracts, patents, copyrights, trademarks, causes of action, other general intangibles, avoidance power claims or actions under section 549 of the Bankruptcy Code and the proceeds thereof, rights under section 506(c) of the Bankruptcy Code and the proceeds thereof, proceeds of avoidance power claims or actions under chapter 5 of the Bankruptcy Code all Prepetition Collateral (as defined below), and to the extent not otherwise included, all products and proceeds, tort claims, insurance claims, and other rights to payment not otherwise included in the foregoing, and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing, subject only to the following (the "Permitted Priority Liens"):  (i) the Carve-Out and (ii) valid, perfected, enforceable and non-avoidable liens as of the commencement of the Chapter 11 Case (the "Petition Date") which were senior in priority to liens securing obligations owing to the Loan Trustee (as defined below) under the Prepetition Loan Agreement (as

defined below) as of the Petition Date.

**Carve-Out:** The liens and the superpriority claims securing the Facility shall be subject to a "Carve-Out", which, for purposes hereof shall mean the sum of the following amounts (collectively, the "Carve-Out Amount"): (i) amounts payable to the United States Trustee (the "Statutory Trustee") pursuant to 28 U.S.C. § 1930(a)(6) and all fees required to be paid to the Clerk of the Bankruptcy Court; *plus* (ii) after the occurrence of a default under the Interim Order or, following the closing of the Facility, after the occurrence of an Event of Default under the DIP Loan Documents, the allowed and unpaid professional fees and disbursements incurred by the Debtor and any official committee(s) of creditors of the Debtor (a "Statutory Committee") for any professionals retained by final order of the Bankruptcy Court (which order has not been vacated, stayed or appealed, unless such stay has been vacated) by the Debtor and any Statutory Committee under sections 327 or 1103(a) of the Bankruptcy Code (the "Case Professionals") in an aggregate amount (the "Case Professionals Carve Out") not in excess of $250,000, *but solely* to the extent such fees and disbursements were incurred in accordance with the Budget; *plus* (iii) all unpaid professional fees and disbursements of such Case Professionals incurred prior to the Termination Declaration Date to the extent allowed or later allowed by the Court (which order has not been vacated, stayed or appealed, unless such stay has been vacated) under sections 328, 330 and/or 331 of the Bankruptcy Code and any interim compensation procedures order (the amounts described in (ii) and (iii) hereinafter sometimes collectively the "Allowed Professional Fees"). The payment of Allowed Professional Fees after the occurrence of the Termination Declaration Date shall reduce the Carve-Out Amount on a dollar-for-dollar basis. Any funding of the Carve-Out shall be added to and made a part of the Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under the Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

**Funding:** The proceeds of the Facility, together with all collections and proceeds from sales of DIP Collateral will be deposited into an account at an institution for which the Lender has a perfected security interest pursuant to the Interim Order or the Final Order, as applicable (the "Controlled Account"). So long as no Default or Event of Default has occurred, the Borrower will be able to withdraw amounts from the Controlled Account, to make payments of a type and in an amount consistent with the Budget and use of proceeds described herein.

To the extent a Controlled Account is not established at the time that a payment is required to be made pursuant to the Budget, the Lender shall, in accordance with an instruction letter from the Borrower, make such payments on behalf of the Borrower and such payments shall be treated in all respects as loans made pursuant to the Facility; and, provided, further, that to the extent such an account is not established, all collections and proceeds from sales of DIP Collateral shall be turned over to the Lender and applied in accordance with the Interim Order.

Upon notice to and consent of the Lender, the Borrower may open or close any account that is not a Controlled Account.

| | |
|---|---|
| **Interest:** | The Facility will accrue interest on a daily basis at a rate equal to 12% per annum, which shall be compounded into the principal outstanding amount of the Obligations at the end of each month and shall be payable on the earlier to occur of the date on which the Obligations are repaid and the Termination Date. |
| **Default Interest Rate:** | Upon the Termination Declaration Date, the outstanding principal amount of the Obligations will accrue interest at the rate in effect *plus* 3.0%, and such interest shall be payable on demand. |
| **Mandatory Repayments:** | 100% of the net sale proceeds from any and all asset sales or insurance and condemnation proceeds of the Borrower. |
| **Representations and Warranties:** | • Borrower (a) is duly organized and validly existing under the laws of the jurisdiction of its organization and (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its Obligations hereunder and under the DIP Loan Documents to which it is a party. |
| | • The execution, delivery and performance by Borrower of its Obligations hereunder and under each other DIP Loan Document to which Borrower is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of Borrower's constitutive documents; (b) conflict with or result in any breach or contravention of, or the creation of any lien under, or require any payment to be made under (i) any contractual obligation to which Borrower is a party or affecting Borrower or the properties of Borrower or any of its subsidiaries or (ii) any order, injunction, writ or decree of any governmental authority or any arbitral award to which Borrower or its property is subject; or (c) violate any law. |
| | • Except for the entry of the Interim Order or the Final Order, whichever occurs first, and except as expressly contemplated hereunder or in any other DIP Loan Documents, no consent, approval, authorization or order of, and no notice to or filing with, any governmental authority or third party is required in connection with the execution, delivery or performance by Borrower of any DIP Loan Document or to consummate any transactions contemplated hereby or thereby. |
| | • This Term Sheet has been, and each other DIP Loan Document, when delivered hereunder, will have been, duly executed and delivered by Borrower. This Term Sheet constitutes, and each other DIP Loan Document when so delivered will constitute and shall remain, a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms. |
| **Approved Budget:** | Borrower shall provide a 13-week budget, which shall be acceptable to the Lender (the "Budget") and shall be updated on a monthly basis during the term of the Facility as further set forth below. |
| **Financial Covenants:** | *Compliance with Budget*. The Borrower will comply with the budget |

approved as the "Budget" within 10% individual line item cumulative and rolling variances. On the first business day on or after the 15th day of each month, the Borrower shall provide (i) an updated Budget; (ii) a monthly comparison of actual performance to Budget, with explanations for any variance by line item; and (iii) a monthly cumulative comparison of actual performance to Budget, with explanations for any variance by line item.

**Affirmative and Negative Covenants:**

- The Borrower will grant access and cooperate with the Lender's financial and legal advisors and the Lender's consultants.

- In accordance with the Budget, maintenance of properties and insurance, payment of taxes, compliance with laws, licenses, contracts, and permits; preparation of and compliance with Budget.

- No indebtedness, guarantees, liens, investments, loans, mergers, permitted acquisitions, and transactions with affiliates, without the Lender's consent.

- No dividends and distributions.

- Limitations on asset sales, except those in the ordinary course of business, without the Lender's consent.

- The Borrower shall have filed its schedules and statement of affairs with the Bankruptcy Court no later than within thirty (30) days after commencement of the Chapter 11 Case.

- The Borrower shall have obtained an order of the Bankruptcy Court setting the last day to file claims in the Chapter 11 Case no later than within forty-five (45) days after commencement of the Chapter 11 Case.

- To the extent the Debtor obtains an order approving a sale (or sales) of all or substantially all of the assets of the Debtor, such order shall be in form and substance acceptable to the Lender.

- No other costs or expenses of administration, other than as provided in the Interim Order or the Final Order, as applicable, or this Term Sheet, which have been or may be incurred in the Chapter 11 Case or any successor cases at any time, shall be charged against the Lender, Loan Trustee or Prepetition Bondholders (as defined below) or any of their respective claims, the DIP Collateral or the Prepetition Collateral pursuant to section 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the affected Lender, Loan Trustee or Prepetition Bondholder, and no such consent shall be implied from any other action, inaction, or acquiescence by the affected Lender, Loan Trustee or Prepetition Bondholder.

- Within two (2) days of the Petition Date (unless extended by the Lender), the Borrower shall file a motion pursuant to section 363 of the Bankruptcy Code to sell all or substantially all of the assets of the Borrower, such sale to occur within fifty-five (55) days of the Petition Date.

- The Borrower shall schedule a hearing for approval of bidding procedures related to the motion pursuant to section 363 of the Bankruptcy Code to sell all or substantially all of the assets of the Borrower, which bidding procedures shall be considered at a hearing to be held not later than twelve (12) days of the filing of such motion, which period may be extended with the consent of the Lender (which consent shall not be unreasonably withheld). The bidding procedures order shall: (a) expressly recognize the right of the Loan Trustee to credit bid pursuant to section 363(k) of the Bankruptcy Code; (b) approve the Loan Trustee or its designee as the "stalking horse" bidder; and (c) provide for an expense reimbursement, bidding increments, and other usual and customary stalking-horse protections (provided, however, that no break-up fee shall apply).

**Events of Default:**

- Failure to pay interest, principal, or fees when due (with a three (3) business day grace period for interest and fees); failure to comply with any term of the DIP Loan Documents, the Interim Order or the Final Order; any post-petition judgment in excess of an amount of $50,000 or which would operate to divest the Borrower of any material assets; the Borrower being enjoined from conducting any material portion of its business; disruption of material business operations of the Borrower; material damage to or loss of material assets or contracts; conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; the dismissal of the Chapter 11 Case, any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing; the appointment in the Chapter 11 Case of a chapter 11 trustee or an examiner with expanded powers; the grant of any superpriority administrative expense claim or any lien (other than in favor of the holders of the Prepetition Secured Obligations as set forth herein) which is *pari passu* with or senior to those of the Lender; any payment of prepetition debt (provided that the Interim Order and all orders relating to cash management shall be acceptable to the Lender in its sole discretion) other than payments as may be acceptable to the Lender and approved by the Bankruptcy Court; the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of the Borrower of a value in excess of an amount of $50,000; an order terminating exclusivity having been entered (or requested, unless actively contested by the Borrower) or failure of the Debtor to obtain, within thirty (30) days following the Petition Date (or such other date as may be agreed to by Lender and fixed by the Bankruptcy Court), the Final Order with respect to those matters covered by the Interim Order and permitting extensions of credit under the Facility not to exceed $5 million in principal amount and otherwise in form and substance reasonably satisfactory to the Lender; any reversal, revocation or modification without the consent of the Lender of such order or any other order of the Bankruptcy Court with respect to the Chapter 11 Case and materially and adversely affecting the Facility.

- Any certification, representation or warranty previously, presently or hereafter made in writing by or on behalf of Debtor in connection

with this Term Sheet or any other DIP Loan Document shall prove to have been false or incorrect in any material respect on the date on or as of which made.

**Remedies:** Immediately upon the occurrence and during the continuation of an Event of Default: the Lender may declare (1) all Obligations owing hereunder and under the other DIP Loan Documents to be immediately due and payable, (2) the termination, reduction or restriction of any further commitment to extend credit to the Borrower to the extent any such commitment remains, and (3) the termination of the Facility and any other DIP Loan Documents as to any future liability or obligation of the Lender, but without affecting any of the Liens or the Obligations under the Facility or the DIP Loan Documents (any such declaration shall be made to the Debtor, the Statutory Committee and the United States Trustee, and shall be referred to herein as a "<u>Termination Declaration</u>" and the date which is the earliest to occur of any such Termination Declaration being herein referred to as the "<u>Termination Declaration Date</u>").

In addition to remedies described above and other customary remedies, five (5) business days following the Termination Declaration Date, the Lender shall have the right to relief from the automatic stay and may foreclose on all or any portion of the DIP Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations, or otherwise exercise remedies against the DIP Collateral permitted by applicable nonbankruptcy law. During such five (5) business day notice period, the Borrower and any Statutory Committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing. Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay, as to the Lender, shall be automatically terminated at the end of such notice period and without further notice or order.

**Expenses:** The Borrower shall be liable for all reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and other out of pocket expenses of the Lender in connection with the Facility and the DIP Loan Documents, whether or not the transactions contemplated hereby are consummated (collectively, the "<u>DIP Expenses</u>"). The DIP Expenses shall be treated as Obligations hereunder in all respects.

**Adequate Protection:** Subject to the Carve-Out, as adequate protection for any diminution in value of the interests of the holders of the Prepetition Secured Obligations in the Prepetition Collateral resulting from imposition of the automatic stay, the sale, lease or use of the Prepetition Collateral securing the Prepetition Secured Obligations, or otherwise, the holders of the Prepetition Secured Obligations will receive: (a) replacement liens on all assets of the Debtor, which shall be junior to the liens securing the Facility; and (b) a superpriority claim status that is junior to the superpriority claim status applicable to the Facility.

**Conditions to Initial** The obligation to provide the initial extension in an amount not to

**Extension:** exceed the Initial Availability shall be subject to the satisfaction of conditions, including, without limitation, the following conditions (all to Lender's satisfaction):

- The Bankruptcy Court shall have entered the Interim Order in form and substance satisfactory to the Lender authorizing the transactions contemplated by the Facility, authorizing the granting of superpriority claim status and the liens (which liens shall be continuing, valid, binding, enforceable, non-avoidable and automatically perfected), authorizing the Facility in an amount not greater than $1,500,000 (subject to the Budget), containing a good faith finding under section 364(e) of the Bankruptcy Code, which order shall not have been reversed, modified, amended or stayed. The Interim Order shall include provisions, in form and substance satisfactory to the Lender, relating to permission for the use of cash and other collateral of the holders of the Prepetition Secured Obligations, the adequate protection afforded to the holders as provided herein, and, with respect to collateral securing the Prepetition Secured Obligations, waivers of the "equities of the case" cutoff under Section 552(b) of the Bankruptcy Code, and to the effect that Section 551 of the Bankruptcy Code shall not apply to preserve for the benefit of the estate any avoided security interest or lien senior to a security interest or lien securing the Facility or the Prepetition Secured Obligations and subject to entry of the Final Order, waivers of any charge to the collateral securing the Facility or the Prepetition Secured Obligations under Section 506(c).

- Prior to making the full amount of the Facility available, the Bankruptcy Court shall have entered the Final Order in form and substance satisfactory to the Lender confirming the authorization of the transactions contemplated by the Facility, the granting of superpriority claim status and the liens contemplated hereby, authorizing extensions of credit under the Facility in an amount not greater than $5 million (inclusive of the Initial Availability) and making such good faith findings and covering such other matters as required by the Lender, which order shall not have been reversed, modified, amended or stayed.

- Receipt of satisfactory corporate resolutions and other evidence of appropriate corporate authorization of the proposed Facility.

- There will have been (a) since the filing date other than those resulting from the commencement of the Chapter 11 Case, no material adverse change, individually or in the aggregate, in the business, prospects, operations, property, assets, or condition, financial or otherwise, of the Borrower or the DIP Collateral taken as a whole, (b) no litigation commenced which could reasonably be expected to have a material adverse impact on the Borrower, or its business, or its ability to perform any material obligation or repay the loans, or which challenges the Facility or the Prepetition Secured Obligations, (c) since the filing date no material increase in the liabilities, liquidated or contingent, of the Borrower, or material decrease in the assets of the Borrower and (d) other than those resulting from the commencement of the Chapter 11 Case, since the

filing date no material adverse change in the ability of the Lender to enforce the DIP Loan Documents and the Obligations of the Borrower thereunder.

- Receipt and reasonable approval by the Lender of the Budget.

- Receipt by the Lender of drafts of the first day pleadings in form and substance reasonably satisfactory to the Lender not later than a reasonable time in advance of the filing of the Chapter 11 Case in order for the Lender's counsel to review and analyze the same.

- The Interim Order and such other orders as may be necessary for the implementation of the Facility or reasonably requested by the Lender shall have been approved and entered by the Bankruptcy Court and shall be in form and substance satisfactory to the Lender.

**Condition to Second Extension:**  The obligation to provide a second extension in an incremental amount not exceed $2,000,000 shall be subject to the Bankruptcy Court's entering of an order approving the bidding procedures related to a Sale and such procedures shall be acceptable to the Lender.

**Condition to Third Extension:**  The obligation to provide a third extension in an incremental amount not exceed $1,500,000 shall be subject to the Bankruptcy Court's entering of an order approving the Sale on or prior to April 15, 2010, and such order shall be in form and substance acceptable to the Lender.

**Conditions of All Extensions of Credit:**  The obligation to provide each extension of credit (including the initial extension of credit) shall be subject to the satisfaction of the following conditions:

- No continuing Event of Default shall exist after giving effect to the proposed extension of credit.

- Representations and warranties shall be true and correct in all material respects at the date of each extension of credit.

- The Borrower shall have paid the balance of all fees and expenses then due and payable as referenced herein.

- The Interim Order or the Final Order, as the case may be, shall be in full force and effect and shall not have been reversed, modified, amended or stayed.

- The request by the Borrower of, and the acceptance by the Borrower of, each extension of credit shall be deemed to be a representation and warranty by the Borrower that the conditions specified above have been satisfied.

**Indemnification:**  The Borrower agrees to indemnify and hold the Lender and its shareholders, directors, agents, officers, subsidiaries, beneficiaries and affiliates harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party by reason of or resulting

from the Facility, this Term Sheet, the other DIP Loan Documents, the transactions contemplated hereby or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such indemnified persons is a party thereto, except to the extent resulting from the gross negligence or willful misconduct of the indemnified party as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the Lender exercising discretionary rights granted under the Facility. In all such litigation, or the preparation therefor, the Lender shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Borrower agrees to pay promptly the reasonable fees and expenses of such counsel.

**Prepetition Secured Obligations:**

**Prepetition Secured Obligations:** Pursuant to that certain loan agreement dated March 23, 2007 (as may be amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition Loan Agreement," and together with all other loan and security documents related to, referenced in or executed in connection with the Prepetition Loan Agreement, the "Prepetition Loan Documents") between the Borrower and Norsk Tillitsmann ASA, as trustee (the "Loan Trustee") on behalf of the bondholders (the "Prepetition Bondholders"), the Borrower issued certain bonds due 2012 in the aggregate principal amount of $210,000,000. As of the Petition Date, the outstanding principal amount of all obligations under the Prepetition Loan Documents was $230,452.704.82 (collectively, together with any amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Loan Documents, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses and disbursements), reimbursement obligations, indemnification obligations and other charges of whatever nature, whether or not contingent, whenever arising, due or owing in respect thereof, including all "Obligations" as described in the Prepetition Loan Documents, the "Prepetition Secured Obligations"). As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, the Borrower granted to the Loan Trustee for the benefit of the Prepetition Bondholders the following security interests and liens (the "Prepetition Liens")

(a) to secure the Bond Prepetition Secured Obligations:

   (i) a first priority floating charge granted by the Borrower in respect of its rights, titles and interests in and to certain Construction Contracts (as defined in the Prepetition Loan Agreement); and

   (ii) a first priority pledge over the escrow account into which the Bond proceeds were originally deposited (although the Bond proceeds have since been transferred to an account in the name of the Loan Trustee); and

(b) to secure the US$3 million of the Bond Prepetition Secured

Obligations which was released after 11 December 2009 from the account of the Loan Trustee containing the Bond proceeds:

(i) a first priority security interest granted by the Borrower over certain OFE equipment being stored by Advance Rig Services LLC at their yard in Houston, Texas; and

(ii) a first priority security interest granted by Remedial Offshore Limited over certain OFE equipment being stored by Advance Rig Services LLC at their yard in Houston, Texas, (collectively, the "Prepetition Collateral").

- **Validity, Perfection and Priority of Prepetition Liens and Prepetition Secured Obligations.**  Subject to the provisions of the Interim Order, the Debtor acknowledges and agrees that:  (a) as of the Petition Date, the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected; (b) as of the Petition Date, the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain Permitted Priority Liens; (c) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtor; (d) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtor and its estate have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against the Loan Trustee or Prepetition Bondholders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to their loans to the Debtor; and (f) any payments made on account of the Prepetition Secured Obligations to or for the benefit of the Loan Trustee or the Prepetition Bondholders prior to the Petition Date were on account of amounts in respect of which the Loan Trustee and the Prepetition Bondholders were oversecured, were payments out of the Prepetition Collateral, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

**Governing Law:**        State of New York.

REMEDIAL (CYPRUS) PUBLIC COMPANY
LIMITED, as the Borrower


By: _____
Name:
Title:

NORSK TILLITSMAN ASA, as trustee on behalf of the Prepetition Bondholders, as Lender

By: _____
Name:
Title: