**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq.
John K. Sherwood, Esq.
Scott Cargill, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Remedial (Cyprus) Public Company Ltd., | Case No. 10-10782 (REG) |
| Debtor. | |

**DEBTOR'S MOTION FOR THE ENTRY OF ORDERS (A) AUTHORIZING THE DEBTOR TO SELL SUBSTANTIALLY ALL OF ITS ASSETS TO A STALKING HORSE BIDDER SUBJECT TO HIGHER AND BETTER OFFERS, (B) APPROVING BIDDING PROCEDURES, (C) SCHEDULING AUCTION AND SALE HEARING, AND (D) FOR RELATED RELIEF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

RELIEF REQUESTED ............................................................................................................... 1

JURISDICTION AND VENUE ................................................................................................. 2

BACKGROUND ....................................................................................................................... 2

    A.    In General. .................................................................................................... 2
    B.    The Debtor's Efforts to Restructure Out of Court. ....................................... 3
    C.    The Stalking Horse Bid and Asset Purchase Agreement. ............................ 6
    D.    The Proposed Bidding Procedures. .............................................................. 8
    E.    Notice Of Sale Hearing, Auction, Bidding Procedures, And Objection
        Dates. ......................................................................................................... 15
    F.    Assumption and Assignment of Contracts. ............................................... 15
    G.    Extraordinary Provisions ............................................................................ 17

LEGAL AUTHORITY ............................................................................................................. 18

    A.    The Bankruptcy Code Permits the Debtor to Sell Assets to Preserve the
        Value of its Estate. ..................................................................................... 18
    B.    The Assets May Be Sold Free And Clear Of Liens, Claims And
        Encumbrances. ........................................................................................... 21
    C.    Stalking Horse Bidder is Entitled to Credit Bid ........................................ 22
    D.    Good Faith Pursuant To § 363(m). ........................................................... 23
    E.    Approval of the Expense Reimbursement. ................................................ 24
    F.    Assumption and Assignment of the Executory Contracts Is Permitted
        Pursuant to Section 365 of the Bankruptcy Code. .................................... 25

FINALITY OF ORDER ........................................................................................................... 27

NOTICE ........................................................................................................................... 27

NO PRIOR REQUEST ............................................................................................................ 28

WAIVER OF BRIEF ............................................................................................................... 28

CONCLUSION ........................................................................................................................ 28

EXHIBITS ........................................................................................................................... 29

**Pages**

CASES

*In re 995 Fifth Ave. Associates, L.P.*,
    96 B.R. 24 (Bankr. S.D.N.Y. 1992) ...................................................................................24

*Abbotts Dairies*, 788 F.2d 143 (3d Cir. 1986) ...............................................................19

*In re Aerovox, Inc.*,
    269 B.R. 74 (Bankr. D. Mass. 2001) ................................................................................19

*In re Allegiance Telecom, Inc.*,
    Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2003) .........................................................25

*In re Andy Frain Services, Inc.*,
    798 F.2d 1113 (7th Cir. 1986) ..........................................................................................23

*In re Chateaugay Corp.*,
    973 F.2d 141 (2d Cir. 1992) .............................................................................................18

*In re Chrysler LLC*,
    405 B.R. 84 (Bankr. S.D.N.Y. 2009), *aff'd*, 576 F.3d 108 (2d Cir. 2009) .............................19

*Cinicloa v. Scharffenberger*,
    248 F.3d 110 (3d Cir. 2001) .............................................................................................26

*Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
    722 F.2d 1063 (2d Cir. 1983) .............................................................................18, 19, 20

*In re Equity Funding Corp. of America*,
    492 F.2d 793 (9th Cir.), cert. denied, 419 U.S. 964 (1974) ...............................................19

*Fulton State Bank v. Schipper*,
    933 F.2d 513 (7th Cir. 1991) ............................................................................................18

*In re G Survivor Corp.*,
    171 B.R. 755 (Bankr. S.D.N.Y. 1994) ..............................................................................26

*In re General Motors Corp.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009) ..............................................................................19

*In re Gucci*,
    126 F.3d 380, 390 (2d Cir. 1997) .....................................................................................23

*In re Integrated Resources, Inc.*,
    147 B.R. 650 (S.D.N.Y. 1992) ....................................................................................19, 24

*In re Loral Space & Communications Ltd.*,
   Case Nos. 03-41710 and 03-41709 (RDD) (Bankr. S.D.N.Y. 2003) .....................................25

*In re Metaldyne Corp.*,
   409 B.R. 671 (Bankr. S.D.N.Y. 2009), *aff'd* 2009 WL 5125116 (S.D.N.Y. Dec. 29,
   2009) ...................................................................................................................................22, 23

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984)................................................................................................................26

*Richmond Leasing Co. v. Capital Bank, N.A.*,
   762 F.2d 1303 (5th Cir. 1985) ................................................................................................26

*In re Richmond Metal Finishers, Inc.*,
   756 F.2d 1043 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).......................................26

*In re Rock Industries Machinery Corp.*,
   572 F.2d 1195 (7th Cir.1978) .................................................................................................23

*In re Sandman Assocs., LLC*,
   251 B.R. 473 (W.D. Va. 2000) ...............................................................................................26

*Sharon Steel Corp. v. National Fuel Gas Dist Corp.*,
   872 F.2d 36 (3d Cir. 1989).....................................................................................................26

*Stephens Indus. Inc. v. McClung*,
   789 F.2d 386 (6th Cir. 1986) ..................................................................................................19

*In re Whitcomb & Keller Mortgage Co., Inc.*,
   715 F.2d 375 (7th Cir. 1983) ..................................................................................................26

## STATUTES

11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), and 364(e)..................................2

28 U.S.C.  §§ 157 and 1334..............................................................................................................2

28 U.S.C.  §§ 1408 and 1409............................................................................................................2

Chapter 11 of the Bankruptcy Code...........................................................................................2, 22

Section 105(a) of the Bankruptcy Code...........................................................................................25

Section 363(b)(1) of the Bankruptcy Code................................................................................18, 19

Section 363(f) of the Bankruptcy Code ...........................................................................................21

Bankruptcy Code section 363(k) .....................................................................................................22

Section 363(m) of the Bankruptcy Code ........................................................................................23

Section 365 of the Bankruptcy Code ......................................................................................25, 26

Section 365(a) of the Bankruptcy Code................................................................................25, 26

Sections 1107(a) and 1108 of the Bankruptcy Code. ...................................................................2

Sections 105(a), 363 and 365 of title 11 of the United States Code ..............................................2

**RULES**

Bankruptcy Rule 1007-2 ................................................................................................................2

Bankruptcy Rule 2002 ............................................................................................................15, 27

Bankruptcy Rule 9006-1(b) .........................................................................................................17

Bankruptcy Rules 4001(b) and 4001(c).........................................................................................3

Bankruptcy Rules 6004(h) and 6006(d)..................................................................................18, 27

Remedial (Cyprus) Public Company Ltd. (the "Debtor"), by its proposed attorneys, submits this motion (the "**Motion**") for orders (a) authorizing the Debtor to sell all or substantially all of its assets to the Debtor's existing secured Bondholders (defined below) or their nominee (the "**Stalking Horse Bidder**"), subject to higher and better offers, (b) approving bidding procedures, (c) scheduling an auction and a sale hearing, and (d) granting related relief. In support of this Motion, the Debtor respectfully states:

## RELIEF REQUESTED

1.      By this Motion, the Debtor seeks entry of two orders.  First, the Debtor requests entry of an order, substantially in the form attached hereto as Exhibit A (the "**Bidding Procedures Order**"), approving bidding procedures, notice procedures, and certain bid protections to be provided to the Stalking Horse Bidder, as described more fully herein.  Second, subject to the terms of the Bidding Procedures Order, the Debtor requests entry of an order (the "**Sale Order**"), approving the sale to the Stalking Horse Bidder or the entity that submits the highest and best offer, and approving the assumption and assignment of the Assumed Contracts (defined below).

2.      On February 17, 2010, when the Debtor filed its chapter 11 petition (the "**Petition Date**"), the Bondholders' secured claim was $230,418,833[1] in principal, interest, fees, and costs. The Stalking Horse Bidder intends to credit-bid $120 million for the purchase of substantially all of the Debtor's assets.

3.      As discussed below, the Debtor believes that a sale of its assets on the terms and conditions described herein and in the APA (defined below) is its best opportunity under the circumstances to maximize the value of its assets and business and that, therefore, the sale is in the best interests of the estate and creditors.

---

[1]      This amount includes $53.5 million in the Escrow Account (defined below).  Thus, the amount of the Bondholders' claim net of the amount in the Escrow Account is approximately $177 million.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The statutory predicates for the relief requested herein are Sections 105(a), 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Federal Rules and Bankruptcy Procedures (the "**Bankruptcy Rules**") 2002, 6004, 6006 and 9014.

## BACKGROUND

**A.     In General.**

6.     On the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

7.     The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

8.     No trustee, examiner, or committee has been appointed in this case.

9.     For information concerning the Debtor's business, prepetition indebtedness and capital structure, events leading to the Debtor's chapter 11 case and other pertinent matters, the Court and parties are referred to the Affidavit of Stuart Bannerman Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Debtor's Petition and First Day Motions, filed on the Petition Date.

10.    On February 19, 2010, this Court held a hearing on the Debtor's First Day Motions, which were the following:

- Debtor's Motion For An Order (1) Authorizing The Debtor To (A) Continue and Maintain its Cash Management System, (B) Continue And Maintain its Existing Bank Accounts And (C) Use Existing Business Forms; (2) Granting Interim Waiver of Section 345 Investment Guidelines; and (3) Granting Related Relief (the "**Cash Management Motion**"); and

- Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1), and 364(e); and (B) Utilize Cash Collateral of Prepetition Secured Parties; (ii) Granting Adequate Protection to Prepetition Secured Parties; (II) Scheduling a Final Hearing Pursuant to

Bankruptcy Rules 4001(b) and 4001(c); and (IV) Granting Related Relief (the "**DIP Motion**").

11.     The Bondholders, represented by Norsk Tillistmann ASA (the "Loan Trustee"), have agreed to provide a multiple draw DIP term loan of up to $5 million as postpetition secured financing.  This Court entered interim orders granting the DIP Motion (the "**Interim DIP Order**") and the Cash Management Motion, on February 22 and 24, 2010, respectively.

12.     The Debtor will use postpetition financing to continue operating its business in the ordinary course, in accordance with the budget submitted with the DIP Motion.  Mostly, the postpetition financing will go toward completing the construction of two Elevating Support Vessels, which are state of the art, stable offshore work platforms specifically designed to support remedial oil and gas activities (the "**Vessels**").

**B.     The Debtor's Efforts to Restructure Out of Court.**

*Bond Loan*

13.     On or about March 28, 2007, the Debtor issued a five-year $210 million Norwegian law bond at a 360-day interest rate equivalent to 3-month USD LIBOR plus 5.25% (the "**Bond Loan**").  The Bond Loan is secured by a floating charge granted by the Debtor to the Loan Trustee in respect of its rights, titles and interests in and to the Debtor's contracts for the construction of the Vessels.

14.     The Bond Loan was also previously secured for the benefit of the bondholders (the "**Bondholders**") over an escrow account into which the proceeds of the Bond Loan were deposited (the "**Escrow Account**").

15.     Over the last three years, as the construction of the Vessels has been plagued by cost overruns and unexpected delays, and the Debtor has only had marginal incoming revenue, the Debtor's liquidity has deteriorated.  The Debtor defaulted under the terms of the Bond Loan in or about September 2009 when it failed to make an interest payment of $3.1 million.  The Debtor was, as a consequence of that default, unable to access the approximately $56.5 million in the Escrow Account.

16.     As part of the discussions which led to a restructuring proposal, the balance of the proceeds of the Bond Loan was moved from the Escrow Account to an account (the "**NTM Account**") held in the name of the Loan Trustee upon the instruction of the Debtor.

17.     In December 2009, during restructuring discussions, the Bondholders authorized the Loan Trustee to advance $3 million from the NTM Account.  The release of these funds was secured by additional collateral provided by the Debtor and its direct, wholly-owned subsidiary (Remedial Offshore Limited) over certain equipment, engines, and rack and chord material.  The full $3 million has since been released from the NTM Account leaving a balance of approximately $53.5 million.

18.     On February 16, 2010, the Loan Trustee issued a notice of acceleration and demand to the Debtor in respect of the amounts due under the Bond Loan as a result of the continuing default.

19.     Prior to the Petition Date, the Debtor negotiated with the Bondholders, through the Loan Trustee, as well as with other major creditors, in an attempt to restructure its debt outside of court.  The Bondholders own, in the aggregate, approximately $210 million in face amount of bonds.  On behalf of the Bondholders, the Loan Trustee engaged a financial advisor, AMA Capital Partners LLC ("**AMA**"), and a legal adviser, Bingham McCutchen, LLP ("**Bingham**" and, together with AMA, the "**Bondholder Advisers**"), to perform due diligence and give advice to the Loan Trustee with respect to the potential restructuring of the Debtor's debt obligations.

20.     On February 12, 2010, the Bondholders met, pursuant to a summons issued by the Debtor, to consider a restructuring proposal that requested approval that, among other things, the Bondholders exchange the outstanding amount of their debt for a 95% pro rata ownership interest in the Debtor.  The Debtor's shareholders previously approved this debt-for-equity transaction at a shareholders' meeting held in December 2009, and the Bondholders approved the restructuring proposal at the Bondholders' meeting.  Had this restructuring proposal been implemented, the Debtor would have given ownership of substantially all of its equity (and

therefore substantially all of its assets) to its prepetition secured bondholders. However, this restructuring proposal was never consummated because certain of the Debtor's unsecured financial institution creditors refused to accept a settlement of their claims, which compromise was a condition to the Bondholders' consent to the terms of the proposed restructuring agreement.

21. Faced with a continuing event of default under the terms of the Bond Loan and no liquidity to fund operations, the Debtor determined that seeking protection under the Bankruptcy Code was in the best interests of all constituents and would provide the Debtor with the best opportunity to maximize value for the Debtor's estate and restructure its balance sheet. Prior to the commencement of this case, the Debtor had been in discussions with the Bondholder Advisers who had indicated that, based on feedback from an ad hoc committee of Bondholders holding approximately 76% of the principal amount outstanding of the bonds, they expected the Bondholders would be willing to purchase substantially all of the assets of the Debtor if a fair value bid could not be achieved from a third party bidder.

22. The Debtor has subsequently negotiated a form of Asset Purchase Agreement ("**APA**") with the Loan Trustee, pursuant to which it is intended that an entity which owns all of the bonds or an assignee or nominee of the Loan Trustee, would purchase all the assets of the Debtor. The Debtor understands that the Bondholders are scheduled to meet prior to the date of the initial hearing on the Motion and expects that, at such meeting, the Loan Trustee will be authorized to make a binding offer to purchase the Debtor's assets pursuant to an agreement substantially in the form of the APA attached as <u>Exhibit B</u>. Upon receipt of the Bondholder approval by the Loan Trustee, the Stalking Horse Bidder has agreed to serve as the stalking horse bidder and, subject its offer to higher and better offers, pursuant to the terms set forth in the Bidding Procedures Order. The Stalking Horse Bidder is not affiliated with the Debtor or its officers, directors, parent or affiliates and has been represented by its own counsel since the outset of the negotiations.

*Agreements with Shipyards*

23.     The Debtor has entered into two contracts for the construction of the Vessels, one with Yantai Raffles ("**Yantai**") and the other with Cosco Shipyard ("**Cosco**").  Delivery of the Vessels from the shipyards (both located in China) is expected during the 2010 calendar year. The Debtor estimates that approximately $25 million remains to be paid under each construction contract before completion.

24.     As part of its restructuring negotiations, the Debtor entered into an agreement with Cosco on February 11, 2010, which provides, among other things, that Cosco will receive a $7,000,000 promissory note from the Debtor in partial discharge of the final payment due under its construction contract, with the remaining amount of the final payment due in cash.   The Debtor intends to assume and assign not only the construction contract with Cosco, as amended, but also the February 11, 2010 agreement and related promissory note.  The Debtor also intends to assume and assign the vessel construction contract with Yantai.

**C.      The Stalking Horse Bid and Asset Purchase Agreement.**

25.     Pursuant to the APA, the Debtor proposes to sell, assign and transfer to the Stalking Horse Bidder substantially all of its assets free and clear of all liens, claims and encumbrances, except for any liabilities that the Stalking Horse Bidder agrees to assume (the "**Assumed Liabilities**").   The assets to be sold (the "**Assets**") are listed in APA §2.01 and include, without limitation:[2]

> (a)     the "**Assumed Contracts**" (including the construction contracts with Yantai and Cosco);
>
> (b)     equipment;
>
> (c)     inventory;
>
> (d)     accounts receivables;
>
> (e)     intellectual property;

---

[2]     Unless otherwise defined herein, capitalized terms used in the following section shall have the meanings ascribed to such terms in the APA.

(f)     goodwill and other intangible property associated with the Debtor's business or the Assets

(g)     books and records; and

(h)     the Debtor's interests in the equity securities of its subsidiaries.

26.     The Bondholders together own in the aggregate approximately $210 million in face amount of bonds.  On the Petition Date, the Bondholders' secured claim was $230,418,833 in principal, interest, fees, and costs.  However, net of the amount in the Escrow Account, the Bondholders' exposure on their secured claim is approximately $177 million.  As consideration for the transaction, the Stalking Horse Bidder will credit-bid $120 million (i.e., a portion of the value of its secured claim), including the entirety of its postpetition claim under its debtor-in-possession credit agreement (which is secured by substantially all of the Assets), for the purchase of the Assets plus the cost to cure any executory contracts to be assumed by the Debtor and assigned to the Stalking Horse Bidder (the "**Purchase Price**"), as more particularly set forth in the APA (the "**Stalking Horse Bid**").

27.     If the Stalking Horse Bidder is not the successful bidder for the Assets, subject to the terms and conditions set forth below and in the proposed Bidding Procedures Order, it will be entitled to reimbursement of actual, reasonable and necessary expenses of the Stalking Horse Bidder in the amount of up to $400,000 (the "**Expense Reimbursement**").  The Stalking Horse Bidder did not request approval of a break-up fee in connection with the sale of the Assets.

28.     In the event that an Expense Reimbursement is to be paid pursuant to the APA, the Debtor or the Stalking Horse Bidder shall provide the Official Committee of Unsecured Creditors, (the "**Creditors' Committee**") (if any is appointed) and the United States Trustee with the documentation supporting the expenses that make up the Expense Reimbursement (subject to redaction for confidentiality and privilege) (the "**Expense Reimbursement Documentation**").  Upon their receipt of the Expense Reimbursement Documentation, the Creditors' Committee (if any is appointed) and the U.S. Trustee shall have five (5) business days from the day of receipt of the Expense Reimbursement Documentation to object to any portion

of the Expense Reimbursement on the basis that such expenses are not payable pursuant to the terms of the APA. If no objection is timely filed, the Expense Reimbursement shall be paid pursuant to the terms of the APA. If a timely objection is filed by the Creditors' Committee (if any is appointed) or the United States Trustee, the Debtor shall pay that portion of the Expense Reimbursement not subject to objection pursuant to the terms of the APA. The Court will decide any objection, after the Debtor and the Stalking Horse Bidder have been provided an opportunity to respond.

29.     The proposed sale is subject to approval of this Court and additional competitive bidding pursuant to the bidding procedures described below (the "**Bidding Procedures**").

**D.      The Proposed Bidding Procedures.**

30.     The Sale of the Debtor's assets is subject to higher and better offers pursuant to the Bidding Procedures. Accordingly, the Debtor seeks approval of the Bidding Procedures attached hereto as <u>Exhibit C</u>. The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualifying," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any subsequent Auction (defined below), the ultimate selection of the successful bidder, and the Court's approval thereof.

31.     The Bidding Procedures take into account the necessity to conduct a sale as quickly as possible to prevent further deterioration of the value of the Debtor's assets. However, given the small universe of potential purchasers, the unique nature of the Debtor's assets, and the fact that the Debtor's liquidity crisis and restructuring attempts have been widely publicized in the industry for months, interested purchasers of the Debtor's assets should have a reasonable opportunity to conduct due diligence and submit a bid.

32.     Furthermore, the Debtor will shortly file an application to retain Clarkson Offshore ("**Clarkson**") as broker. Clarkson will, among other things, market the Debtor's assets to potential purchasers other than the Stalking Horse Bidder. Clarkson will also create and monitor suitable data disclosure provisions concerning the Debtor's confidential information for

use by potential purchasers. These provisions may include providing access to a data room (to the extent a data room is set up by the Debtor or a third-party) and providing information to potential purchasers who have entered into acceptable nondisclosure agreements.

33. Moreover, as more fully described in its retention application, Clarkson has agreed to a fee structure that gives Clarkson a strong incentive to find an alternate purchaser.

34. The proposed Bidding Procedures provide, in relevant part, as follows:[3]

> **Determination of "Qualifying Bidder" Status.** Any potential bidder, other than the Stalking Horse Bidder, that wishes to participate in the Auction (defined below) and bid on the Assets (a "**Potential Bidder**") must demonstrate to the satisfaction of the Debtor that such Potential Bidder is a "**Qualifying Bidder**". A Qualifying Bidder is a Potential bidder that delivers to the Debtor a written and binding offer on or before the Bidding Deadline (defined below) that:
>
> > (a)     is a bid for the Assets in their entirety for a cash price greater than the sum of (i) the Purchase Price, (ii) any cure amounts due for any executory contract or lease to be assumed, and (ii) the "**Minimum Initial Overbid Amount**," which shall be $1 million, <u>provided</u>, that any increase in a credit bid by the Stalking Horse Bidder, as a secured lender, need not be in cash;
> >
> > (b)     states that the Potential Bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Assets (including the Assumed Contracts) on terms and conditions no less favorable to the Debtor than the terms and conditions contained in the APA (as determined by the Debtor in its reasonable business judgment), including, without limitation, the purchase of the Assets (including the Assumed Contracts) and the assumption of the Assumed Liabilities (including any cure amounts due under any Assumed Contract) and is accompanied by a clean and duly executed asset purchase agreement

---

[3]     This section describes only the most salient provisions of the Bidding Procedures. For a complete description of the Bidding Procedures, the Court and parties in interest are referred to <u>Exhibit C</u>.

(the "**Modified APA**") and a marked Modified APA reflecting the variations from the APA;

(c)    states that the Potential Bidder's offer is irrevocable (i) until the closing of the purchase of the Assets if such bidder is the Successful Bidder, and (ii) until forty-eight (48) hours after the closing of the Sale if such bidder is the Back-Up Bidder (defined below);

(d)    does not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement or similar type of payment;

(e)    fully identifies the Potential Bidder and any provider of financing for the Potential Bidder's bid, as well as their representatives who are authorized to act on their behalf regarding the contemplated transaction; if the Potential Bidder is a newly formed acquisition vehicle, the bid must include evidence (in the form of binding commitment letters, current financial statements, guarantees or otherwise) that the Potential Bidder and/or any provider of financing for the Potential Bidder's bid, is able to fulfill all other obligations in connection with the contemplated transaction including, but not limited to, paying liquidated damages, if any;

(f)    except for an increase, if any, in a credit bid submitted by the Stalking Horse Bidder, each bid from a Potential Bidder is accompanied by a deposit in the amount of 10% of the value of its bid (each such deposit, a "**Good Faith Deposit**");

(g)    demonstrates to the reasonable satisfaction of the Debtor, in consultation with the Creditors' Committee (if any is appointed), that such Potential Bidder has the financial ability to fund and consummate the acquisition of the Assets and Assumed Liabilities (including assumption of any executory contracts or leases) by the closing, and the bid shall include such financial and other information that will allow the Debtor, in consultation with the Creditors' Committee (if any is appointed), to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transaction

contemplated by the Modified APA, including assumption of any executory contracts or leases;

(h)     shall not be conditioned on or subject to obtaining financing, shareholder approval or the outcome of due diligence, including environmental due diligence, by the Potential Bidder;

(i)     includes evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Modified APA; and

(j)     states that the Potential Bidder has not engaged (and agrees not to engage) in any collusion with respect to any bids for, or auction or sale of, the Assets.

A competing bid meeting the above requirements shall constitute a "**Qualifying Bid**". The Debtor shall make a determination, after consultation with the Creditors' Committee (if any is appointed), regarding whether a bid is a Qualifying Bid and shall notify Potential Bidders whether their bids have been determined to be qualified by no later than **April _____, 2010, at 4:00 p.m. (ET)**. The Stalking Horse Bidder shall be deemed a Qualifying Bidder and the APA constitutes a Qualifying Bid for all purposes.

**Bidding Deadline.  All Qualifying Bids must be submitted by no later than April _____, 2010, at 4:00 p.m. (ET) (the "Bidding Deadline").**  Prior to the Bidding Deadline, Qualifying Bidders shall deliver written copies of their bids to:  (a) Debtor's counsel, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068, Attn: Kenneth A. Rosen, Esq., John K. Sherwood, Esq. and Scott Cargill, Esq.; (b) counsel to the Creditors' Committee (if any is appointed); (c) counsel to Norsk Tillitsmann ASA (on behalf of the Bondholders), Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022, Attn.: Steven Wilamowsky, Esq., and Erin K. Mautner, Esq.; and (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004, Attn: Paul Schwartzberg, Esq.

**No Qualifying Bids.**  If no timely conforming Qualifying Bids are submitted by the Bidding Deadline, the Debtor shall not hold an Auction and, instead, the Stalking Horse Bidder shall be the Successful Bidder and the Debtor shall request at the Sale Hearing that the Bankruptcy Court approve the APA with the Stalking Horse Bidder.

**Auction.**   In the event that the Debtor receives by the Bidding Deadline one or more bids, other than the Stalking Horse Bid, that it deems in its discretion, in consultation with the Creditors' Committee (if any is appointed), to constitute Qualifying Bids, the Debtor shall conduct an auction with respect to the Assets (the "**Auction**").  **The Auction shall take place on April ___, 2010, at __:__ _.m. (ET)** at the offices of Lowenstein Sandler PC, 1251 Avenue of the Americas, New York, NY  10020, or such other place and time as the Debtor shall notify all Qualifying Bidders, the Creditors' Committee (if any is appointed), Norsk Tillitsmann ASA and other invitees by mail, e-mail or fax.  The Auction shall be governed by the following procedures:

(a)      The only parties eligible to participate in the Auction shall be Qualifying Bidders who have submitted a Qualifying Bid to the Debtor prior to the Bidding Deadline that was not rejected by the Debtor prior to the Auction;

(b)      Only the Stalking Horse Bidder and Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

(c)      Bidding shall commence at the amount of the highest and best Qualifying Bid submitted by the Qualifying Bidders prior to the Auction;

(d)      The Stalking Horse Bidder and the Qualifying Bidders shall participate in person at the Auction, or through a duly authorized representative;

(e)      The Auction may include individual negotiations with the Qualifying Bidders and/or open bidding in the presence of all other Qualifying Bidders;

(f)      The bidding at the Auction shall start at the purchase price stated in the Qualifying Bid that the Debtor, in consultation with the Creditors' Committee (if any is appointed), believes constitutes the highest and best offer, and continue, in one or more rounds of bidding, so long as during each round at least one Overbid (defined below) is submitted.  All Overbids shall be made and received on an open basis, such that all material terms of each Overbid will be fully disclosed to all other Qualifying Bidders;

(g)     An "**Overbid**" is any bid made at the Auction and at least $1 million greater than the immediately preceding bid, and that otherwise complies with the terms and conditions for a Qualifying Bid as set forth herein;

(h)     The Auction shall continue until there is only one offer that the Debtor determines, after consultation with the Creditors' Committee (if any is appointed) and subject to Bankruptcy Court approval, is the highest and best offer submitted at the Auction from among the Qualifying Bidders and the Stalking Horse Bidder (the "**Successful Bid**"). The bidder submitting such Successful Bid shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the Stalking Horse Bidder, as set forth in the applicable Modified APA. Within ten days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Bids made after the close of Auction shall not be considered by the Bankruptcy Court.

The Debtor reserves the right, as it may determine to be in the best interests of its estate, in consultation with the Creditors' Committee (if any is appointed), to: (a) determine which bidders are Qualifying Bidders, except that the Stalking Horse Bidder (or any other designee of the Loan Trustee) is deemed a Qualifying Bidder for all purposes; (b) determine which bids are Qualifying Bids, except that the APA is deemed a Qualifying Bid for all purposes; (c) determine which Qualifying Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures Order or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtor and its estate; (e) extend the deadlines set forth herein; (f) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice; and (g) modify the Bidding Procedures as it may determine to be in the best interests of its estate or to withdraw the Motion at any time with or without prejudice. For example, the Debtor reserves the right to conduct the Auction by sealed bids.

**<u>Sale Hearing</u>**. The Successful Bid (or the Stalking Horse Bid, if no Qualifying Bid other than that of the Stalking Horse Bidder is

received and accepted) will be subject to approval by the Bankruptcy Court. The hearing to approve the sale of the Assets to the Successful Bidder (the "**Sale Hearing**") will take place on **April __, 2010, at __:__ _.m. (ET)**, or at such time thereafter as counsel may be heard, in the United States Bankruptcy Court for the Southern District of New York. The Sale Hearing may be adjourned with the consent of the Successful Bidder from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

**<u>Acceptance of the Successful Bid</u>**. If an Auction is conducted, the Stalking Horse Bidder or the Qualifying Bidder with the next highest and best Qualifying Bid at the Auction, as determined by the Debtor in the exercise of its business judgment and in consultation with the Creditors' Committee (if any is appointed), shall be required to serve as a Back-Up Bidder (the "**Back-Up Bidder**") and keep such bid open and irrevocable until forty-eight (48) hours after the closing of the Sale with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtor will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Bankruptcy Court.

35. The Debtor submits that the Bidding Procedures are designed to generate additional interest in the Assets, to the extent any additional interest exists, and potentially increase the Purchase Price. As previously discussed, the Debtor has not receive any bids other than the offer from the Stalking Horse Bidder on behalf of the Bondholders. Accordingly, the Debtor does not believe that at this juncture, given the Debtor's precarious financial situation and need to sell the Assets as expeditiously as possible, approval of the Bidding Procedures will chill any bidding. Quite to the contrary, given the beneficial terms of the Stalking Horse Bid (including the credit bid of substantially less than the full amount of the principal due and owing under the Bond Loan), approval of the Bidding Procedures is in the best interests of the Debtor, its estate and creditors in that it provides a structure and format for other potentially interested parties to formulate a bid for the Assets. Failure to approve the Bidding Procedures may jeopardize the sale to the detriment of the Debtor's creditors.

**E.** **Notice Of Sale Hearing, Auction, Bidding Procedures, And Objection Dates.**

36.     Subject to the Court's calendar, the Debtor seeks to have the Sale Hearing set for the week of **April 12, 2010**.

37.     Not later than five (5) days after the entry of the Bidding Procedures Order, the Debtor will cause notices of the auction and sale, substantially in the form attached hereto as <u>Exhibit D</u>, to be sent by first-class mail, postage prepaid, to (i) all of the Debtor's known creditors, (ii) all entities known to have expressed a *bona fide* interest in acquiring the Assets, (iii) any party known to have or to assert a lien on any of the Assets, (iv) the Securities and Exchange Commission, (v) the Office of the United States Trustee, (vi) counsel for the Creditors' Committee (if any is appointed), (vii) all federal, state and local regulatory authorities with jurisdiction over the Debtor, (viii) the office of the United States Attorney for the Southern District of New York, (ix) all non-debtor parties to the Assumed Contracts, (x) all parties who entered a notice of appearance and request for service of pleading pursuant to Bankruptcy Rule 2002, and (xi) any parties identified by the Debtor as having an interest in bidding on the Assets.

**F.** **Assumption and Assignment of Contracts.**

38.     In addition, to facilitate the sale and the assumption and assignment of the Assumed Contracts, the Debtor proposes to serve a notice of assumption and assignment in the form annexed hereto as <u>Exhibit E</u>, which will include the amount, if any, required to cure any arrears under any Assumed Contract (the "**Assignment Notice**") as soon as possible but, in any case, no later than five (5) days after the entry of the Bidding Procedures Order and requests that the Court approve the following procedure for fixing any cure amounts owed on all Assumed Contracts.

39.     The Debtor will attach to the Assignment Notice its calculation of the undisputed cure amounts that the Debtor believes must be paid to cure all prepetition defaults under all Assumed Contracts (the "**Prepetition Cure Amounts**").  The Debtor requests that, if a non-debtor party to any Assumed Contracts disputes the assignment of any contract or the Prepetition Cure Amount, such party be required to file an objection (the "**Assignment Objection**") on or

before 4:00 p.m. (prevailing Eastern Time) three (3) days prior to the Sale Hearing (the "**Assignment Objection Deadline**") and serve a copy of the Assignment Objection, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon (a) Debtor's counsel, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068, Attn: Kenneth A. Rosen, Esq., John K. Sherwood, Esq. and Scott Cargill, Esq.; (b) counsel to the Creditors' Committee (if any is appointed); (c) counsel to Norsk Tillitsmann ASA, Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022, Attn.: Steven Wilamowsky, Esq. and Erin K. Mautner, Esq.; and (d) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004, Attn: Paul Schwartzberg, Esq.

40. In the event any such party fails to timely file and serve an Assignment Objection, the Debtor requests that such party be: (i) forever barred from objecting to the Prepetition Cure Amount and from asserting any additional cure or other amounts with respect to such Assumed Contracts and the Debtor shall be entitled to rely solely upon the Prepetition Cure Amount; and (ii) deemed to have consented to the assumption and assignment of such Assumed Contracts and shall be forever barred and estopped from asserting or claiming against the Debtor, the Stalking Horse Bidder or such other Successful Bidder or any other assignee of the relevant Assumed Contract that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such Assumed Contract. The Stalking Horse Bidder or the Successful Bidder shall be able to add or remove any Assumed Contract from the list of Assumed Contracts at any time prior to Closing, and the inclusion of any Assumed Contract in the Assignment Notice shall not constitute an admission by the Debtor or the Stalking Horse Bidder or the Successful Bidder, that such contract will be assumed.

41. In the event that an Assignment Objection is timely filed, the Assignment Objection must set forth: (i) the basis for the objection (including any relevant documentation), and (ii) the amount the party asserts as the Prepetition Cure Amount. After receipt of the Assignment Objection, the Debtor will attempt to reconcile any differences in the Prepetition

Cure Amount believed by the non-debtor party to exist.  In the event, however, that the Debtor and the non-debtor party are unable to consensually resolve the Assignment Objection, the Debtor will segregate any disputed Prepetition Cure Amount pending the resolution of any such disputes by this Court or mutual agreement of the parties.

42.     If no Assignment Amount Objection is received by the Assignment Objection Deadline, the Debtor will submit to the Court a declaration of no objection and a form of order (collectively, the "**Declaration of No Objection**") granting the requested assumption and assignment, and serve such Declaration of No Objection on the counterparty to the applicable executory contract or lease.

**G.     Extraordinary Provisions**

43.     This Court's General Order M-383 requires separate disclosure of any "extraordinary provisions" affecting the sale of the Debtor's assets.

*Notice and Hearing on Bidding Procedures*

44.     The Debtor respectfully requests the Court to hold a hearing on the Bidding Procedures on March 10, 2010, at the same time as the final hearing on debtor-in-possession financing.  Parties in interest will therefore have twelve (12) days of notice, slightly fewer than the fourteen (14) days provided for in Local Bankruptcy Rule 9006-1(b).

45.     The Debtor must complete the sale of its assets as soon as possible to prevent further deterioration of their value and give a strong signal to all stakeholders that this chapter 11 proceeding will promptly provide a fresh start for the Debtor.  The requested notice period is not much shorter than that set forth in the Local Bankruptcy Rules and therefore the Debtor submits the requested notice is sufficient.

*Interim Arrangements between the Debtor and the Stalking Horse Bidder*

46.     The February 11, 2010 agreement between Cosco and the Debtor gives certain rights to the Stalking Horse Bidder, as Loan Trustee.  In essence, the Loan Trustee, instead of the Debtor, may pay Cosco any amounts due under the related construction contract and promissory

note with Cosco. Also, pursuant to the terms of the Interim DIP Order, the Bondholders are providing the Debtor with DIP financing.

### Access to Records after the Sale

47. After completion of the sale, the Debtor, the Creditors' Committee (if any is appointed) and any successor will have the right to review and copy the Debtor's financial books and records that remain in the possession of the Sucessful Bidder, at their sole cost and expense, during normal business hours and upon reasonable notice until the date the Debtor's bankruptcy case is closed or dismissed by order of the Court.

### Sale Free and Clear

48. As more fully explained below, the Debtor requests that the sale of its assets be free and clear of any liens, encumbrances and interests.

### Relief from Bankruptcy Rules 6004(h) and 6006(d)

49. For the same reasons that the Debtor requests a slightly shortened notice period before the first hearing on the Motion, the Debtor requests that, pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Court expressly provide that the effectiveness of any order approving the sale and/or assumption and assignment of the Assumed Contracts not be stayed for any period of time after the entry of such order(s).

## LEGAL AUTHORITY

### A. The Bankruptcy Code Permits the Debtor to Sell Assets to Preserve the Value of its Estate.

50. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Courts have uniformly held that approval of a proposed sale of a debtor's assets outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that sound business reasons justify the transaction. *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Chateaugay Corp.*, 973 F.2d 141, 143-145 (2d Cir. 1992) (affirming the debtors' ability to

sell "an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization"); *see also Fulton State Bank v. Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate outside the ordinary course of business if he has an articulated business justification.") (citations omitted); *Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986) ("… a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re General Motors Corp.*, 407 B.R. 463, 489 (Bankr. S.D.N.Y. 2009) ("it is plain that in the Second Circuit, as elsewhere, even the entirety of a debtor's business may be sold without waiting for confirmation when there is a good business reason for doing so") (internal citations omitted); *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) ("there has to be some articulated business justification for the use, sale or lease of property outside of the ordinary course of business") (internal citations omitted), *aff'd*, 576 F.3d 108 (2d Cir. 2009).

51.    Once the Debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotations omitted). The Debtor's business judgment "should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." *In re Aerovox, Inc.*, 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (internal citations omitted).

52.    Additionally, courts have permitted a sale of all or substantially all of a debtor's assets outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. *See generally*, *Abbotts Dairies*, 788 F.2d 143 (3d Cir. 1986); *Lionel*, 722 F.2d at 1063; *In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir.), cert. denied, 419 U.S. 964 (1974) ("Other circuits have recognized the power of the bankruptcy court under chapter X to authorize a sale of the debtors' property under less than

emergency conditions where such sale is necessary to avoid deterioration in the value of the assets.").

53.     Here, in light of the Debtor's financial and liquidity issues, the Debtor has determined that a sale of its assets as proposed herein is the best means for preserving and maximizing their value for all creditors.

54.     The proposed sale of the Assets pursuant to the APA and the Bidding Procedures described herein passes the "sound business reason" test.  First, the Debtor submits that a prompt sale of the Assets by auction presents the best opportunity to realize the maximum value of the Assets for distribution to creditors.  As previously discussed, prior to the Petition Date, the Debtor engaged in negotiations with the Bondholders and other creditors to attempt restructuring out of court.  This process ultimately failed because of the lack of cooperation by certain unsecured creditors.  Given severe liquidity issues, the Debtor negotiated with the Loan Trustee concerning the potential sale of the Assets.  The Debtor further submits that the value of the Assets will decline absent a prompt sale, due to inadequate liquidity and the resulting lack of necessary capital needed to complete construction and delivery of the Vessels.  *See Lionel*, 722 F.2d at 1071 (holding that the most important factor for court to consider in connection with a section 363(b) motion is whether assets are increasing or decreasing in value).

55.     Second, the Debtor believes that the Bidding Procedures are the best method by which it can provide interested persons with accurate and reasonable notice of the auction and potentially generate interest in the Assets by parties other than the Stalking Horse Bidder. Finally, the Purchase Price is fair and reasonable, as it will be tested through the auction process and the Stalking Horse Bidder or any other Successful Bidder will be responsible for making the necessary payments to take delivery of the Vessels, at an estimated cost of $25 million per Vessel.

56.     The Bidding Procedures also satisfy the good faith requirement of the *Abbotts Dairies* test. As set forth above, the Debtor proposes to serve the Bidding Procedures on, *inter alia*, (i) all of the Debtor's known creditors, (ii) all entities known to have expressed a *bona fide*

interest in acquiring the Assets, (iii) any party known to have or to assert a lien on any of the Assets, (iv) all non-debtor parties to the Assumed Contracts, and (v) any parties identified by the Debtor as having an interest in bidding on the Assets. By serving the Bidding Procedures on these parties, the Debtor believes that any ensuing auction will yield the highest and best price for the Assets.

**B.      The Assets May Be Sold Free And Clear Of Liens, Claims And Encumbrances.**

57.      The Debtor further requests that the Court authorize the sale of the assets free and clear of all liens, encumbrances and interests which may be asserted against the Debtor's assets (collectively, the "**Liens and Claims**"), with all such Liens and Claims to attach only to the proceeds of the transaction with the same priority, validity, force and effect as they now have in or against the Debtor's assets.

58.      Under Section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim, or interest in such property of an entity other than the estate if, among other things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is sold is great that the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

59.      Section 363(f) permits the Debtor to sell the assets free and clear of all Liens and Claims, except the Liens and Claims specifically assumed by the Successful Bidder. Each Lien and Claim that is not the result of an assumed liability satisfies at least one of the five conditions of 11 U.S.C. § 363(f) and the Debtor submits that any such Lien and Claim will be adequately

protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtor may possess with respect thereto. Accordingly, the Debtor requests that the assets be transferred to the Successful Bidder free and clear of all Liens and Claims, except for the liens resulting from the Assumed Liabilities, with such Liens and Claims to attach to the proceeds of the sale of the assets.

**C.      Stalking Horse Bidder is Entitled to Credit Bid**

60.      The recognition of the Stalking Horse Bidder's right to credit bid is in accordance with the Bankruptcy Code and its objectives. Bankruptcy Code section 363(k) provides that where there is a sale of property that is subject to a lien, the holder of an allowed claim secured by such lien "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of the property." 11 U.S.C. § 363(k); see *In re Metaldyne Corp.*, 409 B.R. 671 (Bankr. S.D.N.Y. 2009), *aff'd* 2009 WL 5125116 (S.D.N.Y. Dec. 29, 2009) (bankruptcy court upheld credit bid in the amount of the lender's claims).

61.      In *Metaldyne*, the debtors moved for permission to sell their assets through an auction process soon after filing for relief under Chapter 11 of the Bankruptcy Code. Three "qualified bidders" including the debtor's lenders submitted bids for the debtor's assets. The lenders' bid was comprised of: (i) a credit bid in the full amount of the lenders' claims; (ii) the release of all of the lenders' liens on the debtors' assets that were not included in the sale to the lenders; (iii) the lenders' assumption of administrative priority claims filed in the debtor's bankruptcy case; and (iv) cash. After reviewing all bids received by the debtors, the bankruptcy court found the lender's bid (including the portion where it credit bid the amount of the debtors' loan) to be "far in excess of any other offer for the [debtors'] assets … ." *In re Metaldyne Corp.*, 409 B.R. at 680. The bankruptcy court then granted the sale of the debtors' assets to the lender. The sale order was appealed to the district court by one of the debtors' prepetition lenders. The order was affirmed by the district court in *BDC Finance, LLC v. Metaldyne Corp. (In re Metaldyne Corp.)*, 2009 WL 5125116 *5 (S.D.N.Y. Dec. 29, 2009). The district court held the

lenders were purchasers in "good faith" and, for reasons unrelated here, found the appeal to be moot. *Id.* at *4.

62.     By recognizing the Stalking Horse Bidder's right to credit bid as permitted in *Metaldyne*, the Court's order in the instant case will eliminate any uncertainty on the matter and help to ensure an orderly sale process.

**D.     Good Faith Pursuant To § 363(m).**

63.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

64.     Although the Bankruptcy Code does not define "good faith," the Second Circuit Court of Appeals in *In re Gucci* held that,

> the good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'

126 F.3d 380, 390 (2d Cir. 1997) (*quoting In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir.1978)). *See also In re Andy Frain Services, Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986).

65.     As discussed herein, the APA is the product of negotiations in which both the Debtor and the Stalking Horse Bidder have acted in good faith. The Stalking Horse Bidder is not affiliated with the Debtor or its officers, directors, parent or affiliates and has been represented by its own counsel throughout the negotiations leading to the APA. The Debtor therefore requests that the Court make a finding that the Stalking Horse Bidder, has purchased the Assets

and assumed the Assumed Contracts in good faith within the meaning of the Bankruptcy Code § 363(m).  With respect to any other Successful Bidder, the  Debtor believes that a finding of good faith is appropriate given that: (a) the Successful Bidder will necessarily have made an offer that is higher and better than the one negotiated with the Stalking Horse Bidder; and (b) the Debtor will not entertain a transaction with any party whose good faith can reasonably be challenged.

**E.      Approval of the Expense Reimbursement.**

66.      Break-up fees, expense reimbursements, and other forms of bidding protections encourage potential purchasers to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. *See*, *e.g.*, *In re 995 Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking").  In this case, the Stalking Horse Bidder will receive only the Expense Reimbursement and no break-up fee if it is not the ultimate purchaser of the Assets at the Auction.  The Debtor believes that approval of the Expense Reimbursement, together with the Bidding Procedures, properly balances the Debtor's need to obtain the highest and/or otherwise best offer for the Assets while encouraging the Stalking Horse Bidder to act as a stalking horse bidder.  The Debtor believes that the Expense Reimbursement is reasonable in the context of the Debtor's case and the transaction contemplated by the APA.

67.      Courts in this District have established a three part test for determining when to permit bidding protections.  *See*, *e.g.*, *In re Integrated Resources, Inc.*, 147 B.R. at 657-658.  The three factors are whether (1) the relationship of the parties who negotiated the bidding protections is tainted by self-dealing or manipulation; (2) the bidding protections hamper, rather than encourage, bidding; and (3) the amount of the bidding protections is unreasonable if compared to the purchase price.

68.      Here, the Expense Reimbursement is not the product of self-dealing or manipulation. The APA is the culmination of the Debtor's extensive efforts to restructure its

business.  The Stalking Horse Bidder is not affiliated in any way with the Debtor, and the Stalking Horse Bidder is the only party willing to submit a bid for the Assets prior to the Petition Date and to have that bid used to further the marketing process.  The Debtor submits that the Expense Reimbursement will encourage bidding for the Assets because, without it, the Debtor may not have a stalking horse bidder and would be forced to conduct a blind auction.  Finally, the Expense Reimbursement is fair and reasonable in amount, particularly in view of the efforts to be made by the Stalking Horse Bidder and the risk to it of being used as a stalking horse bidder.  Indeed, the maximum amount of the Expense Reimbursement (0.33% of the Purchase Price, or $400,000) constitutes a fair and reasonable percentage of the proposed purchase price.  Moreover, the amount of the proposed Expense Reimbursement is below the range that has been approved by courts in this District.  *See*, *e.g.*, *In re Allegiance Telecom, Inc.*, Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2003) (2.8% break-up fee and 1% expense reimbursement); *In re Loral Space & Communications Ltd.*, Case Nos. 03-41710 and 03-41709 (RDD) (Bankr. S.D.N.Y. 2003) (2% break-up fee and .8% expense reimbursement).

69.     In addition, Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."   As described above, approval of the Bidding Procedures will greatly assist the Debtor in maximizing the value that it may obtain for the Assets. Consequently, the Debtor respectfully submits that approving the Expense Reimbursement is "appropriate" under the circumstances.

**F.     Assumption and Assignment of the Executory Contracts Is Permitted Pursuant to Section 365 of the Bankruptcy Code.**

70.     The assumption and assignment to the Stalking Horse Bidder of the Assumed Contracts is a material and integral part of the proposed sale and should be approved by the Court.  Section 365(a) of the Bankruptcy Code authorizes a debtor in possession to assume and assign an executory contract or unexpired lease subject to Court approval.  Section 365(b) of the

Bankruptcy Court requires a debtor in possession to satisfy certain requirements at the time of assumption if a default exists under the contract to be assumed.

71.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a). By enacting § 365(a) of the Bankruptcy Code, Congress intended to allow a debtor to assume those leases/contracts that benefit the estate, and to reject those that are of no value or are burdensome to the estate. *See Cinicloa v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983); *In re Sandman Assocs., LLC*, 251 B.R. 473, 481 (W.D. Va. 2000) (noting that "[t]he authority granted by section 365 allows the trustee or debtor in possession to pick and choose among contracts, assuming those that are favorable and rejecting those that are not").

72.     It is well established that decisions to assume or reject executory contracts or unexpired leases are matters within the "business judgment" of the debtor. *See In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) (noting that "[i]n determining whether a debtor may be permitted to reject an executory contract, courts usually apply the business judgment test. Generally, absent a showing of bad faith, or an abuse of discretion, the debtor's business judgment will not be altered") (citations omitted). See also *Sharon Steel Corp. v. National Fuel Gas Dist Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984). Accordingly, courts approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject was "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *In re Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986). Indeed, to impose more exacting scrutiny would slow a debtor's reorganization, thereby increasing its cost and undermining the "Bankruptcy Code's provisions for private control" of the estate's administration. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

73.     Here, adequate business justification exists to merit judicial approval of the proposed assumption and assignment of the Assumed Contracts.  The Assumed Contracts are valuable assets of the Debtor's estate.  To the extent that the Debtor can sell them to a bidder other than the Stalking Horse Bidder, the sale will generate cash which the estate can use to satisfy claims and reduce potential claims against the estate.  Moreover, the assumption and assignment of the Assumed Contracts are a material and integral part of the APA.

74.     Based on the foregoing, the Debtor respectfully requests that the Bankruptcy Court approve the assumption and assignment of the Assumed Contracts.

### FINALITY OF ORDER

75.     The Debtor further seeks, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the Court expressly provide that the effectiveness of any order approving the sale and/or assumption and assignment of the Assumed Contracts not be stayed for any period of time after the entry of such order(s).

### NOTICE

76.     Notice of this Motion has been given to (i) all of the Debtor's known creditors, (ii) all entities known to have expressed a bona fide interest in acquiring the Assets, (iii) any party known to have or to assert a lien on any of the Assets, (iv) the Securities and Exchange Commission, (v) the Office of the United States Trustee, (vi) counsel for the Creditors' Committee (if any is appointed), (vii) all federal, state and local regulatory authorities with jurisdiction over the Debtor, (viii) the office of the United States Attorney for the Southern District of New York, (ix) all non-debtor parties to the Assumed Contracts, (x) all parties who entered a notice of appearance and request for service of pleading pursuant to Fed. R. Bankr. P. 2002, and (xi) any parties identified by the Debtor as having an interest in bidding on the Assets. The Debtor respectfully submits that such notice is sufficient, and requests that this Court find that no further notice of the relief requested herein is required.

## NO PRIOR REQUEST

77.     No previous motion for the relief sought herein has been made to this or to any other court.

## WAIVER OF BRIEF

78.     As no novel issue of law is raised and the relevant authorities relied upon by the Debtor are set forth herein, the Debtor respectfully requests that the requirement of the filing of a brief be waived.

## CONCLUSION

For the foregoing reasons, the Debtor respectfully requests the Court grant the relief requested in this Motion in all respects, and grant such other and further relief as is just and proper.

Respectfully submitted,

**LOWENSTEIN SANDLER PC**

/s/ *John K. Sherwood*
Kenneth A. Rosen, Esq.
John K. Sherwood, Esq.
Scott Cargill, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtor and Debtor in Possession*

Dated:  February 26, 2010
        New York, New York

**EXHIBIT A**

**BIDDING PROCEDURES ORDER**

**EXHIBIT B**

**APA**

**EXHIBIT C**

**BIDDING PROCEDURES**

**EXHIBIT D**

**SALE NOTICE**

# EXHIBIT E

# ASSIGNMENT NOTICE