# ASSET PURCHASE AGREEMENT

dated as of

[_____], 2010

by and between

REMEDIAL (CYPRUS) PUBLIC COMPANY LIMITED

as Seller

and

[NEWCO]

as Buyer

**TABLE OF CONTENTS**

_____

ARTICLE 1
DEFINITIONS

SECTION 1.01.    Definitions. ............................................................................................1

ARTICLE 2
PURCHASE AND SALE

SECTION 2.01.    Purchase and Sale ................................................................................5
SECTION 2.02.    Excluded Assets ....................................................................................7
SECTION 2.03.    Assumed Liabilities. .............................................................................7
SECTION 2.04.    Excluded Liabilities. .............................................................................8
SECTION 2.05.    Purchase Price. ......................................................................................8
SECTION 2.06.    Closing. ..................................................................................................8

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF THE SELLER

SECTION 3.01.    Existence and Power. ...........................................................................10
SECTION 3.02.    Authorization. .......................................................................................10
SECTION 3.03.    Governmental Authorization. ...............................................................10
SECTION 3.04.    Noncontravention; Consents. ...............................................................11
SECTION 3.05.    Title to Assets.  .....................................................................................11
SECTION 3.06.    Litigation; Compliance with Laws. ......................................................12
SECTION 3.07.    Taxes. ....................................................................................................12
SECTION 3.08.    Finders' Fees. .......................................................................................13
SECTION 3.09.    Labor Relations; Employees. ...............................................................15
SECTION 3.10.    Employee Benefits. ...............................................................................15
SECTION 3.11.    Exclusivity of Representations and Warranties. ..................................15

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF THE BUYER

SECTION 4.01.    Existence and Power. ...........................................................................15
SECTION 4.02.    Authorization. .......................................................................................15
SECTION 4.03.    Governmental Authorization. ...............................................................16
SECTION 4.04.    Noncontravention. ................................................................................16
SECTION 4.05.    Litigation. .............................................................................................16
SECTION 4.06.    Exclusivity of Representations and Warranties. ..................................16

## ARTICLE 5
### COVENANTS OF THE SELLER

SECTION 5.01.  *Maintenance of the Purchased Assets*.................................................16
SECTION 5.02.  *Notices*..........................................................................................17
SECTION 5.03.  *Completion of Work.*.......................................................................17
SECTION 5.04.  *Name Change.*.................................................................................18
SECTION 5.05.  *Full Access.*....................................................................................18
SECTION 5.04.  *Confidentiality*...............................................................................18


## ARTICLE 6
### COVENANTS OF THE BUYER AND THE SELLER

SECTION 6.01.  *Further Assurances.*.........................................................................18
SECTION 6.02.  *Certain Filings.*...............................................................................19
SECTION 6.03.  *Public Announcements.*...................................................................19
SECTION 6.04.  *Payment of Cure Amounts; Assumed Contracts; Adequate Assurances*
              *Regarding Assumed Contracts.*.............................................................19
SECTION 6.05.  *Bankruptcy Court Approval.*............................................................19


## ARTICLE 7
### CERTAIN TAX MATTERS

SECTION 7.01.  *Certain Tax Matters.*........................................................................20


## ARTICLE 8
### CONDITIONS TO CLOSING

SECTION 8.01.  *Conditions to Obligations of the Buyer and the Seller.*........................21
SECTION 8.02.  *Conditions to Obligation of the Buyer.*...............................................21
SECTION 8.03.  *Conditions to Obligation of the Seller.*...............................................22


## ARTICLE 9
### SURVIVAL

SECTION 9.01.  *Survival.*........................................................................................23


## ARTICLE 10
### TERMINATION

SECTION 10.01.  *Termination.*.................................................................................23
SECTION 10.02.  *Effect of Termination.*...................................................................24
SECTION 10.03.  *Expenses*......................................................................................25


## ARTICLE 11
### MISCELLANEOUS

SECTION 11.01.  *Notices*.........................................................................................25

A/73290461.7

*SECTION 11.02.*   *Amendments and Waivers.* ...................................................................27
*SECTION 11.03.*   *Successors and Assigns.* ....................................................................27
*SECTION 11.04.*   *Governing Law.* ................................................................................27
*SECTION 11.05.*   *Jurisdiction.* .....................................................................................27
*SECTION 11.06.*   *WAIVER OF JURY TRIAL.* ...............................................................27
*SECTION 11.07.*   *Counterparts; Third Party Beneficiaries.* .........................................28
*SECTION 11.08.*   *Entire Agreement.* ............................................................................28
*SECTION 11.09.*   *Bulk Sales Laws.* .............................................................................28
*SECTION 11.10.*   *Severability.* .....................................................................................28
*SECTION 11.11.*   *Captions, Headings, Interpretation.* ..................................................28

**EXHIBITS**

Exhibit A     -     Form of Sale Order

A/73290461.7

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** dated as of [_____], 2010 (this "**Agreement**") is made by and between Remedial (Cyprus) Public Company Limited, a company incorporated in Cyprus and having its office at Arch. Makarios III Avenue, Fortuna Court Block B, 3105 Limassol, Cyprus (the "**Seller**"), and [Newco], a company incorporated in [_____] (the "**Buyer**").

## W I T N E S S E T H :

**WHEREAS**, the Seller is engaged in the business of designing, constructing and managing elevating support vessels (the "**Business**");

**WHEREAS**, on February [__], 2010 (the "**Petition Date**"), the Seller filed a petition (the "**Chapter 11 Case**") with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") under chapter 11 of title 11 of the United States Code (as amended from time to time, the "**Bankruptcy Code**"); and

**WHEREAS**, in accordance with and subject to the terms and conditions set forth in this Agreement, the Buyer (either directly or through its designated subsidiaries) desires to purchase from the Seller, and, subject to the entry of the Sale Order (as defined below), the Seller desires to sell to the Buyer (or its designated subsidiaries), the Purchased Assets (as defined below), in accordance with sections 363 and 365 of the Bankruptcy Code;

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE 1
### DEFINITIONS

SECTION 1.01. *DEFINITIONS.* (a) The following terms, as used herein, have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.

"**Budget**" means the 13-week budget, which shall be updated on a monthly basis during the term of the Facility (as defined in the DIP Financing Agreement), and which Budget shall at all times be acceptable to the Lender (as defined in the DIP Financing Agreement).

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Closing Date**" means the date of the Closing.

"**COBRA**" means Sections 601 through 608 of ERISA, Section 4980B of the Tax Code, and any applicable state law providing for similar group health or welfare plan continuation coverage.

"**Confidential Information**" means any information concerning the Purchased Assets, the Assumed Liabilities, and the Business that is not generally available to the public.

"**Contract**" means any legally binding agreement, contract, arrangement, lease, license, understanding, commitment, or instrument.

"**Cure Amounts**" means those amounts owed by the Seller to the other parties to the Assumed Contracts as determined by the Bankruptcy Court or by agreements with the parties thereto, which amounts shall be paid by the Buyer at or before Closing so that the Buyer (or its designated subsidiaries) assumes and the Seller assigns the Assumed Contracts free and clear of any defaults and arrearages as of the Closing Date.

"**DIP Financing**" means the financing arrangements provided pursuant to the DIP Financing Agreement.

"**DIP Financing Agreement**" means that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement dated as of February [__], 2010 by and between Norsk Tillitsmann ASA, as Loan Trustee on behalf of the bondholders in the FRN Remedial (Cyprus) Public Company Limited Secured Callable Bond Issue 2007/2012 with ISIN No. 001 036034.0, and the Seller, as debtor and debtor-in-possession.

"**Encumbrance**" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other), claim, liability, charge, lease, covenant, easement, option, right of others, hypothecation, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition, or otherwise), whether imposed by Contract, Law, equity, or otherwise.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) which is considered a single employer with the Seller within the meaning of Section 414(b), (c), (m), or (o) of the Tax Code or Section 4001(b) of ERISA.

"**Governmental Entity**" shall mean any court, administrative or regulatory agency or commission or other foreign, federal, state or local governmental authority or instrumentality.

"**Insolvency Proceeding**" means any receivership, conservatorship, general meeting of creditors, insolvency or bankruptcy proceeding, assignment for the benefit of creditors, or any proceeding by or against the Seller for any relief under any bankruptcy or insolvency law or other laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, liquidations, compositions or extensions.

"**Law**" shall mean any domestic, foreign, federal, state, local or other law, statute,

ordinance, writ, rule, regulation or governmental requirement of any kind, and the rules, regulations and orders promulgated thereunder and any final orders, decrees, judgments or injunction of any regulatory agency, court or other Governmental Entity.

"**Loan Agreement**" means that certain Loan Agreement dated as of March 23, 2007 by and among the Seller and Norsk Tillitsmann ASA, as Loan Trustee, in the original principal amount of $210,000,000.

"**Material Adverse Effect**" means any change, effect, event, occurrence, development, circumstance, or state of facts occurs, except for (a) the commencement of the Chapter 11 Case, and (b) events that would typically result from the commencement of the Chapter 11 Case, as determined by the Buyer in its reasonable discretion, in each case, which has had or would reasonably be expected to have, individually or in the aggregate, a materially adverse effect on the business, financial condition, or results of operations of the Seller, or on the Purchased Assets (taken as a whole), or which would materially impair the ability of the Seller to perform its obligations under this Agreement or the Other Agreements, or prevent or materially delay the consummation by the Seller of the transactions contemplated by this Agreement or the Other Agreements.

"**Order**" shall mean any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Governmental Entity.

"**Other Agreements**" means the Bill(s) of Sale, the Assignment and Assumption Agreement(s), and any other document executed and delivered in connection with this Agreement or the consummation of the transactions contemplated hereby.

"**Permits**" shall mean all licenses, franchises, permits, certificates, notices, registrations, consents, authorizations and approvals of or issued by any Governmental Entity.

"**Permitted Encumbrances**" means:  (a) any lien for Taxes which are not yet due and payable or which are being contested in good faith through appropriate proceedings;  (b) liens in favor of shipyard owners, or other mechanics', carriers', workers', repairers', materialmen's, warehousemen's, lessor's, landlord's and other similar liens, arising or incurred in the ordinary course of business which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings; and (c) liens in favor of the Buyer or its Affiliates.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"**Proceeding**" means any legal, equitable or arbitral actions, suits, proceedings, claims, charges, grievances, disputes, investigation, inquiry, or other proceeding.

"**Seller's Subsidiaries**" means (a) Remedial Offshore Limited; (b) Remedial Offshore, LLC; (c) Remedial Offshore (M) Sdn. Bhd.; (d) Remedial Offshore de Mexico, S.A. de C.V.;

A/73290461.7

(e) Remedial Offshore Services de Mexico, S.A. de C.V.; and (f) any newly established, wholly-owned subsidiary of the Seller that is established with the consent of, and in consultation with, the Buyer.

"**Tax Code**" means the Internal Revenue Code of 1986, as amended.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting information) required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Taxes**" shall mean all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state, local or foreign taxing authority, including, but not limited to, income, gross receipts, license, stamp, occupation, premium, windfall profits, environmental (including taxes under Tax Code Sec. 59A), custom duty, capital stock or other equity, excise, real property, personal property, ad valorem, sales, use, transfer, franchise, payroll, employment, withholding, severance, social security or other tax of any kind whatsoever, including any interest, penalties or additions attributable thereto, whether disputed or not.

Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Agreement | Preamble |
| Assignment and Assumption Agreement(s) | 2.06 |
| Assumed Contracts | 2.01 |
| Assumed Liabilities | 2.03 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefit Plans | 3.09 |
| Bill(s) of Sale | 2.06 |
| Bidding Procedures | 10.01 |
| Books and Records | 2.01 |
| Business | Recitals |
| Buyer | Preamble |
| Chapter 11 Case | Recitals |
| Closing | 2.06 |
| Cosco | 2.01 |
| Cosco Contract | 2.01 |
| Equipment | 2.01 |
| Excluded Assets | 2.02 |
| Excluded Liabilities | 2.04 |
| Expense Reimbursement | 10.02 |
| Final Allocation | 2.05 |
| Intellectual Property | 2.01 |

| Term | Section |
|------|---------|
| Inventory | 2.01 |
| Petition Date | Recitals |
| Purchased Assets | 2.01 |
| Purchase Price | 2.05 |
| Requested Subsidiary Transfer | 8.02 |
| Sale Order | 6.05 |
| Seller | Preamble |
| Total Outstanding DIP Amount | 2.05 |
| Transfer Taxes | 7.01 |
| Yantai | 2.01 |
| Yantai Contract | 2.01 |

ARTICLE 2

PURCHASE AND SALE

SECTION 2.01.         *PURCHASE AND SALE.*  Subject to the entry of the Sale Order and subject to and upon the terms and conditions set forth in this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, the Seller shall sell, transfer, convey, assign and deliver to the Buyer (or to any subsidiaries of the Buyer designated by the Buyer), and the Buyer (or its designated subsidiaries) shall purchase or acquire from the Seller, free and clear of all Encumbrances (other than Permitted Encumbrances), all rights, title and interest of the Seller in, to and under all assets of the Seller (except for the Excluded Assets) (collectively, but not including the Excluded Assets, the "**Purchased Assets**").  For the avoidance of doubt, the Purchased Assets include (but shall not be limited to):

(a)         Agreement for The Construction of an Elevating Support Vessel between Cosco (Nantong) Shipyard Co., Ltd. ("**Cosco**") And Remedial (Cyprus) PLC, dated February 12, 2007, as the same may have been amended from time to time (the "**Cosco Contract**");

(b)         Shipbuilding Contract for the Construction and Sale -- Yantai Raffles Shipyard Ltd ("**Yantai**") and Remedial "Cyprus" Limited for Construction of one (1) unit Super M2 FnG Design Jack Up, dated November 2006, as the same may have been amended from time to time; (the "**Yantai Contract**");

(c)         Subject to the terms and conditions contained herein, all Contracts of the Seller or the Business identified or described on Schedule 2.01(c) (collectively, such Contracts, together with the Cosco Contract and the Yantai Contract, shall be referred to herein as the "**Assumed Contracts**");

(d)         All equipment, engines, motors, machines, filters, thrusters, workover rigs, rack and chord materials, spare leg equipment, spare parts, and tools, wherever located, including:  (i) all owner furnished equipment purchased in connection with the anticipated construction of a third elevating support vessel; and (ii) those items set forth on Schedule 2.01(d) (collectively, the "**Equipment**");

(e)     All inventory, materials, work-in-process, raw materials and supplies, whether on hand, on order, in transit or held by others (collectively, the "**Inventory**");

(f)     All outstanding accounts receivable and other receivables in favor of the Seller, and all claims arising in connection therewith, including the account receivable from Favco relating to the sale of Crane - PC300;

(g)     All intellectual property, including all (i) copyright rights (registered and unregistered) and software (including source code and object code), in any case, whether domestic or foreign, registered, unregistered and/or common law (including, without limitation, all goodwill associated with any of the foregoing, licenses in respect of any of the foregoing and claims for infringement of or interference with any of the foregoing and the right to recover past damages); (ii) trade names, trade name rights, trademarks, trademark applications, trademark rights, service marks, service mark rights, trade dress, domain names, URLs, web pages, in any case, whether domestic or foreign or registered, unregistered and/or common law (including without limitation, all goodwill associated with any of the foregoing, licenses in respect of any of the foregoing, and claims for infringement of or interference with any of the foregoing and the right to recover past damages); (iii) invention disclosures, issued design patents, pending U.S. patent applications and corresponding international and foreign counterpart applications and issued patents, including any applications, continuation applications, divisional applications, issued patents, reexaminations and reissues thereof, whether domestic or foreign (including without limitation, all goodwill associated with any of the foregoing, licenses in respect of any of the foregoing, and claims for infringement of or interference with any of the foregoing and the right to recover past damages); and (iv) confidential information, trade secrets, designs, specifications, know-how and other proprietary information and technology (collectively, the "**Intellectual Property**");

(h)     All goodwill, other intangible property, and causes of action, actions, claims and rights of any kind as against others (whether by Contract or otherwise) relating to any of the Purchased Assets (including the Intellectual Property), the Assumed Liabilities, or the Business;

(i)     All books and records (financial, accounting, business and other) (other than those included in or relating to the Excluded Assets, if any) arising under or relating to the Purchased Assets, the Assumed Liabilities, or the Business (collectively, the "**Books and Records**"), and correspondence and all sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, on disk, film, tape or other media, and including all computerized data), drawings or plans and other technical information and data, and all other business and other records, in each case arising under or relating to the Purchased Assets, the Assumed Liabilities, or the Business;

(j)     All Permits now existing and all Permits issued after the date hereof and through the Closing Date, excluding only such Permits to the extent not legally transferable and Permits related exclusively to Excluded Assets;

(k)     All prepaid expenses, refunds, and security and like deposits;

(l)     All rights, remedies and benefits of the Seller arising under or relating to any of the Purchased Assets, the Assumed Liabilities, or the Business, including rights, remedies and benefits arising out of refund guarantees and out of express or implied warranties from manufacturers or suppliers of the Equipment or the Inventory (or components thereof), the other Purchased Assets or products purchased or ordered by the Seller prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising therefrom;

(m)     All relationships or arrangements of the Seller or the Business with customers for the provision of products or services, all customer, supplier and vendor lists and information, including contact persons and contact information, and all records and databases related to the customers, suppliers and vendors of the Business;

(n)     All of the Seller's rights, title and interest in, to and under insurance policies, including those set forth on Schedule 2.01(n); and

(o)     All of the Seller's, direct or indirect, right, title and interest in, to and under the securities of, or the shares and/or interests in, the Seller's Subsidiaries.

SECTION 2.02.     *EXCLUDED ASSETS.*     Notwithstanding anything contained in Section 2.01 or elsewhere in this Agreement, the following assets of the Seller (the "**Excluded Assets**") are not part of the Purchased Assets and shall remain the property of the Seller after the Closing:

(a)     All claims or causes of action of the Seller arising under sections 544, 545, 546, 547, or 548 of the Bankruptcy Code, except to the extent related to those Purchased Assets specifically enumerated in Section 2.01 above;

(b)     All employment agreements or employment offer letters or outstanding, unaccepted offers of employment, or non-solicitation agreements, commission agreements, consulting agreements or other employment-related agreements of the Seller;

(c)     All Contracts for the lease or use of real property maintained by the Seller (whether used or held for use in connection with the Business or otherwise);

(d)     All Contracts of the Seller or the Business identified or described on Schedule 2.02(d); and

(e)     Any other asset of the Seller or the Business identified or described on Schedule 2.02(e) or otherwise specifically included as an Excluded Asset pursuant to the terms of this Agreement.

SECTION 2.03.     *ASSUMED LIABILITIES.*     Subject to the entry of the Sale Order and subject to and upon the terms and conditions set forth in this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, the Buyer (or its designated subsidiaries) shall assume and agree to pay, honor and discharge when due only (collectively, the "**Assumed Liabilities**") all liabilities arising out of, resulting from, or relating to the Buyer's (or its designated subsidiaries') ownership and

operation of the Purchased Assets, including the Assumed Contracts, for periods after the Closing Date.

SECTION 2.04. *EXCLUDED LIABILITIES.* Except as provided in Section 2.03 hereof, neither the Buyer nor any Affiliate or subsidiary of the Buyer, nor any director, trustee, officer, employee, agent, or other representative of any of them, shall assume or shall be deemed to assume, or shall otherwise become liable for, any liabilities or obligations of, or any claims against, the Seller of any kind or nature, whether absolute, accrued, contingent or otherwise and whether due or to become due and whether or not asserted, and whether or not known or unknown or currently existing or hereafter arising (the "**Excluded Liabilities**"), including, without limitation, any liabilities or obligations arising out of, resulting from, or relating to the Excluded Assets. All such Excluded Liabilities shall be retained by, and remain liabilities and obligations of, the Seller.

SECTION 2.05. *PURCHASE PRICE.*

(a) Purchase Price. The purchase price (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of the Seller's right, title and interest in, to and under the Purchased Assets shall consist of: (i) the release of the Seller of obligations, claims, rights, actions, causes of action, suits, liabilities, damages, debts, costs, expenses and demands whatsoever, in law or in equity, arising under, or otherwise relating to: (A) first, the DIP Financing Agreement, in an aggregate amount equal to the amount outstanding under the DIP Financing as of the Closing Date, together with all accrued but unpaid interest earned thereon (the "**Total Outstanding DIP Amount**"); and (B) then, the Loan Agreement, in an aggregate amount equal to: (x) $120,000,000, less (y) the Total Outstanding DIP Amount (the "**Credit Bid and Release**"); (ii) the assumption of the Assumed Liabilities; and (iii) any Cure Amounts paid or to be paid by the Buyer.

(b) Allocation of Purchase Price. The Purchase Price shall be allocated among the Purchased Assets in accordance with an allocation proposed by the Buyer and reasonably acceptable to the Seller, which shall be prepared in accordance with Section 1060 of the Tax Code and delivered by the Buyer to the Seller within a reasonable time following the Closing (the "**Final Allocation**"). The Buyer and the Seller each agrees to file all applicable Tax Returns in accordance with the Final Allocation.

SECTION 2.06. *CLOSING.*

(a) Closing. Subject to the satisfaction of each of the conditions set forth in Article 8 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the transactions contemplated hereby (the "**Closing**"), shall take place at the offices of Bingham McCutchen LLP located at 399 Park Avenue, New York, New York 10022 (or at such other place as the parties may mutually agree in writing) within [three] Business Days after the date on which all of the conditions set forth in Article 8 hereof have been satisfied or waived by the party entitled to waive that condition (other than conditions which, by their terms, may only be satisfied on the Closing Date), or on such other date and time as the Buyer and the Seller may mutually agree in writing.

(b)     Requested Subsidiary Transfer.  In connection with the Closing, and to the full extent that the Seller is legally entitled to do so, the Buyer shall have the right to require the Seller to transfer any Purchased Asset being acquired hereunder to a newly established, wholly-owned subsidiary of the Seller (which such subsidiary shall be established with the consent of, and in consultation with, the Buyer) on the basis that the Seller shall sell, transfer, convey and assign such subsidiary, and any debt owed from such subsidiary to the Seller, to the Buyer at the Closing (a "**Requested Subsidiary Transfer**").  To the extent that a Requested Subsidiary Transfer requires the Seller to give a guarantee or other financial commitment to a third party, the Seller shall be entitled to require the Buyer to provide the Seller with an indemnity to ensure that the Seller is able to meet that guarantee or other financial commitment; provided that the Seller shall use reasonable efforts to obtain the agreement of the third party that the guarantee or other financial commitment is provided by the Buyer, and if the third party so agrees, the Buyer shall not be required to provide an indemnity to the Seller.  In addition, the Buyer shall be entitled to designate one or more of its subsidiaries to whom the Seller shall transfer any of the Purchased Assets on the Buyer's instruction.

(c)     Deliveries by the Buyer.  At the Closing, the Buyer shall deliver to the Seller:

(i)     the Purchase Price, in the form of the Credit Bid and Release (including documentation reasonably satisfactory to the Seller evidencing satisfaction of the obligations under the DIP Financing Agreement and a reduction of obligations under the Loan Agreement in an aggregate amount equal to the Credit Bid and Release); and

(ii)     an assignment and assumption agreement (or assignment and assumption agreements), in form(s) mutually acceptable to the Buyer and the Seller (the "**Assignment and Assumption Agreement(s)**"), executed by the Buyer (or its designated subsidiaries).

(d)     Deliveries by the Seller.  At the Closing, the Seller shall deliver to the Buyer:

(i)     a certified copy of the Sale Order which shall be final and non-appealable;

(ii)     to the extent practicable or unless otherwise agreed to the Buyer, possession of all tangible assets comprising the Purchased Assets;

(iii)     a bill of sale (or bills of sale) covering the Purchased Assets, in form(s) and substance reasonably satisfactory to the Buyer (the "**Bill(s) of Sale**"), executed by the Seller;

(iv)     the Assignment and Assumption Agreement(s), executed by the Seller; and

(v)     such other documents (including, without limitation, endorsements, consents and assignments) as the Buyer's counsel may reasonably request that are

customary for a transaction of this nature or necessary to evidence or consummate the transactions contemplated by this Agreement.

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer:

SECTION 3.01.    *EXISTENCE AND POWER.*    The Seller is a company duly organized, validly existing and, except as set forth in Schedule 3.01, in good standing, under the laws of its jurisdiction of organization and has all requisite powers and authority, and all material governmental licenses, authorizations, permits, consents and approvals required, to own, lease and operate its properties and to carry on its business as it is now being conducted, subject to the limitations, if any, imposed by applicable bankruptcy law.  The Seller is duly qualified to do business and is in good standing in all jurisdictions in which the location of its assets or the operation of its business makes such qualification necessary, except to the extent that the failure to be so qualified would not have a Material Adverse Effect.

SECTION 3.02.    *AUTHORIZATION.*

(a)    The Seller has full power and authority to execute and deliver this Agreement and the Other Agreements to which it is a party, and, subject to entry of the Sale Order, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Other Agreements to which the Seller is a party and the performance and consummation of the transactions contemplated hereby and thereby by the Seller have been duly authorized by all necessary action on the part of the Seller.

(b)    This Agreement and the Other Agreements to which the Seller is a party have been (or to the extent to be entered into on or prior to the Closing, will be) duly executed and delivered by the Seller and, subject to the entry of the Sale Order and the due authorization, execution and delivery of such agreements by the other parties thereto, this Agreement and the Other Agreements constitute (or to the extent to be entered into on or prior to the Closing, will constitute) valid and binding obligations of the Seller, enforceable against the Seller in accordance with their terms, except as set forth in Schedule 3.02.

SECTION 3.03.    *GOVERNMENTAL AUTHORIZATION.*    The execution, delivery and, subject to the entry of the Sale Order, performance by the Seller of this Agreement and the Other Agreements to which the Seller is a party and the consummation of the transactions contemplated hereby and thereby require no material action by or in respect of, or filing with, any Governmental Entity, other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

SECTION 3.04.     *NONCONTRAVENTION; CONSENTS.*

(a)     Neither the execution and delivery by the Seller of this Agreement or the Other Agreements to which the Seller is (or will be) a party nor, after giving effect to the Sale Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order, compliance by the Seller with any of the provisions hereof or thereof will (a) conflict with or result in a violation of (i) any provision of the organizational or governing documents of the Seller or (ii) any Order or Law binding upon the Seller or by which the Seller's business or any of the Purchased Assets are subject or bound; (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under (i) any material note, bond, mortgage, indenture, deed of trust, Contract or other obligation to which the Seller is a party or by which the Seller may be bound or to which any of the Purchased Assets may be subject or affected, or (ii) any material Permit or Order of, or registration, declaration or filings with, any Governmental Entity; or (iii) result in the creation of any Encumbrance upon the properties or assets of the Seller being sold or transferred hereunder.

(b)     Other than the Sale Order, no consent, waiver, approval, order, Permit or authorization of or from, or declaration or filing with, or notification to, any Person or Governmental Entity is required on the part of the Seller in connection with the execution and delivery of this Agreement or the Other Agreements, or the compliance by the Seller with any of the provisions hereof or thereof.

SECTION 3.05.     *TITLE TO ASSETS.*

(a)     The Seller has good, valid and marketable right, title and/or interest in the Purchased Assets free and clear of all Encumbrances other than Permitted Encumbrances, and, subject to the entry of the Sale Order, at the Closing, will convey all of its right, title and interest to all of such Purchased Assets to the Buyer (or its designated subsidiaries) free and clear of all Encumbrances except for the Assumed Liabilities and Permitted Liens. The Purchased Assets constitute all of the assets that are reasonably necessary or required to carry on the Business as currently conducted. The tangible Purchased Assets are in good operating condition and repair, ordinary wear and tear excepted.

(b)     (i)     The Seller directly owns, beneficially and of record, 100% of the issued and outstanding securities of, or shares and/or interests in, Remedial Offshore Limited, free and clear of all Encumbrances except Permitted Encumbrances. Remedial Offshore Limited directly owns, beneficially and of record, 100% of the issued and outstanding securities of, or shares and/or interests in: (A) Remedial Offshore, LLC; (B) Remedial Offshore Services de Mexico, S.A. de C.V. and (C) Remedial Offshore de Mexico, S.A. de C.V., in each instance, free and clear of all Encumbrances except Permitted Encumbrances. Remedial Offshore Limited directly owns, beneficially and of record, 30% of the issued and outstanding securities of, or shares and/or interests in Remedial Office (M) Sdn. Bhd., free and clear of all Encumbrances except Permitted Encumbrances, and Ungku Suleiman holds the other 70% of such shares in trust for Remedial Offshore Limited.

11

(ii)     Other than as described in Section 3.05(b)(i) above, neither the Seller nor any Seller's Subsidiary owns or controls, directly or indirectly, any securities of, or shares and/or interests in, any Person.  Neither the Seller nor any Seller's Subsidiary is subject to any obligation or requirement to provide funds for, or to make any investment (in the form of a loan, capital contribution, or otherwise) to or in, any Person.

(c)     As of the date hereof:  (i) approximately $[_____] remains to be paid by the Seller pursuant to the terms of the Cosco Contract (as amended or varied as of the date hereof); and (ii) approximately $[_____] remains to be paid by the Seller pursuant to the terms of the Yantai Contract (as amended or varied as of the date hereof).

SECTION 3.06.     *LITIGATION; COMPLIANCE WITH LAWS.*

(a)     Except as set forth in <u>Schedule 3.06</u>, there are no [material] Proceedings pending, or to the Seller's knowledge, threatened against or affecting the Seller, including, without limitation, any Proceedings relating to the Purchased Assets, the Assumed Liabilities, the Seller's business, the Seller's (or any of its Affiliate's) current or former employees, consultants or contractors, or the transactions contemplated by this Agreement or the Other Agreements, at law, in equity or otherwise, in, before, or by any Governmental Entity, arbitrator or mediator.  The Seller is not in material default under any Order.

(b)     The Seller has been at all times within the applicable statute of limitations in compliance in all material respects with all applicable Laws and Permits material to the Seller or the Seller's business.  Since January 1, 2008, no communication, whether from a Governmental Entity, citizens group, employee or otherwise, has been received by the Seller and no investigation or review is pending or, to the knowledge of the Seller, threatened by any Governmental Entity with respect to (i) any alleged violations by the Seller of any Law or Permit or (ii) any alleged failure to have all Permits required in connection with the operation of the Seller's business or the ownership of the Purchased Assets.

SECTION 3.07.     *TAXES.*

(a)     All federal, state, foreign, county, and local income and other material Tax Returns required to be filed by or on behalf of the Seller have been timely filed, or extensions of the time to file have been obtained, and are true and correct in all material respects, and all Taxes due and owing (whether or not shown on any Tax Returns) were paid or adequately accrued, except to the extent contested in good faith by proper proceedings. True and complete copies of all Tax Returns filed by the Seller for each of its three most recent fiscal years have been delivered to the Buyer.  The Seller has duly withheld and paid all Taxes required to have been withheld and paid relating to any employee, independent contractor, creditor, shareholder, member, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.  There are no Encumbrances for any Tax on the Purchased Assets, except for Taxes not yet due and payable.

(b)     The Seller has not received from the Internal Revenue Service or from the tax authorities of any state, county, local or other jurisdiction any written notice of underpayment

of Taxes or other deficiency which has not been paid.  There are no outstanding agreements, waivers, or arrangements extending the statutory period of limitation applicable to any claim for, or the period for the collection or assessment of, Taxes due from or with respect to the Seller for any taxable period.

SECTION 3.08. *FINDERS' FEES*.  There is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of the Seller who might be entitled to any fee or commission from the Buyer or any of its Affiliates upon consummation of the transactions contemplated by this Agreement.

SECTION 3.09. *LABOR RELATIONS; EMPLOYEES*.

(a) Except as set forth on Schedule 3.09(a)(i), the Seller and each Seller's Subsidiary is in compliance in all material respects with all federal, state, local and foreign Laws respecting employment and employment practices, terms and conditions of employment, wages and hours and nondiscrimination in employment, and to the Seller's knowledge is not engaged in any unfair labor practice.  Except as set forth on Schedule 3.09(a)(ii), there is no charge pending or, to the Seller's knowledge, threatened against the Seller or any Seller's Subsidiary alleging unlawful discrimination, harassment or retaliation in employment practices or alleging violation of any Law regarding wages, hours or working conditions, including without limitation workplace safety, before any Governmental Entity, and there is no pending or, to Seller's knowledge,  threatened charge of or Proceeding with regard to any unfair labor practice against the Seller or any Seller's Subsidiary pending before the National Labor Relations Board (or any similar board in a foreign jurisdiction).  There is no investigation or inquiry pending or, to the Seller's knowledge, contemplated, of or concerning the Seller or any of Seller's Subsidiaries with regard to alleged or potential unlawful discrimination in employment practices or alleged or potential violation of any Law regarding employment, including without limitation regarding wages, hours, working conditions, or workplace safety, by any federal, state, local, or foreign Governmental Entity.  There is no labor strike, dispute, slow-down or work stoppage actually pending or, to the Seller's knowledge, threatened against or involving the Seller or any Seller's Subsidiary.  Neither the Seller nor any Seller's Subsidiary has any collective bargaining agreements with any of their employees.  To the Seller's knowledge, there is no labor union organizing activity pending or, to the Seller's knowledge, threatened, with respect to the Seller or any Seller's Subsidiary.  Neither the Seller nor any Seller's Subsidiary has experienced any organized work stoppage during the last five years.

(b) The Seller has no employees or consultants.  Schedule 3.09(b)(i) contains a complete and correct list of all employees and consultants of the Seller's Subsidiaries, as of the date hereof, showing for each the following:  current job title or description, hire date, and current salary level (including any bonus paid to each such employee for 2009, if any).  Except as set forth on Schedule 3.09(b)(ii), neither the Seller nor any Seller's Subsidiary is a party to or bound by any currently effective employment, consulting, or severance agreement or arrangement.

SECTION 3.10. *EMPLOYEE BENEFITS*.

(a)     Schedule 3.10(a) sets forth a complete and accurate list of each bonus, deferred compensation, incentive compensation, stock or equity purchase or option, severance, hospitalization, medical, life, disability or other insurance, supplemental unemployment benefits, profit-sharing, 401(k), pension or retirement plan, and each other material employee benefit plan, program, agreement, or arrangement, sponsored, maintained, or contributed to or required to be contributed to by the Seller or any of the Seller's Subsidiaries for the benefit of any employee or former employee of the Seller or any of the Seller's Subsidiaries and/or their beneficiaries, whether formal or informal (collectively, the "**Benefit Plans**").

(b)     The Seller has delivered to the Buyer a true and complete copy of each Benefit Plan and, if applicable, all related funding agreements (e.g., trust agreements or insurance contracts), amendments, summary plan descriptions, summaries of material modifications, the most recent Internal Revenue Service determination letter for each Benefit Plan that is intended to qualify for favorable income tax treatment under Section 401(a) of the Tax Code, the two (2) most recent annual reports (Form 5500 and all schedules thereto) that were filed with respect to any Benefit Plan.

(c)     Each Benefit Plan has at all times been operated in all material respects in accordance with its terms, and complies currently, and has complied in the past, both in form and in operation, with all applicable Law, including ERISA and the Tax Code.  The Internal Revenue Service has issued a favorable determination or opinion letter with respect to each Benefit Plan that is intended to qualify under Section 401(a) of the Tax Code, and to the Seller's knowledge, no event has occurred that is reasonably likely to result in the disqualification of any such Benefit Plan.

(d)     Other than routine claims in the ordinary course for benefits under any Benefit Plan, there are no pending or, to Seller's knowledge, threatened actions, lawsuits or other claims or any investigations or audits by a Governmental Entity with respect to any Benefit Plan, or any fiduciary of any Benefit Plan (within the meaning of Section 3(21)(A) of ERISA), nor, to the Seller's knowledge, is there any reasonable basis for any such action, lawsuit or claim.

(e)     All contributions required to be made to each Benefit Plan under the terms of such Benefit Plan, ERISA, the Tax Code or any other applicable Law have been, to the Seller's knowledge, timely made. None of the Benefit Plans provide any benefits that become payable or become vested solely as a result of the consummation of the transactions contemplated by this Agreement.

(f)     None of the Seller, the Seller's Subsidiaries or ERISA Affiliates maintains or contributes to, or has maintained or contributed to, or has any liability under, a plan that is subject to Title IV of ERISA or to Section 302 of ERISA or Section 412 of the Tax Code.  No Benefit Plan is or was at any time a multiemployer plan, as defined in Section 3(37) of ERISA, and neither the Seller nor any of the Seller's Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any multiemployer plan.  No Benefit Plan is part of, or has at any time been part of, a multiple employer welfare arrangement, as defined in Section 3(40) of ERISA.  No Benefit Plan is a multiple employer plan, as described in Tax Code Section 413(c) or Sections 4063 or 4064 of ERISA, and neither the Seller, nor any of the Seller's

14

Subsidiaries or ERISA Affiliates has contributed to or had an obligation to contribute to any such plan.

(g)  No Benefit Plan provides (or will provide) medical or other welfare benefits to one or more former employees or independent contractors (including retirees) of the Seller or any of the Seller's Subsidiaries, except to the extent required by COBRA.

(h)  To the Seller's knowledge, none of the persons performing services for the Seller or any of the Seller's Subsidiaries has been improperly classified as an independent contractor, leased employee, or as being exempt from the payment of wages for overtime.

SECTION 3.11.  *EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES.* The representations and warranties made by the Seller in this Agreement are in lieu of and are exclusive of all other representations and warranties, including, without limitation, any implied warranties.  The Seller hereby disclaims any such other or implied representations or warranties, notwithstanding the delivery or disclosure to the Buyer or its officers, directors, employees, agents or representatives of any documentation or other information (including any supplemental data not included in this Agreement).

ARTICLE 4
REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller that:

SECTION 4.01.  *EXISTENCE AND POWER.*  The Buyer is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.

SECTION 4.02.  *AUTHORIZATION.*

(a)  The Buyer has full power and authority to execute and deliver this Agreement and the Other Agreements to which it is (or to the extent to be entered into in or prior to the Closing, will be) a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Other Agreements to which the Buyer is a party and the performance and consummation of the transactions contemplated hereby and thereby by the Buyer have been duly authorized by all necessary action on the part of the Buyer.

(b)  This Agreement and the Other Agreements to which the Buyer is a party have been (or to the extent to be entered into on or prior to the Closing, will be) duly executed and delivered by the Buyer and, subject to the due authorization, execution and delivery of such agreements by the other parties thereto, this Agreement and the Other Agreements constitute (or to the extent to be entered into on or prior to the Closing, will constitute) valid and binding obligations of the Buyer, enforceable against the Seller in accordance with their terms.

SECTION 4.03. *GOVERNMENTAL AUTHORIZATION.* The execution, delivery and performance by the Buyer of this Agreement and the Other Agreements to which the Buyer is a party and the consummation of the transactions contemplated hereby and thereby require no material action by or in respect of, or filing with, any Governmental Entity, other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

SECTION 4.04. *NONCONTRAVENTION.* Neither the execution and delivery by the Buyer of this Agreement or the Other Agreements to which the Buyer is (or will be) a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by the Buyer with any of the provisions hereof or thereof will (a) conflict with or result in a violation of (i) any provision of the organizational or governing documents of the Buyer or (ii) any Order or Law binding upon the Buyer; (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under (i) any material note, bond, mortgage, indenture, deed of trust, Contract or other obligation to which the Buyer is a party, or (ii) any material Permit or Order of, or registration, declaration or filings with, any Governmental Entity.

SECTION 4.05. *LITIGATION.* There are no material Proceedings pending, or to the knowledge of the Buyer, threatened against or affecting the Buyer which has had or could reasonably be expected to have a material adverse effect on the ability of the Buyer to consummate the transactions contemplated hereby.

SECTION 4.06. *EXCLUSIVITY OF REPRESENTATIONS AND WARRANTIES.* The representations and warranties made by the Buyer in this Agreement are in lieu of and are exclusive of all other representations and warranties, including, without limitation, any implied warranties. The Buyer hereby disclaims any such other or implied representations or warranties, notwithstanding the delivery or disclosure to the Seller or its officers, directors, employees, agents or representatives of any documentation or other information (including any supplemental data not included in this Agreement).

ARTICLE 5
COVENANTS OF THE SELLER

The Seller agrees that:

SECTION 5.01. *MAINTENANCE OF THE PURCHASED ASSETS.* Except as expressly contemplated by this Agreement or with the prior written consent of the Buyer, the Seller covenants and agrees that, between the date hereof and the Closing Date, the Seller shall operate its business in the ordinary course in a manner consistent with past practice, but subject to the Seller's compliance with the Budget, and shall confer with the Buyer and its representatives, as reasonably requested, to report on operational matters and the general status of ongoing operations. Notwithstanding the generality of the foregoing, the Seller shall, between the date hereof and the Closing Date, except as expressly required by this Agreement or with the prior written consent of the Buyer, not to be unreasonably withheld or delayed:

(a)     conduct its business in compliance with all applicable Laws (except

for those Laws whose effect is waived or suspended by the application of the Bankruptcy Code);

(b)     use commercially reasonable efforts to preserve the relationships with the current customers, distributors, suppliers, vendors, landlords and others having business dealings with the Seller;

(c)     preserve and maintain the assets, properties and facilities of the Seller, the Seller's Subsidiaries and the Business, including the Purchased Assets, in their current working order, condition and repair as of the date hereof, ordinary wear and tear excepted;

(d)     (i) perform all obligations required to be performed by the Seller under its Contracts; and (ii) not enter into any Contract, or any amendment, waiver, or other modification of any Contract;

(e)     maintain all Permits and insurance policies in full force and effect through the close of business on the Closing Date;

(f)     not:  (i) sell, lease, license, assign, reject, terminate, or otherwise dispose of any Purchased Asset or agree or commit to do the foregoing; (ii) acquire any asset that would constitute a Purchased Asset; or (iii) incur any liability or obligation that would constitute an Assumed Liability;

(g)     not:  (i) institute or settle any Proceeding; (ii) waive any material right; or (iii) forgive, cancel or defer payment of any amount owed to the Seller, whether indebtedness for borrowed money, trade receivables, or otherwise; and

(h)     not take any action that would reasonably be expected to cause the failure of any of the conditions contained in Section 8.01 or 8.02.

SECTION 5.02.     *NOTICES.*  Between the date hereof and the Closing, the Seller shall give prompt written notice to the Buyer of (a) the Seller's receipt of any notice or other communication from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by this Agreement or the Other Agreements; (b) the Seller's receipt of any notice or other communication from any Governmental Entity in connection with the transactions contemplated by this Agreement or the Other Agreements; (c) any Proceedings commenced, or, to the knowledge of the Seller, threatened, relating to or involving or otherwise affecting the Seller or the transactions contemplated by this Agreement or the Other Agreements; and (d) any breach by the Seller of any of its representations, warranties, covenants, or agreements contained in this Agreement or the Other Agreements.

SECTION 5.03.     *COMPLETION OF WORK.*  The Seller shall use commercially reasonable efforts to complete the work described on Schedule 5.03 with respect to the Equipment described on such schedule on or before [_____], 2010.

SECTION 5.04.    *NAME CHANGE.*  Following the Closing, if directed by the Buyer, the Seller shall promptly change its corporate name to a name that does not use any of the Intellectual Property purchased pursuant to Section 2.01(h) hereof.

SECTION 5.05.    *FULL ACCESS.*  The Seller shall permit representatives of the Buyer to have full access at all reasonable times, to all premises, assets, properties, personnel, accountants, customers, suppliers, vendors, landlords, third-party lenders, books, records, Contracts, accounting statements and documents of the Seller and the Seller's Subsidiaries.  The Seller shall also permit financial, environmental, physical property and other audits and inspections to be conducted as are reasonably deemed desirable by the Buyer; provided, that any reasonable out of pocket costs incurred by the Seller as a result of such audits and inspections shall be the sole responsibility of the Buyer.

SECTION 5.06.    *CONFIDENTIALITY.*  From and after the Closing, the Seller shall treat and hold as confidential all Confidential Information, refrain from using any Confidential Information except in connection with this Agreement or to pursue the Chapter 11 Case, and deliver promptly to the Buyer or destroy, at the request and option of the Buyer, all tangible embodiments (and all copies) of Confidential Information with respect to the Purchased Assets, the Assumed Liabilities and the Business in the Seller's possession.  In the event that the Seller is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, the Seller shall notify the Buyer promptly of the request or requirement so that the Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 5.06.  If, in the absence of a protective order or the receipt of a waiver hereunder, the Seller is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, the Seller may disclose such Confidential Information to, and as required to be disclosed by, the tribunal; provided, however, that the Seller shall use reasonable efforts to obtain, at the request and sole expense of the Buyer, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed.  The foregoing provisions shall not apply to any Confidential Information which is generally available to the public immediately prior to the time of disclosure.

ARTICLE 6
COVENANTS OF THE BUYER AND THE SELLER

The Buyer and the Seller agree that:

SECTION 6.01.    *FURTHER ASSURANCES.*  Subject to the terms and conditions of this Agreement, the Buyer and the Seller will use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws to consummate the transactions contemplated by this Agreement.  The Buyer and the Seller agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement and to vest in the Buyer (or its designated subsidiaries) good title to the Purchased Assets.

18

SECTION 6.02.    *CERTAIN FILINGS.*  The Seller and the Buyer shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Entity is required, or any actions, consents, approvals or waivers are required to be obtained from Persons to any material Contracts, in connection with the consummation of the transactions contemplated by this Agreement and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

SECTION 6.03.    *PUBLIC ANNOUNCEMENTS.*  Except as required by applicable Law, the rules of any applicable stock exchange, or orders of the Bankruptcy Court, neither the Buyer nor the Seller shall, nor shall they permit any of their respective Affiliates to, make any public announcement in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other party hereto (which consent shall not be unreasonably withheld or delayed).

SECTION 6.04.    *PAYMENT OF CURE AMOUNTS; ASSUMED CONTRACTS; ADEQUATE ASSURANCES REGARDING ASSUMED CONTRACTS.*

(a)    Payment of Cure Amounts.  The Buyer shall be responsible for the payment of any and all Cure Amounts related to the Assumed Contracts as of the Closing. Notwithstanding anything herein to the contrary, the Buyer's obligation to pay Cure Amounts shall be limited to an aggregate amount of $[_____].  If the aggregate of the Cure Amounts exceeds $[_____], then the Buyer may, at its sole option, instruct the Seller to move the Bankruptcy Court to reject such contract(s) as the Buyer shall designate, or any combination of contracts that would otherwise be Assumed Contracts, which brings the aggregate of the Cure Amounts above $[_____].

(b)    Assumed Contracts.  Notwithstanding any contrary provision contained in this Agreement, the Buyer shall notify the Seller in writing of each of the Contracts that the Buyer intends to have included as Assumed Contracts on Schedule 2.01(c) prior to the Closing, and Schedule 2.01(c) shall be modified by the parties to reflect only those Assumed Contracts so identified by the Buyer.  Any Contract previously included on Schedule 2.01(c) but not identified in such notice from the Buyer shall:  (i) not constitute an Assumed Contract hereunder; (ii) not be assumed by the Buyer hereunder for any purpose; (iii) be added to and included on Schedule 2.02(d); and (iv) remain the Seller's liability and obligation (and the Seller shall retain the right to reject any or all of such Contract).  For the avoidance of doubt, the Cosco Contract and the Yantai Contract shall at all times be Assumed Contracts under this Agreement.

(c)    Adequate Assurances Regarding Assumed Contracts.  With respect to each Assumed Contract, to the extent requested by the Seller, the Buyer shall reasonably cooperate with the Seller to provide adequate assurance of future performance by the Buyer of such Assumed Contract in accordance with sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code.

SECTION 6.05.    *BANKRUPTCY COURT APPROVAL.*

(a)     The Seller shall file with and seek entry by the Bankruptcy Court of an order in the form attached as <u>Exhibit A</u> hereto approving this Agreement, which order shall be entered by the Bankruptcy Court in the form attached as <u>Exhibit A</u> hereto without material modification unless the Buyer consents to such modification (the "**Sale Order**").

(b)     The Seller and the Buyer shall each use their reasonable best efforts, and shall cooperate, assist and consult with each other, to secure the entry of the Sale Order.  The Seller and the Buyer shall consult with one another regarding pleadings which any of them intend to file, or positions any of them intend to take, with the Bankruptcy Court in connection with, or which might reasonably affect, the Bankruptcy Court's entry of the Sale Order.  The Seller shall provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court pertaining to any other transaction contemplated by this Agreement.

(c)     If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such order), the Seller and the Buyer will cooperate in taking such steps diligently to defend such appeal, petition or motion; and the Seller and the Buyer shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

ARTICLE 7
Certain Tax Matters

SECTION 7.01.     *Certain Tax Matters.*

(a)     To the extent not exempt under Section 1146(c) of the Bankruptcy Code in connection with the Chapter 11 Case, all excise, sales, use, value added, registration stamp, recording, documentary, conveyancing, franchise, property, transfer, gains and similar Taxes, levies, charges and fees (collectively, "**Transfer Taxes**") incurred in connection with the transactions contemplated by this Agreement shall be borne by the Buyer.  The Buyer and the Seller shall cooperate to:  (a) determine the amount of Transfer Taxes payable in connection with the transactions contemplated under this Agreement; (b) provide all requisite exemption certificates and other similar documentation; and (c) prepare and file any and all required Tax Returns for or with respect to such Transfer Taxes with any and all appropriate taxing authorities.

(b)     From and after the Closing Date, the Buyer shall provide reasonable access to the Seller (after reasonable notice and during normal business hours and at the Seller's expense) to the Books and Records and any other documents and other information relating to the Purchased Assets or the Assumed Liabilities possessed by the Buyer, as the Seller may reasonably deem necessary to:  (i) properly prepare for, file, prove, answer, prosecute and/or defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer; (ii) administer or complete the Chapter 11 Case; or (iii) otherwise to comply with applicable Law.

(c)     The Buyer and the Seller shall cooperate with each other and provide each

other with such assistance as reasonably may be requested by either of them in connection with the preparation and filing of any Tax Return or any audit or other examination by any taxing authority, or any judicial or administrative proceedings relating to any liability for Taxes under this Agreement. Nothing in this Section 7.01 or any other provision of this Agreement shall require the Buyer to be liable for any of the income tax liability of the Seller or require the Seller to be liable for any of the income tax liability of the Buyer.

## ARTICLE 8
### CONDITIONS TO CLOSING

SECTION 8.01.     *CONDITIONS TO OBLIGATIONS OF THE BUYER AND THE SELLER.*  The obligations of the Buyer, on the one hand, and the Seller, on the other hand, to consummate the Closing are subject to the satisfaction of the following conditions:

(a)     No Injunctions.  No Governmental Entity shall have issued an Order, and there shall be no Proceeding pending before a Governmental Entity, restraining, enjoining or otherwise prohibiting consummation of the transactions contemplated hereby (or seeking to restrain, enjoin or otherwise prohibit consummation of the transactions contemplated hereby). No Governmental Entity shall have promulgated, entered or issued, or determined to be applicable to this Agreement, any Law making the consummation of the transactions contemplated hereby illegal, and no Proceeding with respect to the application of any such Law shall be pending.

(b)     Bankruptcy Court.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be unstayed and unmodified and shall be in full force and effect.

SECTION 8.02.     *CONDITIONS TO OBLIGATION OF THE BUYER.*  In addition to the conditions set forth in Section 8.01, the obligations of the Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment at or prior to the Closing Date of each of the following conditions (any or all of which may be waived in whole or in part by Buyer).

(a)     Representations and Warranties.  Each representation and warranty of the Seller contained herein shall have been true and correct in all respects as of the date hereof and as of the Closing Date, as if made on the Closing Date (unless, in each case, such representations and warranties are expressly made as of a different date, in which case such representations and warranties shall have been true and correct in all respects as of such other date), except to the extent that the failure of such representations and warranties to be true and correct shall not either, individually or in the aggregate, constitute a Material Adverse Effect. For purposes of determining compliance with this Section 8.02(a), all references to the words "material," "Material Adverse Effect" or words of similar import in such representations and warranties shall be disregarded.

(b)     Performance.  The Seller shall have performed and complied, in all material respects, with all agreements, obligations and covenants required by this Agreement to be so performed and complied with by the Seller at or prior to the Closing.

A/73290461.7

(c)     Closing Documents.  On the Closing Date, the Seller shall have executed and delivered to the Buyer, in form and substance reasonably acceptable to the Buyer, each of the documents listed in Section 2.06(d) hereof.

(d)     Material Adverse Effect.  At the Closing Date, since the date hereof, no event or events shall have occurred, nor shall any condition or conditions exist, that, individually or in the aggregate, have had or would be reasonably likely to result in a Material Adverse Effect.

(e)     [Cosco Contract; Yantai Contract.

(i)     Cosco Contract.  Cosco shall have consented to the assignment and/or novation of the Cosco Contract to the Buyer (in form and substance reasonably acceptable to the Buyer), and such consent shall not have been modified or withdrawn, and shall remain in full force and effect as of the Closing.

(ii)    Yantai Contract.  Yantai shall have consented to the assignment and/or novation of the Yantai Contract to the Buyer (in form and substance reasonably acceptable to the Buyer), and such consent shall not have been modified or withdrawn, and shall remain in full force and effect as of the Closing.]

(f)     [Closing of Thailand Office.  Actions shall have been taken to commence closing the Thailand office of the Business and all obligations of the Seller and the Seller's Subsidiaries with respect to that office shall have been satisfied in full or shall be subject to discharge in the Chapter 11 Case or shall otherwise been satisfactorily provided for.]

SECTION 8.03.       *CONDITIONS TO OBLIGATION OF THE SELLER.*  In addition to the conditions set forth in Section 8.01, the obligation of the Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment at or prior to the Closing of each of the following conditions (any or all of which may be waived in whole or in part by the Seller):

(a)     Representations and Warranties. Each representation and warranty of the Buyer contained herein shall have been true and correct in all respects as of the date hereof and as of the Closing Date, as if made on the Closing Date (unless, in each case, such representations and warranties are expressly made as of a different date, in which case such representations and warranties shall have been true and correct in all respects as of such other date), except to the extent that the failure of such representations and warranties to be true and correct shall not, either individually or in the aggregate, constitute a material adverse effect of the Buyer.  For purposes of determining compliance with this Section 8.03(a), all references to the words "material" or words of similar import in such representations and warranties shall be disregarded.

(b)     Performance.  The Buyer shall have performed and complied, in all material respects, with all agreements, obligations and covenants required by this Agreement to be so performed or complied with by the Buyer at or prior to the Closing Date.

(c)     Closing Documents. On or prior to the Closing Date, the Buyer shall have delivered to the Seller, in form and substance reasonably acceptable to the Seller, each of the documents listed in Section 2.06(c) hereof.

## ARTICLE 9
### SURVIVAL

SECTION 9.01.     *SURVIVAL.*  The representations and warranties of the Buyer and the Seller contained in this Agreement and the covenants and agreements of the Buyer and the Seller contained in this Agreement that, by their terms, are to be performed prior to the Closing, shall not survive the Closing and the consummation of the transactions contemplated by this Agreement.  All other covenants and agreements shall survive the Closing and the consummation of the transactions contemplated by this Agreement; provided, that the covenants and agreements contained in Article 7 shall survive until expiration of the statute of limitations applicable to the matters covered thereby (giving effect to any waiver, mitigation or extension thereof).

## ARTICLE 10
### TERMINATION

SECTION 10.01.     *TERMINATION.*  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date as follows:

(a)     by mutual written agreement of the Seller and the Buyer;

(b)     by Buyer upon a breach of any representation, warranty, covenant or agreement of the Seller set forth in this Agreement such that the conditions set forth in Section 8.02 would be incapable of being satisfied; provided, however, that the right to terminate this Agreement pursuant to this Section 10.01(b) for breaches of covenants or agreements shall only be available to the Buyer after the Seller has received written notice of such breach and a reasonable opportunity (of not more than 15 days) to cure;

(c)     by the Seller upon a breach of any representation, warranty, covenant or agreement of the Buyer set forth in this Agreement such that the conditions set forth in Section 8.03 would be incapable of being satisfied; provided, however, that the right to terminate this Agreement pursuant to this Section 10.01(c) for breaches of covenants or agreements shall only be available to the Seller after the Buyer has received written notice of such breach and a reasonable opportunity (of not more than 15 days) to cure;

(d)     by the Buyer or the Seller, if there shall be any Order, binding on the Buyer or the Seller, which prevents or permanently prohibits or restrains the Buyer and/or the Seller from consummating the transactions contemplated hereby and such Order is or shall become final and non-appealable;

(e)        by the Buyer, if the Sale Order shall have been stayed, vacated, modified, or supplemented without the Buyer's prior written consent;

(f)        by the Buyer or the Seller, if the Seller complies with the orders of the Bankruptcy Court in the Chapter 11 Case approving "Debtor's Motion for the Entry of Orders (a) Authorizing the Debtor to Sell Substantially All of its Assets to an Assignee of Norsk Tillitsmann ASA Subject to Higher and Better Offers, (b) Approving Bidding Procedures, (c) Scheduling Auction and Sale Hearing, and (d) For Related Relief" (the "**Bidding Procedures**") and accepts a Qualifying Bid (as defined in the Bidding Procedures) from a Person other than the Buyer;

(g)        by the Buyer, if for any reason, other than the Buyer's failure to comply with its representations, covenants and agreements contained in this Agreement in a manner that would entitle the Seller to terminate this Agreement under Section 10.01(c), the Closing has not occurred prior to the date that is [75] calendar days after the Petition Date; or

(h)        by the Buyer, if there shall have occurred following the date of this Agreement a change, effect, event, occurrence, development, circumstance or state of facts, that has had or would reasonably be expected to have or result in a Material Adverse Effect.

SECTION 10.02.        *EFFECT OF TERMINATION.*

(a)        In the event of the termination of this Agreement, written notice thereof shall forthwith be given by the party so terminating to the other party, and this Agreement shall terminate, and the transactions contemplated hereby shall be abandoned, without further action by the Seller or the Buyer, except that the provisions of this Section 10.02(a) and Sections 10.02(b) (to the extent the provisions of Section 10.02(b) are approved by the Bankruptcy Court), 6.03, 10.03, 11.01, 11.02, 11.03, 11.04, 11.05, 11.06, 11.07, 11.08, 11.10 and 11.11 hereof shall survive any termination of this Agreement and nothing contained in this Agreement shall relieve any party hereto from liability for any breach or inaccuracy of its representations, warranties, covenants or agreements contained in this Agreement prior to such termination. Notwithstanding anything to the contrary set forth in this Agreement, except in the event of fraud, (x) the Seller's aggregate liability for money damages in the event of the termination of this Agreement shall not exceed an amount equal to the Expense Reimbursement and (y) the Buyer's aggregate liability for money damages in the event of the termination of this Agreement shall not exceed an amount equal to the Seller's reasonable and documented out-of-pocket costs and expenses (including legal, accounting, and other consultant fees and expenses) incurred in connection with the transactions contemplated by this Agreement, up to a maximum amount of $400,000.

(b)        If this Agreement is terminated for any reason other than pursuant to Sections 10.01(a), 10.01(c) or 10.01(d), the Seller shall reimburse the Buyer for all of its reasonable and documented out-of-pocket costs and expenses (including legal, accounting, and other consultant fees and expenses) incurred in connection with the transactions contemplated by this Agreement, up to a maximum amount of $400,000 (the "**Expense Reimbursement**"). The Expense Reimbursement, to the extent payable, shall be paid by the Seller to the Buyer

immediately upon the termination of this Agreement by wire transfer of immediately available funds to an account designated by the Buyer to the Seller.

SECTION 10.03. *EXPENSES.* Except as otherwise set forth in this Agreement, and except as may otherwise be agreed to in writing by the Seller and the Buyer, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.

ARTICLE 11
MISCELLANEOUS

SECTION 11.01. *NOTICES.* All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to the Buyer, to:

[Name]
[Address]
[Address]
Attention:
Phone:
Fax:
Email:

with a copy to:

Norsk Tillitsmann ASA
Postboks 1470 Vika
0116 Oslo
Norway
Attention:  Ola Nygård
Phone:  +47 22 87 94 06
Fax:  +47 22 87 94 10
Email:  ola@trustee.no

and

Bingham McCutchen (London) LLP
41 Lothbury
London EC2R  7HF
Attention:  James Terry
Phone:  +44.20.7661.5310
Fax:  +44.20.7661.5400
Email:  james.terry@bingham.com

with a further copy to:

25

Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022
Attention: Steven Wilamowsky
Phone: (212) 705-7960
Fax: (212) 702-3607
Email: steven.wilamowsky@bingham.com

if to the Seller, to:

Remedial (Cyprus) Public Company Limited
Arch. Makarios III Avenue
Fortuna Court Block B
3105 Limassol, Cyprus
Attention:
Phone:
Fax:

with a copy to:

Chrysses Semetriades & Co LLC
284 Arch. Makarios III Avenue,
Fortuna Court, Block B, 2nd floor,
3105 Limassol, Cyprus
P.O. Box 50132,
3601 Limassol, Cyrus
Attention: Agis Agapiou
Phone: +357.25.800.000
Fax: +357.2558.7191
Email:

with a further copy to:

Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068
Attention: Scott Cargill
Phone: 973-422-6508
Fax: 973-422-6509
Email: scargill@lowenstein.com

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

SECTION 11.02.     *AMENDMENTS AND WAIVERS.*

(a)     Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)     No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 11.03.     *SUCCESSORS AND ASSIGNS.*  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; underlined(provided) that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto, underlined(provided), underlined(however), that the Buyer may assign, without the consent of the other parties hereto, all or part of its interest in this Agreement  and the Other Agreements and all or part its rights hereunder and thereunder to any of its Affiliates.  In the case of any such assignment to an Affiliate, the term "Buyer" shall include, following such assignment, any such Affiliate to the extent of such assignment.

SECTION 11.04.     *GOVERNING LAW.*  This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such state.

SECTION 11.05.     *JURISDICTION.*  Except as otherwise expressly provided in this Agreement, the parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court, and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum.  Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 11.01 shall be deemed effective service of process on such party.

SECTION 11.06.     *WAIVER OF JURY TRIAL.* EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 11.07.    *COUNTERPARTS; THIRD PARTY BENEFICIARIES.*  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.  No provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

SECTION 11.08.    *ENTIRE AGREEMENT.*  This Agreement, the Other Agreements and the schedules and exhibits hereto and thereto constitutes the entire agreement between the parties with respect to their subject matter.  This Agreement supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter hereof.

SECTION 11.09.    *BULK SALES LAWS.*  The Buyer hereby waives compliance by the Seller, and the Seller hereby waives compliance by the Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state.

SECTION 11.10.    *SEVERABILITY.*  Should any provision of this Agreement for any reason be declared invalid or unenforceable by a court of competent jurisdiction, such decision shall not affect the validity or enforceability of any of the other provisions of this Agreement, which other provisions shall remain in full force and effect and be enforced to the fullest extent permitted by Law.

SECTION 11.11.    *CAPTIONS, HEADINGS, INTERPRETATION.*  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disbarring any party by virtue of authorship of any provisions of this Agreement.

**[Remainder of page intentionally left blank]**

A/73290461.7

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be duly executed by their respective authorized officers as of the date first written above.

REMEDIAL (CYPRUS) PUBLIC COMPANY LIMITED


By:_____
　　Name:
　　Title:



[NEWCO]


By:_____
　　Name:
　　Title:

## Exhibit A

## Form of Sale Order